# 24-1653

## United States Court of Appeals
### for the Second Circuit

IN RE: PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST LITIGATION

On Appeal from the United States District Court
for the Southern District of New York

## OPENING BRIEF FOR APPELLANTS

## & SPECIAL APPENDIX

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Mark C. Rifkin
Thomas H. Burt
270 Madison Ave.
9th Floor
New York, NY 10016
(212) 545-4600
rifkin@whafh.com
burt@whafh.com

*Attorneys for Plaintiffs-Appellants*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF CITATIONS ........................................................................ iii

PRELIMINARY STATEMENT ............................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 8

ISSUES PRESENTED FOR REVIEW ................................................... 8

STATEMENT OF THE CASE ............................................................... 9

SUMMARY OF ARGUMENT ............................................................ 16

ARGUMENT ..................................................................................... 18

I.     THE DISTRICT COURT ERRED BY HOLDING THE SQUARE
SELLERS ARE IN THE SETTLEMENT CLASS BECAUSE THEY
PHYSICALLY TOOK CREDIT CARDS, EVEN THOUGH THEY ARE
NEITHER DIRECT PURCHASERS NOR PAYORS ................................ 18

     A.     The District Court Improperly Determined Class Membership
Contrary to Direct Purchaser Standing ................................. 18

     B.     The Square Sellers Did Not Directly Pay the Challenged Interchange
Fees to Visa and Mastercard, Square Did ............................. 21

     C.     Square, Not the Square Sellers, Contracts Directly with Defendants
Visa and Mastercard and Buys Card Processing Services Directly
from Visa and Mastercard .................................................... 26

     D.     Square Is the Direct Purchaser of Credit and Debit Card Transaction
Services from Visa and Mastercard Under Longstanding Supreme
Court Precedent .................................................................. 27

     E.     As Between Square and the Square Sellers, Square is the More Direct
Payor of the Interchange Fees and Defendants Never Argued
Otherwise ........................................................................... 34

     F.     The District Court's Decision is Internally Inconsistent .......... 35

     G.     Belated Inclusion of the Square Sellers in the Settlement Class Creates
An Irreconcilable Conflict Between Class Members ............... 36

i

II.    ALTERNATIVELY, THE SQUARE SELLERS WERE ENTITLED TO NOTICE OF THE PROPOSED SETTLEMENT AND THE RIGHT TO REQUEST EXCLUSION FROM THE SETTLEMENT CLASS OR OBJECT TO THE PROPOSED SETTLEMENT .........................................43

    A.    Due Process Requirements for Notice .................................................43

    B.    The Square Sellers Did Not Receive Notice ......................................45

    C.    Publication Notice Does Not Substitute for Direct Notice .................48

    D.    The Notice Would Have Been Inadequately Vague and Ambiguous.50

CONCLUSION .........................................................................................................53

# TABLE OF CITATIONS

## CASES

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019) ..............................................................29, 32, 33

*California v. ARC America Corp.*,
  490 U.S. 93 (1989) ........................................................................32

*Charron v. Wiener*,
  731 F.3d 241 (2d Cir. 2013) ..........................................................16

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ................................................................6, 44, 49

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
  62 F.4th 704 (2d Cir. 2023) ................................................... *passim*

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
  617 F.2d 478 (7th Cir. 1980) ........................................................30

*In re Franklin Nat. Bank Sec. Litig.*,
  574 F.2d 662 (2d Cir.), *on reh'g*, 599 F.2d 1109 (2d Cir. 1978) ........................49

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
  392 U.S. 481 (1968) ................................................................*passim*

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ................................................................*passim*

*Intuit, Inc. v. Visa Inc.*,
  No. 21-CV-1175, order (E.D.N.Y. Mar. 5, 2021) ..................................12

*Laumann v. Nat'l Hockey League*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012) ............................................30

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
  No. 11 MD 2262(NRB), 2011 WL 5007957 (S.D.N.Y. Oct. 18, 2011) ................40

*In re Literary Works in Electronic Databases Copyright Litigation*,
654 F.3d 242 (2d Cir. 2011).............................................................36, 38, 39, 42

*Lowell v. Am. Cyanamid Co.*,
177 F.3d 1228 (11th Cir. 1999) .............................................................30

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990)........................................................................*passim*

*Kashi v. Gratsos*,
790 F.2d 1050 (2d Cir. 1986)..................................................................31

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ...................................................................30

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) .................................................................30

*Olean Wholesale Grocery Coop., Inc., v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ...................................................................40

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)..............................................................38, 39, 42

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
281 F.3d 629 (7th Cir. 2002) ...................................................................30

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 1:05-MD-1720, 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008).........................10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 1:05-MD-1720, 2012 WL 12929536 (E.D.N.Y. Nov. 27, 2012) .................10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013) ......................................................10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 1:05-MD-1720, 2016 WL 8138988 (E.D.N.Y. Nov. 30, 2016) ............. 10-11

iv

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016)...................................................................*passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-md-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) .................*passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-MD-1720 (MKB), 2024 WL 278565 (E.D.N.Y. Jan. 25, 2024) .............31

*In Re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
No. 1:05-md-01720-MKB-JAM,
ECF No. 9308 (E.D.N.Y. May 28, 2024) ......................................................*passim*

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)........................................................................................6, 44

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
No. CV-04-2195 (CPS), 2006 WL 941765 (E.D.N.Y. Apr. 12, 2006) ...............44

*State of Ariz. v. Shamrock Foods Co.*,
729 F.2d 1208 (9th Cir. 1984) ............................................................................30

*In re Stock Exchanges Options Trading Antitrust Litig.*,
99 Civ. 096 (RCC), 2006 WL 3498590 (S.D.N.Y. Dec. 4, 2006)........................44

*United States v. Smith*,
513 F. App'x 43 (2d Cir. 2013) ...........................................................................31

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012)...........................................................................40

## STATUTES & RULES

Federal Rules of Civil Procedure
   Rule 23(b)(3)...........................................................................................*passim*
   Rule 23(c)(2)................................................................................................49
   Rule 23(c)(2)(B).........................................................................................*passim*
   Rule 23(c)(2)(B)(ii).........................................................................................50

v

28 U.S.C. § 1291 .......................................................................8

28 U.S.C. § 1332(a)(1) ............................................................8

Class Action Fairness Act
  28 U.S.C. § 1332(d)............................................................8

Clayton Act, 15 U.S.C. §§ 12-27 .........................................12

Sherman Act, 15 U.S.C. §§ 1 *et seq.* ...........................................*passim*

## OTHER AUTHORITIES

A. Conte & H. Newberg, *Newberg on Class Actions* § 8.2 (4th ed. 2002).............44

## SPECIAL APPENDIX

Memorandum and Order Appealed From, Hon. Margo K. Brodie, U.S.D.J.
(May 28, 2024 .............................................................................SpA.1


Rule 23. Class Actions _ Federal Rules of Civil Procedure......................SpA.32


28 U.S.C. § 1332 - U.S. Code Title 28. Judiciary and Judicial Procedure
§ 1332 .......................................................................................SpA.77

## **PRELIMINARY STATEMENT**

This is the third appeal from the District Court's approval of a proposed settlement of the direct purchaser class action against Visa U.S.A., Inc. ("Visa") and Mastercard International Inc. ("Mastercard"), and their acquiring banks challenging the interchange fees paid on credit and debit card transactions. Appellants are customers of Block, Inc. f/k/a Square ("Square"), known as "Square Sellers." The Square Sellers are *indirect* purchasers of payment processing services, and pay interchange fees only indirectly. They pay no interchange fees directly to any Defendant and they purchase no card transaction services directly from any Defendant. The Square Sellers seek reversal of the District Court's erroneous decision including them in the *direct* purchaser settlement class.

As this Court held in *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023), due to the direct purchaser standing requirement of the Sherman Act, the settlement class must include *only* the direct payors of the challenged interchange fees. *Id.* at 716 ("the *only* entities that could fall within the class definition were those deemed to be *direct* payors of the challenged fees") (emphasis added). In the District Court, "Defendants agree[d]" that the Square Sellers "*are indirect purchasers*." 1/8/24 Brief at 21 (emphasis added). Following this Court's decision in *Fikes*, Defendants' admission dooms the District Court's Order and forecloses Defendants from arguing otherwise now. The District Court's decision

that the Square Sellers, who buy no card transaction services directly from any Defendant and pay no interchange fees directly to any Defendant, are members of the direct purchaser Settlement Class runs afoul of both *Fikes* and more than a half-century of Supreme Court precedent.

By focusing on the simplistic—and legally insignificant—physical act of touching a payment card instead of the meaningful—and legally determinative—fact of paying the challenged interchange fee to determine class membership, the District Court's decision reintroduces the very same ambiguity in the direct purchaser Settlement Class definition that this Court carefully and scrupulously eliminated in *Fikes*. In addition, by forcing *indirect* purchasers into the Settlement Class, the District Court's decision created irreconcilable intra-class conflicts of interest between the direct purchasers and the indirect purchasers. And by doing so without requiring adequate notice of the settlement to the indirect purchasers, the District Court's decision creates substantive due process issues that would invalidate the settlement.

The District Court's manifestly erroneous decision should be reversed. The least disruptive remedy is to reverse the District Court's erroneous inclusion of Square Sellers in the direct purchaser class and preserve the $6 billion settlement. The alternative is to scuttle a massive settlement that the District Court refused to stay pending this appeal.

In 2005, direct purchasers of credit and debit card services from Visa and Mastercard brought an antitrust class action under the federal Sherman Act challenging the interchange fees charged to them by both card networks for payment card processing services. That direct purchaser class action was settled in 2019 on behalf of entities that "accepted" Visa and Mastercard payment cards,[1] and the settlement was approved by this Court on March 15, 2023. *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023). In affirming the District Court's approval of the direct purchaser settlement, this Court held that a settlement class definition based on who "accepted" Visa and/or Mastercard payment cards "lends itself to ambiguity," but that ambiguity was avoided "using objective criteria" by reference to the underlying settled Sherman Act claim. *Id*. at 716. More specifically, the Court held that "***only*** . . . direct payors of the challenged fees" could fall within the Rule 23(b)(3) settlement class definition. *Id*. (emphasis added).

The Square Sellers commenced their ***indirect*** purchaser class action in 2021 under various state antitrust and consumer laws. All parties ***agree*** that the Square Sellers are ***not*** direct payors of the challenged fees. The Square Sellers purchase a

---

[1] The direct purchaser plaintiffs previously attempted to settle the case, but this Court reversed the District Court's approval of that settlement on the basis that class counsel's simultaneous representation of two classes was inadequate and violated due process in that overbroad proposed settlement. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 234 (2d Cir. 2016).

3

bundle of products and services, including card transaction hardware, support software, and the ability to process card payments, from *Square*. Upstream from them, Square purchases the card transaction services directly from Visa and Mastercard. Square is the official "Merchant of Record" on each payment card transaction initiated by the Square Sellers' customers, assumes all liability for the transactions it facilities, and has complete control over which transactions to accept or reject.

Most importantly, Square pays all the interchange fees associated with transactions facilitated for the Square Sellers directly to Visa, Mastercard, and their participating banks on all those transactions. ██████████████████ ██████████████ and the Square Sellers do not control or pay those rates. The service fees the Square Sellers pay to Square are distinct from the interchange fees, which the record unequivocally establishes Square alone pays directly to Visa and Mastercard.

Because the Square Sellers are not direct purchasers of payment card processing services but are *indirect* purchasers of those services from Square, and because Square Sellers paid none of the challenged interchange fees directly to Visa or Mastercard, they have no standing to assert federal antitrust damages claims. Instead, they assert only *indirect* purchaser claims under the antitrust repealer statutes and consumer laws of 25 states and the District of Columbia that permit

4

downstream purchasers to recover damages for antitrust violations.

Under this Court's decision in *Fikes*, the Square Sellers cannot fall within the definition of the Rule 23(b)(3) Settlement Class, because "the **only** entities that could fall within the class definition [*i.e.*, those that 'accepted' payment cards] were those deemed to be **direct** payors of the challenged fees." 62 F.4th at 716 (emphasis added). The District Court committed a clear error of law by sweeping the Square Sellers into a massive **direct** purchaser federal antitrust settlement alongside many of the nation's largest merchants (including airlines, hotel chains, and retail behemoths), when it held that settlement class membership did not turn on direct purchaser standing, but on some other basis.

The District Court concluded that the Square Sellers are members of the settlement class simply because some of them literally took cards from customers, notwithstanding that the Square Sellers' card transactions were actually "accepted" by a Square device and processed using Square software. On this basis, the District Court found that the Rule 23(b)(3) Settlement released the Square Sellers' claims. In so holding, the District Court did not find the Square Sellers are "direct payors" of interchange fee, or are more direct payors than Square. Nor could it. Visa and Mastercard have conceded that "the merchants that engage Square or Intuit as payment facilitators [*i.e.*, Square Sellers] are indirect purchasers." 1/8/24 Br. at 21. The District Court's ruling therefore directly contradicts this Court's holding that

5

"the word 'accepted' creates ambiguity" and must be resolved "according to the substantive federal law that provides the basis for the [underlying] class action." *Id.* at 715-16; *see also Illinois Brick Co. v. Illinois*, 431 U.S. 720, 727-29 (1977) (direct purchase required for federal antitrust standing). This error must be reversed.

Compounding the District Court's error, the Square Sellers were not given direct notice of the settlement even though their addresses were known or readily could have been obtained. Due process requires direct notice whenever practicable, as well as the opportunity to request exclusion from the class or object to the settlement. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174-75 (1974). As counsel for the Rule 23(b)(3) Settlement Class and their claims administrator recently admitted, the settling parties sent millions of settlement notices to merchants, but they *never* sent settlement notice to the Square Sellers. *See* A.7964, 7970. Even if the Square Sellers happened upon the settlement notice – *e.g.*, in a publication – they had no reason to know from the ambiguous class definition that they were part of the Rule 23(b)(3) Settlement Class. Because they were not given notice of their purported inclusion in the settlement class alongside the nation's largest merchants, they were denied their due process right to request exclusion from the settlement class or object.

When the Square Sellers raised this constitutional issue with the District Court, Visa and Mastercard offered *no response*, except to insist that the publication

notice campaign, which made no effort to target or alert the Square Sellers that they were purported members of the *direct* purchaser settlement class, was somehow sufficient. The District Court simply ignored the notice issue.

The fact that notice was sent to millions of direct-purchaser merchants but not to the Square Sellers was not an oversight. It confirms that the Square Sellers were never included in the Rule 23(b)(3) Settlement Class. Had the Square Sellers always been in the settlement class, notice would have been sent to them – and they would have been given their due process rights to object or to request exclusion – when it was sent to all the "other" class members. Those due process rights have been taken from the Square Sellers.

In addition, the belated attempt to sweep the Square Sellers into the settlement class and send notice to them now merely creates irreconcilable conflicts among the class members. The claims administrator recently admitted in the District Court that Visa and Mastercard lack interchange data for the Square Sellers – because they are not direct purchasers of payment card processing services – from which their claims could be calculated. *See* A-7971 ¶ 3. This stands in stark contrast to the remainder of the class – all of whom are direct merchants – for whom Visa and Mastercard have such data. As a result, there will be disparate treatment between how the claims of the Square Sellers are processed and how all the other settlement class members' claims are processed.

The simplest way for this Court to protect the massive $6 billion settlement is to hold that the District Court misapplied this Court's decision in *Fikes* by sweeping the Square Sellers into the settlement, as no new notice or change in the claims process would follow. If the Court were to hold that the Square Sellers are members of the Rule 23(b)(3) Settlement Class, the failure to give them notice and protect their constitutional due process right to object to the settlement or request exclusion from the class is fatal and dooms the settlement. In that case, due process would require that the settlement be set aside and the District Court's decision be reversed and remanded with instruction to re-notice the class.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction over the action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), and under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the District Court's judgment resolved all claims between the parties.

## ISSUES PRESENTED FOR REVIEW

Were the Square Sellers, who never paid interchange fees directly to Visa or Mastercard, and who never purchased card acceptance services from Visa or Mastercard, nonetheless members of the direct purchaser settlement class, certified

by the District Court and affirmed by this Court?

Alternatively, if they were members of the direct purchaser settlement class, were the Square Sellers, whose identities and contact information were known or knowable by Visa and Mastercard, entitled as a matter of due process to direct notice of their membership in the settlement class and the right to request exclusion from the settlement class or object to the proposed settlement?

## STATEMENT OF THE CASE

This appeal arises from a decision by the United States District Court for the Eastern District of New York denying the Square Sellers' cross-motion for summary judgment and holding that Square Sellers, who never paid the disputed interchange fees directly to Visa or Mastercard (or to anyone else) and who purchased no payment card transaction services directly from Visa or Mastercard, are members of the *direct* purchaser settlement class. *In Re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 1:05-md-01720-MKB-JAM, ECF No. 9308 (E.D.N.Y. May 28, 2024) (A.7522). Visa and Mastercard have never argued that Square's sub-merchant customers (*i.e.*, the Square Sellers) are direct purchasers of card transaction services, let alone that they are more direct purchasers than Square itself.

In October of 2005, several direct purchaser class and individual actions asserting federal antitrust claims against Visa, Mastercard, and their issuing and

acquiring banks were consolidated for pretrial purposes in the Eastern District of New York. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 1:05-MD-1720, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008). In April of 2006, the plaintiffs in the direct purchaser class actions (the "Direct Purchaser Plaintiffs") filed a consolidated amended complaint on behalf of two classes: one seeking damages and the other seeking equitable relief. *Id.* at *1-2. In November of 2012, the District Court provisionally certified two settlement-only classes and preliminarily approved a proposed settlement between the Direct Purchaser Plaintiffs and the defendants. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 1:05-MD-1720, 2012 WL 12929536, at *1-2 (E.D.N.Y. Nov. 27, 2012). In 2013, the District Court approved the settlement. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 241 (E.D.N.Y. 2013).

However, in 2016, this Court vacated certification of the classes and reversed approval of the class action settlement because the Direct Purchaser Plaintiffs' counsel's simultaneous representation of both direct purchaser classes was improper. *In re Payment Card Antitrust Litig.*, 827 F.3d at 241.

On remand, the District Court appointed separate counsel for the two classes, one seeking only equitable relief pursuant to Rule 23(b)(2) and the other seeking only damages pursuant to Rule 23(b)(3). *In re Payment Card Interchange Fee &*

*Merch. Disc. Antitrust Litig.*, No. 1:05-MD-1720, 2016 WL 8138988, at *1 (E.D.N.Y. Nov. 30, 2016). In December of 2019, the District Court granted final approval of a new settlement between Visa and Mastercard and the Direct Purchaser Plaintiffs on behalf of the Rule 23(b)(3) Settlement Class. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 1:05-MD-1720, 2019 WL 6875472, at *36 (E.D.N.Y. Dec. 16, 2019). The Rule 23(b)(3) Settlement Class was defined as "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [of January 24, 2010]." Rule 23(b) Settlement Agreement, at ¶ 4 (A.7577).

In March of 2023, this Court affirmed the District Court's decision certifying the Rule 23(b)(3) Settlement Class and approving the settlement. *Fikes*, 62 F.4th at 727. Notably, the Court held that the term "accepted" as used in the Rule 23(b)(3) Settlement Class definition "creates ambiguity." *Id.* at 715. However, any ambiguity from the term was not fatal because the class definition was interpreted "according to the substantive law that provides the basis for the class action" *id.* at 716 (quoting *In re Motorola Sec. Litig.*, 644 F.3d 511, 517 (7th Cir. 2011)), and was therefore "objectively guided by federal antitrust standards." *Id.* Applying those objective criteria, the Court interpreted the scope of the ambiguously-defined Rule 23(b)(3) Settlement Class through the direct purchaser standing requirement under the federal

Sherman Act, and therefore affirmed the District Court's decision resolving that ambiguity, noting approvingly that "the district found that federal antitrust law clarified that the *only* entities that could fall within the class definition were those deemed to be *direct* payors of the challenged fees." *Fikes*, 62 F.4th at 716 (emphasis added) (affirming Final Approval Order dated Dec. 16, 2019 (ECF No. 7821) (cited as No. 05-md-1720, 2019 WL 6875472, at *31)).

Both Square and Intuit Inc. and Intuit Payment Solutions, LLC (collectively, "Intuit")—each of which provide payment facilitator services—timely opted out of the Rule 23(b)(3) Settlement Class. In February of 2021, Intuit filed a complaint in the Northern District of California against Visa and Mastercard asserting direct claims for damages under the Clayton Act. Compl., *Intuit, Inc. v. Visa Inc.*, No. 21-CV-1175 (N.D. Cal. Feb. 19, 2021). In March of 2021, Intuit's action was transferred and consolidated with *In re Payment Card & Merchant Discount Antitrust Litig*. *See* Order Transferring Case dated Mar. 5, 2021, *Intuit*, No. 21-CV-1175 (E.D.N.Y. Mar. 5, 2021). In July of 2023, Square filed its own complaint in the Eastern District of New York against Visa and Mastercard, also asserting direct purchaser claims against Visa and Mastercard under the federal antitrust laws. *See* Compl., *Block, Inc. v. Visa, Inc.*, No. 23-CV-5377 (E.D.N.Y. July 14, 2023). *See In Re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 1:05-MD-1720-MKB-JAM (E.D.N.Y.) (A.1933 (Intuit) & A.4388 (Square)).

12

The Square Sellers[2] commenced this class action in 2021 to recover billions of dollars for themselves and all other individuals and small businesses in 26 states (including the District of Columbia)[3] that use payment card transaction services on the Visa and Mastercard networks provided to them by Square. ███████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████

The Square Sellers are customers of Square. They, and more than one million other individuals and small businesses whom they represent, purchased a bundle of goods and services (including payment card processing equipment and a variety of services) from *Square*, for which they paid contractual service fees directly to *Square*, allowing consumers to make payments using Visa- and Mastercard-branded

---

[2] The Plaintiff-Appellants are Hayley Lanning, Camp Grounds Coffee, LLC, 803 Kava LLC, CryoServices, Inc., d/b/a Andersonville Cryotherapy and Athletic Recovery Center, Dell Fox Jewelry, Maureen Roxberry, SBG Designs, LLC d/b/a Goldfine Jewelry, and Shen Shu Acupuncture, PLLC (collectively, "Appellants" or the "Square Sellers").

[3] The Square Sellers assert their claims under the state laws (including the so-called *Illinois Brick* repealer statutes) of Arizona, California, Connecticut, the District of Columbia, Florida, Hawaii, Iowa, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, North Carolina, North Dakota, Nebraska, New Hampshire, New Mexico, Nevada, New York, Rhode Island, South Dakota, Utah, Vermont, West Virginia, and Wisconsin.

credit and debit cards. Square charges a fee, called a "Transaction Fee," to the Square Sellers in an amount that is set high enough to cover the merchant discount fees and other costs that Square incurs. The only fee the Square Sellers pay is the Transaction Fee, which they pay to **Square**.

The overwhelming majority of the Merchant Discount Fees that Square pays is comprised of the so-called "Interchange Fee"—a fee paid to the card-issuing bank on each credit-card transaction under Visa and Mastercard rules. A.29. The obligation to pay the Interchange Fee is the product of horizontal price-fixing agreements among the card-issuing banks that comprise the Visa and Mastercard networks. A.29-30. The Interchange Fee is purely a toll that the credit-card issuing banks, in a collective exercise of monopoly power, levy on each credit card transaction. A.30. Accordingly, *Square* is the direct purchaser of the card acceptance services—and also the direct payor of the challenged interchange fees—with standing to seek damages for a violation of the Sherman Act.[4]

On January 31, 2024, Visa and Mastercard moved to enforce the Direct Purchaser Settlement against Square and Intuit. A.138. They sought to dismiss Square's own direct-purchaser claim, arguing that the Square Sellers were Rule

---

[4] The Square Sellers ultimately shoulder the burden of the Interchange Fees, but it is undeniable that Square *directly* purchases the payment card services and Square *directly* pays the challenged interchange fees.

23(b)(3) settlement class members and had somehow released any claims Square might have had. Visa and Mastercard have conceded that the Square Sellers are *indirect* purchasers, 1/8/24 Br. at 21, and they never argued that they were somehow more direct payors than Square. Square, Intuit, and the Square Sellers opposed the motion, and both the Square Sellers and Intuit cross-moved for partial summary judgment, seeking rulings that, respectively, Square and Intuit had antitrust standing to bring direct purchaser claims based on the transactions at issue, and (for the Square Seller's motion) a ruling that the Square Sellers – who purchased no payment card transaction services from Visa and Mastercard or their acquiring banks, and paid no interchange fees to Visa, Mastercard or the banks – were never members of the direct purchaser Rule 23(b)(3) Settlement Class.

On May 28, 2024, the District Court granted Visa's and Mastercard's motion to enforce the settlement. Despite this Court's holding in *Fikes*, 62 F.4th at 716, the District Court dispensed with direct purchaser standing in interpreting the term "accepted" in the Rule 23(b) Settlement Class definition, and held that "accepting" a payment card for purposes of the settlement meant physically taking the cards from a customer. A.7552. On that basis, the District Court denied the Square Sellers' cross-motion for summary judgment and denied Intuit's cross-motion for summary judgment, finding that payment facilitator customers, like the Square Sellers, were members of the Rule 23(b)(3) Settlement Class. *Id.*

Because the District Court held that the Square Sellers are members of the Rule 23(b)(3) Settlement Class, they had only until August 30, 2024, to file a claim to receive distributions from the settlement fund or risk getting nothing if this appeal is not successful. *See* Docket Order re ECF No. 9294 (entered on May 14, 2024) (setting claim filing deadline). They had no opportunity to object to the proposed settlement or seek exclusion from the Rule 23(b)(3) Settlement Class, as was their right, because their time to do so ended on July 23, 2019. *See In re Payment Card Litig.*, 2019 WL 6875472, at *5.

On June 12, 2024, the Square Sellers timely filed a Notice of Appeal from the District Court's May 28 Order. A.8122.[5]

## SUMMARY OF ARGUMENT

This Court reviews a district court's factual findings for clear error and its conclusions of law are reviewed *de novo*. *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013).

The District Court erred as a matter of law by holding that the word "accepted"

---

[5] On July 19, 2024, the Square Sellers moved in the District Court to stay administration of the settlement and disbursement of the settlement fund pending a determination of this appeal. *See* No. 05-MD-1720, ECF No. 9358. Their motion was denied on August 8, 2024, when the District Court ordered class counsel for the direct purchaser plaintiffs to "plac[e] funds owed to the [Square] Sellers in a trust account, as suggested by Class Counsel." *See* No. 05-MD-1720, ECF No. 9384, at 10-11. That escrow will not protect the Square Sellers against the risk that their claims will be swallowed up and dwarfed by the claims of direct purchaser merchants as a result of their belated inclusion in the Rule 23(b)(3) Settlement Class.

in the Rule 23(b)(3) Settlement turned on who takes a credit card for payment rather than who is the direct purchaser of the disputed interchange fees under federal antitrust law. This error then resulted in an erroneous holding that the Square Sellers were members of the Rule 23(b)(3) Settlement Class even though they paid no interchange fees directly to Visa, Mastercard, or any issuing or acquiring bank; they acquired no payment card services directly from Visa or Mastercard; and they had no contracts for payment card transaction services with Visa or Mastercard. The record establishes that Square is the only entity that can decide whether to "accept" a payment card when used at a Square Seller, and Square Sellers have no ability to take a card payment that *Square* does not accept. *See*, *e.g*., ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

The District Court also erred as a matter of law by failing to consider whether the Square Sellers, if they were members of the Rule 23(b)(3) Settlement Class, were deprived of their constitutional due process right to notice of the settlement, opportunity to object or to request exclusion from the class or object to the proposed settlement (including the scope of membership). The District Court's decision must be reversed for that additional reason as well.

# ARGUMENT

I. **THE DISTRICT COURT ERRED BY HOLDING THE SQUARE SELLERS ARE IN THE SETTLEMENT CLASS BECAUSE THEY PHYSICALLY TOOK CREDIT CARDS, EVEN THOUGH THEY ARE NEITHER DIRECT PURCHASERS NOR PAYORS**

### A. The District Court Improperly Determined Class Membership Contrary to Direct Purchaser Standing

In concluding that Square Sellers are members of the Rule 23(b)(3) Settlement Class, the District Court ignored this Court's careful construction of the Rule 23(b)(3) Settlement Class definition in *Fikes*, 62 F.4th at 715-16, and instead held that "accepted" meant physically taking cards. Despite this Court's holding, the District Court ignored direct purchaser standing under the Sherman Act.

The District Court posited a "prototypical transaction" in which a "cardholder hands her card to a Seller, who 'accepts' it for payment at the point of sale, just as the Seller could have instead accepted cash from a customer." A.7543. The District Court then quoted a dictionary as authoritative on settlement class membership: "This interpretation of "accept" comports with its plain-English meaning to "take or receive (something offered) willingly." *Id.* (quoting *Accept*, Oxford English Dictionary, https://www.oed.com/dictionary/accept_v (last modified Mar. 2024)). The District Court fundamentally misunderstood the prototypical card transaction at a Square Seller. In the prototypical payment transaction, the customer taps, swipes, or inserts the card into a Square card reader. A.3685; 3689. Indeed, Square asserts that the Square Sellers pay Square a service fee to be relieved of the cumbersome

18

card acceptance interaction. Square Reply Brief, ECF No. 9091, p. 4. Square Sellers often have no contact whatsoever with the payment card itself in physical transactions. The same is true for all online purchases made from a Square Seller. There, a customer interacts directly with a website (often run by Square software) and submits card payment information to *Square*, which accepts the card. From the moment a customer presents a card to the moment a Square Seller receives payment, it is *Square* that actually accepts the card, processes the payment (and pays all associated interchange fees), and disburses funds to the Seller.

If the word "accepts," as it was used in the settlement agreement, could be understood as applying to a "prototypical transaction" under its "plain-English meaning," this Court would not have held that it made the Rule 23(b)(3) Settlement Class definition ambiguous. *Cf. Fikes*, 62 F.4th at 716. Defining "accepts" literally, as the District Court has, would mean that class counsel represented both direct purchasers and indirect purchasers in the same settlement, notwithstanding that the settling parties repeatedly said that only direct purchasers, and not indirect purchasers, were included in the settlement class. *See* Brief of Defendants-Appellees at 24, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 20-339-cv(L) (2d Cir. Oct. 15, 2020), ECF No. 209; Final Approval Order dated Dec. 16, 2019 (ECF No. 7821) (cited as No. 05-md-1720, 2019 WL 6875472, at *31); *Fikes,* 62 F.4th at 716 n.5.

Visa and Mastercard previously elaborated the point in this Court in *Fikes*: an **indirect** purchaser merchant "is deemed ***not*** to be the appropriate claimant for any of its Visa or Mastercard transactions" in the settlement, and instead retains the right to proceed as "an indirect payor with a claim under state law." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 20-339-cv(L) (2d Cir.), ECF No. 209, at 42 (Brief of Defendants-Appellees) (Oct. 15, 2020).

However, the word "accepts" was not used by the settling parties in that simple fashion. Rather, as this Court held, to avoid ambiguity, as used in the Rule 23(b)(3) Settlement Class definition, the word must be understood by reference to direct purchaser standing under federal antitrust law. *Fikes*, 62 F.4th at 716. In that context, the word has a particular meaning: the person or entity who ***directly*** purchased the card processing service and ***directly*** paid the challenged interchange fee for that transaction. Only that person is a member of the Rule 23(b)(3) settlement class. *Id.* When more than one merchant could possibly claim to have acquired the card processing service and paid the challenged interchange fee for a given transaction, "accept" refers to one merchant who ***more directly paid*** the interchange fee to Visa or Mastercard. The District Court never considered that particular meaning or that context.

The District Court also considered contracts between Square and its customers to determine who "accepted" payment cards, again deviating from the holding in

*Fikes*. A.7542 (citing Square Payment Terms § 1). The Square Sellers' colloquial use of "accepted" in their declarations, Square Seller Decls. ¶ 2 (*e.g.,* A.5415), does not mean they directly purchased payment card processing services from Visa or Mastercard or directly paid the challenged interchange to anyone. The Square Sellers say they did not do so, and Defendants admit they were ***not*** direct purchasers.

Finally, the District Court considered Square's contracts with Visa and Mastercard. The District Court concluded that those contracts made Square a "Payment Facilitator" and made the Square Sellers "Submerchants." A.7544-46. The Square Sellers were not parties to any of those contracts with Visa or Mastercard, which the District Court never discussed.

More importantly, Visa's and Mastercard's rules do not bear on who ***directly purchased*** card processing services from Visa or Mastercard. Plainly, Square did, and the Square Sellers did not. Nor do those rules bear on who ***directly paid*** Visa and Mastercard for the payment card processing services. Again, Square plainly did so and the Square Sellers plainly did not.

### B. The Square Sellers Did Not Directly Pay the Challenged Interchange Fees to Visa and Mastercard, Square Did

In *Fikes*, this Court's discussion of the way "[t]he word 'accepted' creates ambiguity" in the settlement class definition arose from a dispute between gas station

21

franchisors and franchisees over membership in the Rule 23(b)(3) Settlement Class.[6] *Fikes*, 62 F.4th at 715. In concluding that the ambiguity did not render the class unascertainable, the Court held it must be resolved by interpreting the settlement class definition "according to the substantive law that provides the basis for the class action." *Id.* at 716. Here, that substantive law is the Sherman Act, giving only ***direct*** purchasers standing to sue. *See Hanover Shoe*, 392 U.S. at 488-89; *Illinois Brick*, 431 U.S. at 727-29. Accordingly, the Court held that "federal antitrust law clarified that the ***only*** entities that could fall within the class definition were those deemed to be ***direct payors*** of the challenged fees." *Fikes*, 62 F.4th at 716 (emphasis added).

The District Court since admitted that it diverged from this Court's holding in *Fikes*. The District Court recently explained that it included the Square Sellers in the settlement class not because they were the "direct payors" of the interchange fees, as this Court held, but instead because they are the direct ***purchasers*** of the card transaction service. E.D.N.Y. No. 05-md-01720 ECF No. 9384 at 8. According to the District Court, the Court's "direct payor" holding in *Fikes* was a mere "proxy for the relevant inquiry: the direct purchaser of card-acceptance services . . . because no party is ***purchasing*** interchange fees." *Id.* (emphasis original). The District Court's

---

[6] "The franchisees claim to have 'accepted' Visa and/or MasterCard from consumers paying for the gasoline dispensed at their stations, while the franchisors claim to have 'accepted' the payment cards by, inter alia, providing operating and processing services on the same set of transactions." *Fikes*, 62 F.4th at 715-16.

superficial distinction misconstrues the holding in *Fikes*. It also ignores the fact that the interchange fee is what direct purchasers pay for the card acceptance services they acquire from Visa and Mastercard. In any event, for the reasons explained in Section I.C. below, **Square** is both the direct purchaser of the card transactions and the direct payor of the interchange fees. Square—not the Square Sellers—has contracts with Visa and Mastercard and with acquiring banks, allowing it to use their payment card processing networks, and Square—not the Square Sellers—is named in those contracts as the Merchant of Record for all those card transactions. A.3696 at § 3.3, A.4040.

When Visa and Mastercard defended the District Court's approval of the settlement on appeal, they told this Court: "there has never been a dispute that, consistent with federal law, *only one entity* can recover in the settlement for any given transaction." *See* Brief of Defendants-Appellees at 24, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 20-339-cv(L) (2d Cir. Oct. 15, 2020), ECF No. 209 (emphasis added). Importantly, they specified who that would be: "as the parties have long understood about the settlement, only the merchant that is the *more direct payor of the interchange fee* can recover in the settlement. And it is **that merchant—and no other—that is encompassed in the class definition**." *Id*. (emphasis added).

Taking Visa and Mastercard at their word, the District Court found no intra-

class conflict because *only the more direct payors of the interchange fee* are members of the Settlement Class. Final Approval Order dated Dec. 16, 2019 (ECF No. 7821) (cited as No. 05-md-1720, 2019 WL 6875472, at *31). This Court likewise credited the parties' agreement that "for any given transaction, only one interchange was paid and only one claimant is entitled to recover based on that fee." *Fikes*, 62 F.4th at 716 n.5. On remand, the parties continued to agree that "only one entity may be in the [Rule 23(b)(3)] Settlement Class for a given transaction," which the District Court also acknowledged.  A.7540.

Accordingly—and this has never been in dispute—either Square or the Square Sellers, *but not both*, are members of the Rule 23(b)(3) Settlement Class. The requirement for direct purchaser standing, and therefore membership in the direct purchaser settlement class, is *direct payment of the interchange fee*. Square meets this standard; the Square Sellers do not. Square processed all the payment card transactions on behalf of the Square Sellers. ███████████████████████████████

███████████████████████████████████████████ A.3676 at ¶ 5, A.3702-03 at § 5.2, A.4027 at § 4.4, A.4040, A.4048. This makes *Square* the direct payor of the interchange fee. Square paid interchange fees directly. A.3637. The Square Sellers did not. A.5415-39.Those facts were not disputed in the District Court.

Square Sellers paid no interchange fees at all. Instead, the Square Sellers pay

a service fee to Square for the bundle of services they purchase from Square,[7] which includes the interchange fee as a mere component. For the service fees they paid *to Square*, they received hardware, transaction processing and tracking software, hardware service and maintenance, and also the payment card processing services *from Square*. The upstream interchange fees paid on each transaction were never paid by the Square Sellers. *See* Square Seller Decls. ¶¶ 2-6 (*e.g.,* A.5415-16). That fact was not disputed in the District Court.

The District Court's decision does not address these critical facts about direct payment of the disputed interchange fees. Despite the importance of who actually paid the challenged interchange fees to direct purchaser standing—which *Fikes* held determines who "accepted" the payment cards—the District Court's decision is entirely silent on it.

Again, the District Court failed to address this issue. If the trier of fact later finds, as the District Court held it may, that Square rather than the Square Sellers is the direct purchaser (and thus a member of the settlement class), there would then be two purchasers for each such transaction. But for any transaction, there can be only one. *Fikes,* 62 F.4th at 731 (Leval, J., concurring). The District Court made no effort to explain or resolve this inconsistency.

---

[7] Square Seller Decls. ¶ 9 (*e.g.,* A.5416).

### C. Square, Not the Square Sellers, Contracts Directly with Defendants Visa and Mastercard and Buys Card Processing Services Directly from Visa and Mastercard

In addition to paying Visa and Mastercard directly for payment card processing services, Square was also the party that purchased the card processing services directly from Visa and Mastercard.[8] █████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ Square Seller Decls. ¶ 3 (*e.g.,* A.5415). Instead, they entered into agreements with ***Square*** to purchase those payment card processing services from ***Square***, as part of a bundle of goods and services that included the card processing hardware, service on the hardware, transaction processing services, and payment dispute resolution services. Square Seller Decls. ¶ 9 (*e.g.,* A.5416); *see* A.414, A.428, A.430, A.435.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[8] This is not a more difficult case where the direct purchaser and the direct payor are *different* entities, such as in pharmaceutical and healthcare antitrust litigation (where the direct purchasers are patients, and the direct payors are insurance companies). This is a much simpler case, where the direct purchaser and the direct payor are the *same*: Square.

███████████████████████████████████████

███████████████████████████████████

On the other hand, the Square Sellers bought no payment card processing services from Visa, Mastercard, or any network bank. They are not merchants of record on any of those transactions. Square Seller Decls. ¶ 14 (*e.g.,* A.5417). They had no contracts with Visa or Mastercard for payment card acceptance services. Square Seller Decls. ¶ 3 (*e.g.,* A.5415). Their contracts were with *Square*. They bought card processing services from Square, █████████████████████ ████████████████████████████████ along with other card issuers like American Express and Discover, to the Square Sellers. Square Seller Decls. ¶ 9 (*e.g.,* A.5416); ████████████████ Importantly, the District Court did *not* hold otherwise.

### D. Square Is the Direct Purchaser of Credit and Debit Card Transaction Services from Visa and Mastercard Under Longstanding Supreme Court Precedent

The District Court's conclusion that the Square Sellers are members of the Rule 23(b)(3) Settlement Class merely because they "accepted" payment cards in a literal and superficial sense is inconsistent with all the facts relevant to the Supreme Court's decisions on Sherman Act direct purchaser standing. These controlling facts include that: (i) █████████████████████████████████████ (ii) █████████████████████████████████████

27

███████████████████████████████████████

██████████ (iii) the Square Sellers paid no interchange fees directly to Visa or Mastercard; and (iv) the Square Sellers have no such contractual relationships with Visa or Mastercard (*see* Square Seller Decls. (A.5415-39)).

Beginning with *Hanover Shoe*, the Supreme Court has applied the direct purchaser antitrust standing rule in a straightforward, bright-line manner. As the Supreme Court explained in *Illinois Brick*, 431 U.S. at 734-35, the standing requirement of "*Hanover Shoe* . . . rest[s] on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Hanover Shoe* conclusively established that "a pass-on theory may not be used defensively by an antitrust violator against a direct purchaser plaintiff." *Id*. at 726.

In *Illinois Brick*, the Supreme Court focused on the "chain of manufacture or distribution" and explained that "the effectiveness of the antitrust treble-damages action would be substantially reduced by adopting a rule that any party in the chain may sue to recover the fraction of the overcharge allegedly absorbed by it." *Id*. at 729. It declined to overrule *Hanover Shoe* or create exceptions for any particular industries, such as banks or credit card issuers. *Id*. at 731.

Next, in *Kansas v. UtiliCorp United, Inc*., 497 U.S. 199, 208-17 (1990), the

Supreme Court declined to create an exception to the direct purchaser rule even where direct purchasers passed on 100% of their costs to consumers. *Id*. at 208-17. Again focusing on the chain of distribution, the Supreme Court reiterated that only the immediate buyer from the alleged monopolist has standing to assert antitrust claims:

> Like the State of Illinois in *Illinois Brick*, the consumers in this case have the status of indirect purchasers. . . . They bought their gas from the utilities, not from the suppliers said to have conspired to fix the price of the gas. Unless we create an exception to the direct purchaser rule established in *Hanover Shoe* and *Illinois Brick*, any antitrust claim against the defendants is not for them, but for the utilities to assert.

*Id*. at 207.

Echoing those seminal decisions, in *Apple Inc. v. Pepper*, 587 U.S. 273 (2019), the Supreme Court again reiterated the straightforward direct purchaser standing requirement of *Hanover Shoe* and *Illinois Brick*. As the Supreme Court concisely explained:

> The bright-line rule of *Illinois Brick*, as articulated in that case and as we reiterated in *UtiliCorp*, means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue. By contrast, direct purchasers – that is, those who are "the immediate buyers from the alleged antitrust violators" – may sue. *UtiliCorp*, 497 U.S. at 207, 110 S.Ct. 2807.
>
> For example, if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator. That is the straightforward rule of *Illinois Brick*. *See Loeb Industries, Inc. v. Sumitomo Corp*., 306 F.3d 469, 481-482 (C.A.7 2002) (Wood, J.)

*Apple v. Pepper*, 587 U.S. at 280 (footnote omitted).

Defendants admitted in the District Court that the Square Sellers are indirect purchasers: "Defendants agree" that the Square Sellers "*are indirect purchasers*." 1/8/24 Brief at 21 (emphasis added). Defendants tried to shrug off their admission by arguing that Square also is an indirect purchaser from "an upstream intermediary and not directly [from] the networks or issuing banks." *Id*. at 22. Their attempt misses the mark. The "upstream intermediary banks" to which Defendants referred are the Acquiring Banks with whom they dealt. Those same Acquiring Banks were alleged to be *part of the conspiracy*. A.8005. Because it purchased card transaction services directly from alleged co-conspirators, Square plainly satisfies the direct purchaser requirement of *Illinois Brick*.[9] *Illinois Brick* has long been understood to establish a rule "allocat[ing] to the *first non-conspirator* in the distribution chain the right to collect 100% of the damages." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002) (emphasis added); *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020). This is because all co-

---

[9] *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019) (purchaser from vertical conspiracy); *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1231 (11th Cir. 1999) (same); *State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 (9th Cir. 1984) (sellers conspired with intermediates in the distribution chain); *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980)) (*Illinois Brick* is "inapplicable to claims against remote sellers when the plaintiffs allege that the sellers conspired with intermediates in the distribution chain"); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 480-83, 482 n.94 (S.D.N.Y. 2012) (standing where "all middlemen are alleged to be co-conspirators").

conspirators are jointly and severally liable for all the harm caused by an antitrust conspiracy. *See United States v. Smith*, 513 F. App'x 43, 46 (2d Cir. 2013) (district court properly held co-conspirator liable for the full amount of losses suffered by victims of antitrust conspiracy); *Kashi v. Gratsos*, 790 F.2d 1050, 1054-55 (2d Cir. 1986) (antitrust conspiracy exposes co-conspirator to joint and several liability for the victim's losses).

The District Court twice accepted the parties' agreement in the direct purchaser action that the relevant markets here are the markets for general purpose credit and debit card transactions. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2024 WL 278565, at *12 (E.D.N.Y. Jan. 25, 2024); A.7549-50. For these purposes, the Square Sellers accept that the relevant markets are payment card transactions.

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ The Square Sellers did not buy or pay for payment card transaction processing from Visa or Mastercard. Under the Supreme Court's straightforward, bright-line direct purchaser standing requirement, Square—not the Square Sellers—has direct purchaser standing. Square transacts directly with Visa and Mastercard to buy their card processing services. It then combines those services with a suite of other products and offers those to its

customers (the Square Sellers), who are small merchants and use the credit and debit card transaction services one at a time when customers present their cards. As in *Illinois Brick*, the direct purchaser resells the product, and the end user is an *indirect* purchaser without Sherman Act standing.

To be sure, after ███████████████████████████████████████ ██████████████████████ it passed on the entire challenged interchange fees to the Square Sellers as a component of Square's Transaction Fees (as in *Hanover Shoe* and *UtiliCorp*). Under the controlling Supreme Court precedent, however, this pass-through is irrelevant to a federal antitrust claim, and is instead a matter of proof for the indirect purchasers under **state** laws that permit **indirect** claims. *See California v. ARC America Corp.*, 490 U.S. 93, 105-06 (1989).

██████████████████████████████████████████████████████ ████████████████████████████████████████ even though the transactions took place between different parties. *Apple v. Pepper* is instructive. Apple argued it was not a direct seller of iPhone apps because the apps were, in fact, sold to iPhone customers by third-party app developers. The Supreme Court rejected Apple's argument, concluding that the plaintiffs purchased the apps from Apple on its App Store, where Apple forces them to buy apps, and because the consumers paid their money directly to Apple, not to the app developers. 587 U.S. at 281 ("iPhone owners purchase apps directly from the retailer Apple, who is the alleged antitrust

violator" and "pay the alleged overcharge directly to Apple"). That the transactions involved app sales by third parties was irrelevant to the Supreme Court's decision in *Apple v. Pepper*, and it is equally irrelevant here.

Just as the Supreme Court did in *Apple v. Pepper*, applying the bright-line direct purchaser standing test, it is clear that Square, not the Square Sellers, is the direct purchaser of the credit and debit card transaction services from Visa and Mastercard, even though the transactions were ancillary to sales that involved third parties (*i.e.*, customers of the Square Sellers). *First*, Square ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ whereas the Square Sellers buy a bundle of services from **Square**, permitting them to use **Square's** hardware and software to process the payments. Square Seller Decls. ¶ 9 (*e.g.,* A.5416).

*Second*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ The Square Sellers do not pay any interchange fees to Visa or Mastercard or anyone else. Square Seller Decls. ¶¶ 11, 12 (*e.g.,* A.5416). Instead, they pay Transaction Fees to Square for the bundle of goods and services they buy from Square. It is irrelevant that Square ▮▮▮▮▮ ▮▮▮▮▮▮▮▮[10] to the Square Sellers, and equally

---

[10] *Illinois Brick* (431 U.S. at 726-27) and *Utilicorp* (497 U.S. at 204) were classic reseller cases.

irrelevant that Square ███████████████████████████████████

███████████████████████████—to the Square Sellers when it sets the

Transaction Fees they pay.

### E. As Between Square and the Square Sellers, Square is the More Direct Payor of the Interchange Fees and Defendants Never Argued Otherwise

Visa and Mastercard previously argued (A.7532 at n.16) that the acquiring

banks are the direct payors of interchange fees. The District Court left that argument

for the trier of fact. *See* A.7550-51 ("triable question of fact as to the identity of the

direct purchaser of the card-acceptance services").[12] But even crediting that

argument, and also hewing to the position that the proper Rule 23(b)(3) Settlement

Class member is the *most direct payor* of the interchange fee, the Square Sellers are

undeniably *farther* removed from direct purchaser standing, as they are downstream

of *both* the acquiring banks and Square in the payment stream.

As between Square and the Square Sellers, Square is undoubtedly "the *more*

---

[11] *Hanover Shoe* (392 U.S. at 484-89) and *Utilicorp* (497 U.S. at 208-17) both involved a 100% pass-on of the alleged overcharge.

[12] Similarly, the District Court has not yet resolved the factual dispute whether the gasoline station franchisors or franchisees are direct purchasers of the payment card transaction services, and thus are members of the Rule 23(b)(3) Settlement Class. In terms of direct purchaser standing, the relationship between the franchisors and their franchisees is similar to the relationship between Square and the Square Sellers. If the factual dispute between the franchisors and franchisees is open and unresolved, it is difficult to understand how the District Court resolved the standing issue against the Square Sellers.

*direct payor of the interchange fee*." *See In re Payment Card Interchange Antitrust Litig.*, 2d Cir No. 20-339-cv(L), ECF No. 209 at 24 (emphasis added). ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Square Sellers do not. As Visa and Mastercard previously told the Court, only "*that merchant – and no other . . . is encompassed in the class definition*." *Id.* Taking Visa and Mastercard at their word, *Squar*e is the proper party with direct purchaser standing, not the Square Sellers.

### F. The District Court's Decision is Internally Inconsistent

Despite accepting the parties' agreement that there can be only one direct purchaser, and only one direct payor, for any given transaction, the District Court's decision leaves open the possibility of a subsequent, inconsistent finding that both Square *and* the Square Sellers were direct purchasers of the card processing services and direct payors of the fees for all those transactions at issue.

The District Court held that the Square Sellers are members of the Rule 23(b)(3) Settlement Class because they "accepted" the payment cards for purchases made by their own customers. A.7546. However, the District Court also held that it could not determine whether Intuit (and Square, for the same reason) is the direct purchaser of card-acceptance services. A.7550 ("the facts before the Court preclude the Court from granting summary judgment in Intuit's favor on the issue of whether it is the direct purchaser of card-acceptance services").

Then, after holding that the Square Sellers were members of the Rule 23(b)(3)

Settlement Class because they "accepted" Visa and Mastercard payment cards, the District Court said there was a triable fact as to who the direct purchasers are as between Intuit and its sellers: "Visa's and Mastercard's rules similarly create a triable issue of fact as to whether Intuit is the direct purchaser of those transactions, suggesting instead that the Sellers are direct purchasers." A.7551.

### G. Belated Inclusion of the Square Sellers in the Settlement Class Creates An Irreconcilable Conflict Between Class Members

The belated attempt by Visa and Mastercard to squeeze the Square Sellers into the direct purchaser Rule 23(b)(3) Settlement Class and send untimely notice to them also creates an irreconcilable conflict among the settlement class members. Such an intra-class conflict is impermissible. *Cf. Fikes*, 62 F.4th at 717-18. It results directly from class counsel's 13th-hour over-reaching, for the reasons previously set forth by this Court in *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242, 252 (2d Cir. 2011); *see In re Payment Card Antitrust Litig*., 827 F.3d at 236-37 (discussing inadequacy of representation where there are conflicts among class members).

This is not the first time class counsel have over-reached when trying to settle this massive case. A prior attempt by class counsel to settle both monetary and non-monetary claims in the District Court caused this Court to reverse the proposed settlement because class counsel improperly represented two separate classes with "divergent interests." *See In re Payment Card Antitrust Litig*., 827 F.3d at 233-34

(class counsel's "inadequate representation . . . disadvantaged the [Rule 23] (b)(2) injunction class"). They are again guilty of the same over-reaching.

In a sworn declaration filed in the District Court on August 6, 2024, the court-appointed claims administrator recently admitted that claims submitted by the Square Sellers (who do *not* belong in this settlement) will be treated *differently* than the claims of other settlement class members (*i.e.*, the direct-purchaser merchants who belong in the settlement class). The claims administrator explained that the interchange data for Square Sellers from which their claims could be calculated ***does not exist***:

> a large number of Class Members are merchant-customers of payment facilitators. Based upon the Class Administrator's current understanding of the data in its possession . . . Visa monthly roll-up reports of interchange transaction activity do not include a distinct merchant identifier for each distinct underlying payment facilitator merchant-customer. Without a distinct merchant identifier for a given merchant-customer, the Class Administrator is not aware of a method to link this interchange activity data back to a merchant-customer TIN.

A.7974 at n.1. The data is missing for "a ***significant*** number of additional Class Members." A.7964, A.7971 at ¶ 3 (emphasis added).[13]

The settlement class, not as it was previously envisioned but as it stands after

---

[13] Indeed, *tens of millions* of Square Sellers – mostly individuals or small businesses – have now been swept into the settlement. While their numbers are quite large, their claims will be quite small compared to the retail giants, like Walmart, Apple, the major airlines, and other large merchants – who are direct purchasers of the card services and direct payors of the interchange fees.

the District Court's May 28 Order, is now in the following untenable posture:

- It includes merchants with federal antitrust claims who accepted payment cards, but also merchants with only state claims in states that permit indirect purchaser claims. The Settlement treats their claims as identical.

- It also includes merchants in states that do not permit indirect claims and therefore have no viable claim. The Settlement treats their claims as identical to both direct and indirect claimants.

- It includes merchants whose share of the settlement can be calculated precisely from their transactions using Defendants' records. It also included merchants whose transactions were never in Defendants' records because they processed cards only through a payment facilitator. These two groups are treated differently both procedurally and substantively, with the latter in all or most instances getting a flat recovery.

These disparities are what this Court has warned against.

The *Literary Works* settlement contained the same "ingredients of conflict identified in *Amchem* and *Ortiz*." *See In re Payment Card Antitrust Litig.*, 827 F.3d at 232 (citing *Literary Works*, 654 F.3d at 251). That settlement divided class claims into three categories, capped defendants' overall liability at $18 million, and used a formula for splitting that capped amount among the class members. The settlement was more restrictive toward the third category, putting all the risk of *pro rata*

reduction on it. Even though the class representatives included individuals with claims in each category, this Court held that class members with claims only in the third category required separate representation because their interests were antagonistic to the other class members on a matter of critical importance: how the money would be distributed. *Id.* at 254. Similarly, here, the Square Sellers all have valuable state law claims, but by being swept into the Rule 23(b)(3) Settlement Class, they are precluded from pursuing those claims and are instead forced to accept a $25 payment instead.

It is not the $25 solution that reflects the impermissible conflict. *First*, the proposed treatment is disparate internally, treating people with valuable *indirect* claims and people with no indirect claims at all the same as people with federal direct claims. "It is no answer to say . . . that these conflicts may be ignored because the settlement makes no disparate allocation of resources as between the conflicting classes." *In re Payment Card Antitrust Litig.*, 827 F.3d at 232 (quoting *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 857 (1999)). The "very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that [the disparate claimants] would have chosen." *Id*. Here, the Square Sellers have chosen differently: they elected to bring their own **indirect** purchaser claims, which were extinguished by being forced into the **direct** purchaser settlement class.

Typically, direct and indirect purchasers claiming damages are in separate classes, represented separately by plaintiffs with the appropriate direct or indirect purchaser standing and by separate counsel. *See*, *e.g.*, *In re LIBOR-Based Financial Instruments Antitrust Litig.*, Case No. 11 MD 2262(NRB), 2011 WL 5007957, at *3 (S.D.N.Y. Oct. 18, 2011) ("commonsense approach is to divide plaintiffs into two putative classes and appoint interim lead counsel for each class", citing cases); *Olean Wholesale Grocery Coop., Inc., v. Bumble Bee Foods LLC*, 31 F.4th 651, 662 (9th Cir. 2022) (affirming certification of separate classes and appointment of separate plaintiffs and separate counsel for direct and indirect purchasers of packaged tuna); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 102 (E.D.N.Y. 2012) (indirect purchaser "lacks standing to sue for damages under federal law and cannot join the putative [direct purchaser] Damages Class"). Here, *all* the settling plaintiffs are *direct* purchaser merchants; *none* of them is an *indirect* purchaser. A.7990-93, at ¶¶ 10-18. They cannot represent a single class of direct *and* indirect purchasers.

*Second*, claimants in the Rule 23(b)(3) Settlement Class will receive different processing and different effective resolutions. The direct purchaser settlement requires the claims administrator pre-populate a claim for each claimant in the settlement class, using data from Visa and Mastercard "to estimate the total value of interchange fees attributable to each Authorized Claimant on its [eligible] Visa and Mastercard card transactions." A.7789. The settlement notice sent to all

members of the direct purchaser settlement class – but *not* to the Square Sellers – told class members they would receive secure access to a website where they could review a "pre-populated" claim form prepared by the claims administrator using data from Visa and Mastercard. *Id*. Class members could submit the pre-populated claim form or dispute it by submitting evidence of the interchange fees they paid. *Id*.

Those claim procedures are *not* available to the Square Sellers. The claims administrator admits the process is impossible for them because the data needed to prepare their pre-populated claim form *does not exist*. A.7971-72 at ¶ 5 & A.7974 n.1. Making matters worse, the claims administrator also admits that the Square Sellers are unlikely to have interchange fee information themselves from which they can submit their own claims. A.7971-72 at ¶ 5. To solve the problem created by adding the Square Sellers to the direct purchaser settlement, the claims administrator now proposes a $25 minimum payment to those claimants. *Id.*

While a $25 minimum payment to class members and a different treatment in processing procedures might be proper under other circumstances, here they are an inadequate attempt to solve a problem of unfairness and inequity created by the forced inclusion of dissimilar members into an already-approved settlement: indirect purchasers in a direct purchaser settlement that was understood by this Court to include *only* direct purchasers. *Fikes*, 62 F.4th at 716.

As the claims administrator recently admitted in the District Court, the

settlement "is based on the equitable distribution of the Cash Fund to eligible claimants in proportion to Interchange Fees Paid." A.7971 at ¶ 5. The settlement agreement itself requires the plan of distribution to be "fair and equitable." *See* A.7820. However, because the settlement class now includes both direct and indirect payors of the interchange fees—leaving apart the standing problem discussed in Section I.D. above—the plan of distribution is unfair and inequitable.

The late insertion of indirect purchasers, including the Square Sellers, into the Rule 23(b)(3) Settlement Class both creates and ignores the critical differences among class members, in defiance of the adequacy test in *Ortiz* and *Literary Works*. It reflects a settlement that ignores a critical difference in claims by treating a divided class (direct and indirect purchasers of card transaction services) as unitary. *Ortiz*, 527 U.S. at 857 (treating dissimilar claims as the same is itself an allocation decision). In addition, it also creates a disparity, both procedural and substantive, in how the claims of the members of the one, giant, unitary class are compensated.

Neither the decision to treat indirect claimants on par with direct claimants, nor the disparity of data available for direct versus indirect claims, was addressed and evaluated at final approval. These issues arose only after Visa and Mastercard moved to enforce the settlement to extinguish Square's and Intuit's claims, which led to the District Court belatedly including the Square Sellers in the Rule 23(b)(3) Settlement Class. Class counsel went along with this, and the District Court

erroneously accepted the retrofit to keep the settlement on track.

It is impossible to be confident that the distribution will be "based on the equitable distribution of the Cash Fund to eligible claimants in proportion to Interchange Fees Paid." The effect of including both direct and indirect purchasers in the settlement class, if it were ever proper to do so, had to be considered in the approval process, when objections were timely and when the District Court could consider the disparities and determine if separate representation was required. Because the settlement class has only now been interpreted retroactively to include members who are disparately situated, the distribution will not be fair or equitable; it will be arbitrary and unpredictable.

The belated insertion of disparate class members into the Rule 23(b)(3) Settlement Class yields a settlement that cannot be approved. However, if the Court reverses the District Court's May 28 Order on the basis that it erroneously included the Square Sellers in the class, the settlement approved by the District Court and affirmed in *Fikes* can proceed without disruption.

## II.  ALTERNATIVELY, THE SQUARE SELLERS WERE ENTITLED TO NOTICE OF THE PROPOSED SETTLEMENT AND THE RIGHT TO REQUEST EXCLUSION FROM THE SETTLEMENT CLASS OR OBJECT TO THE PROPOSED SETTLEMENT

### A.  Due Process Requirements for Notice

The settlement of class action certified under Rule 23(b)(3) requires that absent class members *must* be given "the best notice that is practicable under the

circumstances, including *individual notice* to all members who can be identified through reasonable effort." Fed. R. Civ. P. Rule 23(c)(2)(B) (emphasis added); *see also* A. Conte & H. Newberg, *Newberg on Class Actions* § 8.2 at 162-65 (4th ed. 2002). In *Eisen*, *supra*, 417 U.S. at 173, the Supreme Court held the meaning of "the best notice practicable [is] unmistakable. Individual notice *must* be sent to all class members whose names and addresses may be ascertained through reasonable effort." *Id*. (emphasis added). *See also Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, No. CV-04-2195 (CPS), 2006 WL 941765, at *5 (E.D.N.Y. Apr. 12, 2006) (ordering individual notice to class members who "[could] be identified through reasonable effort"). Indeed, even in litigation involving publicly traded securities, which most investors hold in "street name" instead of their own names, it is typical to take extra steps to secure direct communication of notice to the beneficial owners of the stock. *See, e.g.*, *In re Stock Exchanges Options Trading Antitrust Litig.*, 99 Civ. 096 (RCC), 2006 WL 3498590, at *7 (S.D.N.Y. Dec. 4, 2006) (noting "the need to often first notice brokerage firms and wait for responses or other action before noticing class members directly").

If the Square Sellers are members of the Rule 23(b)(3) Settlement Class, every Square Seller had a due process right to receive direct notice, and an opportunity to opt out, to object to the settlement, or to participate in the recovery thereunder. *See Phillips Petroleum*, 472 U.S. at 814 (opportunity to opt out satisfies the Due Process

Clause).

**B.      The Square Sellers Did Not Receive Notice**

Visa and Mastercard conceded in the District Court that the identities of the Square Sellers were known. *See* E.D.N.Y. 05-md-1720 ECF No. 9057 at 21 ("merchants serviced by payment facilitators do exist within Defendants' transactional data"); *see also* A.5596. Visa and Mastercard admitted below to knowing their identities, and never argued it would be unreasonably difficult to ascertain their contact information. Alternatively, since Visa and Mastercard have contracts and commercial relationships directly with Square, they could have supplemented their direct mail or email address list by asking Square for the contact information, such as addresses, email addresses, or mobile phone numbers of all the Square Sellers. Neither Visa nor Mastercard even attempted to make a showing that they did so.

The settling parties in the direct purchaser case provided extensive direct notice to the direct-purchaser merchants. Direct notice was sent to 16 million merchants throughout the United States. *See* Declaration of Cameron R. Azari, Esq. (dated June 6, 2019) at ¶ 14 (A.7844). By stark contrast, the settling parties did nothing to send notice of the proposed settlement directly to ***tens of millions*** of Square Sellers, as Rule 23(c)(2)(B) and the relevant case law require, or to assure the District Court that they had given the requisite notice to them. It was undisputed

below that:

- no attempt was made to give direct mail notice to the universe of Square Sellers (*see* E.D.N.Y. ECF No. 7257-1, section V.A.; A.7557);

- no attempt was made to give direct email notice to all the Square Sellers (*See* Cameron R. Azari Decl. (dated June 6, 2019) at ¶ 21 (A.7846-47));

- no attempt was made to obtain the Square Sellers' addresses or contact information for the purposes of a notice program (A.7557, A.7841);

- there was no attempt to tailor a publication notice program to reach the Square Sellers, or to call their attention to the effect of the Settlement on them (A.7557, A.7841);

- there was no discussion in the approval process of reaching the Square Sellers, or sub-merchants more broadly (A.7557, A.7841); and

- most of the Square Sellers did not receive notice of the settlement. *See* Square Seller Decls. ¶ 13 (*e.g.,* A.5417).

*Nothing* was done here to comply with this constitutional requirement. The Square Sellers provided detailed declarations attesting that they did not receive notice of the proposed settlement. Square Seller Decls. ¶ 13 (*e.g.,* A.5417). Visa and Mastercard effectively conceded that notice of the proposed settlement was *not* sent to the Square Sellers before the July 23, 2019, deadline for them to object to the proposed settlement or request exclusion from the Rule 23(b)(3) Settlement Class.

The Square Sellers' declarations were undisputed. Visa and Mastercard offered no contrary evidence in the District Court that notice was sent to any Square Seller prior to their deadline to object to the settlement or request exclusion from the settlement class on July 23, 2019.

For their part, the Direct Purchaser Plaintiffs likewise effectively conceded that the settlement notice was *not* sent to the Square Sellers before July 23, 2019. They, too, did nothing to dispute the Square Sellers' declarations, nor did they offer any contrary evidence that notice was sent to any Square Seller prior to July 23, 2019.

The settling parties sent settlement notices to more than 16 million direct purchaser merchants who are proper members of the Rule 23(b)(3) Settlement Class. A.7844. After this appeal was taken, on August 6, 2024, counsel for the Rule 23(b)(3) Settlement Class and the claims administrator admitted in the District Court that they never sent settlement notice to any Square Sellers. *See* A.7964, A.7971 at ¶ 3 ("a *significant* number of additional Class Members . . . did not receive claim forms sent in 2023") (emphasis added). The claims administrator recommended sending *claim forms* to those settlement class members who were not sent notice of the proposed settlement in 2019.[14]

---

[14] Sending notice of the proposed settlement – which was approved by the District Court many years ago – would be futile now, as the claims administrator surely knows. The deadline to object to the proposed settlement or request exclusion from

The fact that notice was sent to millions of direct-purchaser merchants but not to tens of millions of Square Sellers was not an oversight. It confirms that the Square Sellers were never included in the Rule 23(b)(3) Settlement Class. Had the Square Sellers always been in the settlement class, notice would have been sent to them – and they would have been given their due process rights to object or to request exclusion from the class – when it was sent to all the "other" class members. Those due process rights have been taken from the Square Sellers.

Before moving to enforce the settlement against Square and Intuit or opposing the Square Sellers' motion for summary judgment, if Visa and Mastercard genuinely believed the Square Sellers were members of the Rule 23(b)(3) Settlement Class, they should and would have taken steps to ensure that clear and direct notice was sent to them *before* the time to object to the proposed settlement or request exclusion from the settlement class had passed.

### C.    Publication Notice Does Not Substitute for Direct Notice

Publication notice is no substitute for direct notice. Rule 23(c)(2)(B) has long required direct notice to the absent members of a class certified under Rule 23(b)(3): "the court *must* direct to class members the best notice that is practicable under the circumstances, including *individual notice* to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B) (emphasis added). The

---

the settlement class passed on July 23, 2019, more than four years ago.

Supreme Court has long agreed: "We think the import of this language is unmistakable. Individual notice *must* be sent to all class members whose names and addresses may be ascertained through reasonable effort." *Eisen*, 417 U.S. at 173 (emphasis added) (citing Rule 23(c)(2)(B)). In *In re Franklin Nat. Bank Sec. Litig.*, 574 F.2d 662, 670 (2d Cir.), *on reh'g*, 599 F.2d 1109 (2d Cir. 1978), this Court rejected the plaintiff's argument that sending copies of a settlement notice to 661 brokerage firms that were stockholders of record was sufficient notice, because classmembers' names and addresses could be obtained by "search[ing] the records of the brokerage houses in this case."

Here, that means the Direct Purchaser Plaintiffs were required by Rule 23(c)(2) to obtain the contact information of all the Square Sellers and send them the settlement notice directly. This was not done, depriving the Square Sellers of their constitutional right to timely object or request exclusion.

The claims administrator's recent declaration in the District Court confirms that *no effort* was made to deliver contact information for the Square Sellers to the claims administrator before notice was sent to the Rule 23(b)(3) Settlement Class members or before the deadline to object to the settlement or request exclusion from the settlement class. A.7971 at ¶ 3. The claims administrator does not indicate when it received the data identifying those "newly identified potential Class Members." A.7972 at ¶ 7.

49

### D. The Notice Would Have Been Inadequately Vague and Ambiguous

One basic requirement of a settlement notice is that it must define the certified class. Fed. R. Civ. P. 23(c)(2)(B)(ii) ("the definition of the class certified"). Another equally important requirement of a settlement notice is that it "must *clearly and concisely* state" the required information "in *plain, easily understood language*." Fed. R. Civ. P. 23(c)(2)(B) (emphasis added). The notice here did not define the settlement class clearly and concisely in plain, easily understood language.

As this Court already decided, the Rule 23(b)(3) Settlement Class definition was ambiguous. *Fikes*, 62 F.4th at 715-16. It was unclear to the Court who has "accepted" Visa and Mastercard payment cards. *Id.* ("The word 'accepted' [in the settlement class definition] creates ambiguity.") The Court held that the ambiguity could be resolved only by reference to the "substantive law that provides the basis for the class action" – *i.e.*, the *Illinois Brick* direct purchaser standing requirement for a federal Sherman Act claim. *Id.* at 716. As the Square Sellers argue in Point I above, the District Court itself misapplied the Court's holding in *Fikes* and mistakenly concluded that the Square Sellers are members of the Rule 23(b)(3) Settlement Class.

Thus, membership in the Rule 23(b)(3) Settlement Class cannot be determined without considering the *Illinois Brick* direct purchaser standing requirement for a federal Sherman Act claim. An *ambiguous* class definition that can be understood

50

only by reference to the technical legal requirement of antitrust standing is *not* clearly and concisely stated in plain, easily understood language. *Cf.* Fed. R. Civ. P. 23(c)(2). It is anything but that. Requiring absent class members to be familiar with that arcane law to know whether they are included in the proposed settlement class is patently unreasonable.

The definition of the settlement class in the notice included the same ambiguous term "accepted" as the Rule 23(b)(3) Settlement Class definition. *See* A.7776. Such an ambiguous settlement notice does not meet the requirements of Rule 23(c)(2)(B) and due process. *See* Fed. R. Civ. P. 23(c)(2)(B). Accordingly, if this Court holds that the Square Sellers are to remain in the Rule 23(b)(3) Settlement Class, the defective settlement should be vacated and the case should be remanded to the District Court with instruction to re-notice the direct purchaser settlement to protect the Square Sellers' constitutional due process rights.

Nothing in the short-form published notice was aimed at notifying the Square Sellers of their inclusion in the Rule 23(b)(3) Settlement Class. There is no discussion of Square Sellers, sub-merchants, or businesses that operate through payment facilitators in the Notice Plan (Appendix F to the Settlement Agreement) (A.7709), in the Azari Declaration submitted June 7, 2019 (A.7841), or the supplemental Azari Declaration submitted August 7, 2019 (A.7957) submitted to the Court before notice was published.

Further, even if any Square Sellers happened upon the settlement notice – *e.g.*, in a publication – they had no reason to know from the ambiguous class definition that they were part of the Rule 23(b)(3) Settlement Class. Because they were not given notice of their purported inclusion in the settlement class with many of the nation's largest merchants, they were denied their constitutional due process right to object to the proposed settlement or request exclusion from the settlement class.

The Square Sellers did not pay any interchange fees to the settling Defendants. Nothing in the published notice or the long-form mailed notice would have called their attention to their status as settlement class members, which might have alerted them that, though they did not directly do business with Visa or Mastercard and paid no interchange fees to Visa or Mastercard, their rights would be impacted.

No effort was made to notify the Square Sellers about the settlement or inform them that their objection and opt-out rights were at stake. No one involved in this sprawling two decades of litigation ever told the District Court or this Court that the Square Sellers were members of the Rule 23(b)(3) Settlement Class members until years after the settlement was approved by the District Court and affirmed by this Court. Every prior indication was that *Square*, not the Square Sellers, was the direct purchaser settlement class member. With no reason for the Square Sellers to believe they were involved in the proposed settlement or that their rights would be affected, this vast population of small businesspeople had no way to know that they should

click on links for legal notice and attempt to decipher them.

Even if the full notice had been sent to the Square Sellers, or if the Court concludes that the published summary notice reached them, both were inadequately vague and ambiguous to reasonably inform the Square Sellers of their inclusion in the Rule 23(b)(3) Settlement Class and their due process right to object to the settlement or request exclusion from the settlement class.

## CONCLUSION

For all the foregoing reasons, the District Court's decision misapplying this Court's decision in *Fikes* and sweeping the Square Sellers into the massive direct purchaser settlement must be reversed and remanded. Alternatively, the Court should vacate the defective settlement, which did not provide clear notice to the Square Sellers, and remand to the District Court with instructions to re-notice the settlement to protect the Square Sellers' constitutional due process rights.

Dated:  October 15, 2024

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: *s/ Mark C. Rifkin*
    Mark C. Rifkin (MR-0904)
    Thomas H. Burt (TB-7601)
    270 Madison Avenue
    9th Floor
    New York, NY  10016
    (212) 545-4600
    rifkin@whafh.com
    burt@whafh.com

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief was prepared in proportionally spaced 14-point font using Microsoft Word, and according to that software, it contains 12,923 words, not including the cover, the table of contents, the table of authorities, and this certificate.

*s/ Mark C. Rifkin*
MARK C. RIFKIN

# SPECIAL APPENDIX

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**FILED UNDER SEAL**

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)

This document refers to:

ALL RULE 23(b)(3) CLASS ACTIONS;
*Block, Inc. v. Visa Inc.*, No. 23-CV-5377;
*Lanning v. Visa Inc.*, No. 21-CV-2360;
*Camp Grounds Coffee, LLC v. Visa, Inc.*, No. 21-CV-3401; *Intuit, Inc. v. Visa Inc.*, No. 21-CV-1175

-----------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.   Background ........................................................................................................ 4
   a.   Procedural history ...................................................................................... 4
      i.   Procedural history of the Rule 23(b)(3) Class ..................................... 4
   b.   Factual overview of the payment facilitators ............................................ 8
II.  Discussion .......................................................................................................... 9
   a.   Standard of review ..................................................................................... 9
      i.   Motion to enforce a settlement agreement .......................................... 9
      ii.  Summary judgment ............................................................................. 10
   b.   Square and Intuit are not members of the Settlement Class ..................... 11
      i.   The term "accepted" as used in the Settlement Agreement is ambiguous ... 16
      ii.  The term "accepted" is "guided by federal antitrust standards" ......... 19
      iii. The Court finds that Sellers "accepted" payment cards ..................... 21
   c.   *Lanning* Plaintiffs are members of the Settlement Class ........................ 26
   d.   The Court denies Intuit's cross-motion for partial summary judgment .... 26
III. Conclusion ........................................................................................................ 31

# Pages SpA.2 through SpA.31 filed under seal.

LII  > Federal Rules of Civil Procedure  > **Rule 23. Class Actions**

# Rule 23. Class Actions

(a) PREREQUISITES. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) TYPES OF CLASS ACTIONS. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D) the likely difficulties in managing a class action.

(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.

    (1) *Certification Order.*

      (A) *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

      (B) *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

      (C) *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

    (2) *Notice.*

      (A) *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

      (B) *For (b)(3) Classes.* For any class certified under Rule 23(b)(3)—or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means.The notice must clearly and concisely state in plain, easily understood language:

        (i) the nature of the action;

        (ii) the definition of the class certified;

        (iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

(3) *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

(A) for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

(B) for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

(5) *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

(d) Conducting the Action.

(1) *In General.* In conducting an action under this rule, the court may issue orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

(B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

(i) any step in the action;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

(E) deal with similar procedural matters.

(2) *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

SpA.34

(e) Settlement, Voluntary Dismissal, or Compromise. The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) *Notice to the Class*.

(A) *Information That Parties Must Provide to the Court*. The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

(B) *Grounds for a Decision to Give Notice*. The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

(i) approve the proposal under Rule 23(e)(2); and

(ii) certify the class for purposes of judgment on the proposal.

(2) *Approval of the Proposal*. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

(3) *Identifying Agreements.* The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) *New Opportunity to Be Excluded*. If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) *Class-Member Objections.*

(A) *In General*. Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

(B) *Court Approval Required for Payment in Connection with an Objection*. Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

(i) forgoing or withdrawing an objection, or

(ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

(C) *Procedure for Approval After an Appeal*. If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

(f) Appeals. A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

(g) Class Counsel.

(1) *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

(E) may make further orders in connection with the appointment.

(2) *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

(3) *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

(4) *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

(h) ATTORNEY'S FEES AND NONTAXABLE COSTS. In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

(As amended Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 24, 1998, eff. Dec. 1, 1998; Mar. 27, 2003, eff. Dec. 1, 2003; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

### NOTES OF ADVISORY COMMITTEE ON RULES—1937

*Note to Subdivision (a)*. This is a substantial restatement of [former] Equity Rule 38 (Representatives of Class) as that rule has been construed. It applies to all actions, whether formerly denominated legal or equitable. For a general analysis of class actions, effect of judgment, and requisites of jurisdiction see Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft*, 25 Georgetown L.J. 551, 570 *et seq*. (1937); Moore and Cohn, *Federal Class Actions*, 32 Ill.L.Rev. 307 (1937); Moore and Cohn, *Federal Class Actions— Jurisdiction and Effect of Judgment*, 32 Ill.L.Rev. 555—567 (1938); Lesar, *Class Suits and the*

*Federal Rules*, 22 Minn.L.Rev. 34 (1937); *cf.* Arnold and James, *Cases on Trials, Judgments and Appeals* (1936) 175; and see Blume, *Jurisdictional Amount in Representative Suits*, 15 Minn.L.Rev. 501 (1931).

The general test of [former] Equity Rule 38 (Representatives of Class) that the question should be "one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court," is a common test. For states which require the two elements of a common or general interest and numerous persons, as provided for in [former] Equity Rule 38, see Del.Ch.Rule 113; Fla.Comp.Gen.Laws Ann. (Supp., 1936) §4918 (7); Georgia Code (1933) §37–1002, and see *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 16, r. 9. For statutory provisions providing for class actions when the question is one of common or general interest or when the parties are numerous, see Ala.Code Ann. (Michie, 1928) §5701; 2 Ind.Stat.Ann. (Burns, 1933) §2–220; N.Y.C.P.A. (1937) §195; Wis.Stat. (1935) §260.12. These statutes have, however, been uniformly construed as though phrased in the conjunctive. See *Garfein v. Stiglitz*, 260 Ky. 430, 86 S.W.(2d) 155 (1935). The rule adopts the test of [former] Equity Rule 38, but defines what constitutes a "common or general interest". Compare with code provisions which make the action dependent upon the propriety of joinder of the parties. See Blume, *The "Common Questions" Principle in the Code Provision for Representative Suits*, 30 Mich.L.Rev. 878 (1932). For discussion of what constitutes "numerous persons" see Wheaton, *Representative Suits Involving Numerous Litigants*, 19 Corn.L.Q. 399 (1934); Note, 36 Harv.L.Rev. 89 (1922).

*Clause (1), Joint, Common, or Secondary Right*. This clause is illustrated in actions brought by or against representatives of an unincorporated association. See *Oster v. Brotherhood of Locomotive Firemen and Enginemen*, 271 Pa. 419, 114 Atl. 377 (1921); *Pickett v. Walsh*, 192 Mass. 572, 78 N.E. 753, 6 L.R.A. (N.S.) 1067 (1906); *Colt v. Hicks*, 97 Ind.App. 177, 179 N.E. 335 (1932). Compare Rule 17(b) as to when an unincorporated association has capacity to sue or be sued in its common name; *United Mine Workers of America v. Coronado Coal Co*., 259 U.S. 344 (1922) (an unincorporated association was sued as an entity for the purpose of enforcing against it a federal substantive right); Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft*, 25 Georgetown L.J. 551, 566 (for discussion of jurisdictional requisites when an unincorporated association sues or is sued in its common name and jurisdiction is founded upon diversity of citizenship). For an action brought by representatives of one group against representatives of another group for distribution of a fund held by an unincorporated association, see *Smith v. Swormstedt*, 16 How. 288 (U.S. 1853). Compare *Christopher, et al. v. Brusselback*, 58 S.Ct. 350 [ 302 U.S. 500 ] (1938).

For an action to enforce rights held in common by policyholders against the corporate issuer of the policies, see *Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356 (1921). See also *Terry v. Little*, 101 U.S. 216 (1880); *John A. Roebling's Sons Co. v. Kinnicutt*, 248 Fed. 596 (D.C.N.Y., 1917) dealing with the right held in common by creditors to enforce the statutory liability of stockholders.

Typical of a secondary action is a suit by stockholders to enforce a corporate right. For discussion of the general nature of these actions see *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288 (1936); Glenn, *The Stockholder's Suit—Corporate and Individual Grievances*, 33 Yale L.J. 580 (1924); McLaughlin, *Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit*, 46 Yale L.J. 421 (1937). See also *Subdivision (b)* of this rule which deals with Shareholder's Action; Note, 15 Minn.L.Rev. 453 (1931).

*Clause (2)*. A creditor's action for liquidation or reorganization of a corporation is illustrative of this clause. An action by a stockholder against certain named defendants as representatives of numerous claimants presents a situation converse to the creditor's action.

*Clause (3)*. See *Everglades Drainage League v. Napoleon Broward Drainage Dist*., 253 Fed. 246 (D.C.Fla., 1918); *Gramling v. Maxwell*, 52 F.(2d) 256 (D.C.N.C., 1931), approved in 30 Mich.L.Rev. 624 (1932); *Skinner v. Mitchell*, 108 Kan. 861, 197 Pac. 569 (1921); *Duke of Bedford v. Ellis* (1901) A.C. 1, for class actions when there were numerous persons and there was only a question of law or fact common to them; and see Blume, *The "Common Questions" Principle in the Code Provision for Representative Suits*, 30 Mich.L.Rev. 878 (1932).

*Note to Subdivision (b)*. This is [former] Equity Rule 27 (Stockholder's Bill) with verbal changes. See also *Hawes v. Oakland*, 104 U.S. 450, 26 L.Ed. 827 (1882) and former Equity Rule 94, promulgated January 23, 1882, 104 U.S. IX.

*Note to Subdivision (c)*. See McLaughlin, *Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit*, 46 Yale L.J. 421 (1937).

### Notes of Advisory Committee on Rules—1946 Amendment

Subdivision (b), relating to secondary actions by shareholders, provides among other things, that in, such an action the complainant "shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law . . ."

As a result of the decision in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (decided April 25, 1938, after this rule was promulgated by the Supreme Court, though before it took effect) a question has arisen as to whether the provision above quoted deals with a matter of substantive right or is a matter of procedure. If it is a matter of substantive law or right, then under *Erie R. Co. v. Tompkins* clause (1) may not be validly applied in cases pending in states whose local law permits a shareholder to maintain such actions, although not a shareholder at the time of the transactions complained of. The Advisory Committee, believing the question should be settled in the courts, proposes no change in Rule 23 but thinks rather that the situation should be explained in an appropriate note.

The rule has a long history. In *Hawes v. Oakland* (1882) 104 U.S. 450, the Court held that a shareholder could not maintain such an action unless he owned shares at the time of the transactions complained of, or unless they devolved on him by operation of law. At that time

the decision in *Swift v. Tyson* (1842) 16 Peters 1, was the law, and the federal courts considered themselves free to establish their own principles of equity jurisprudence, so the Court was not in 1882 and has not been, until *Erie R. Co. v. Tompkins* in 1938, concerned with the question whether *Hawes v. Oakland* dealt with substantive right or procedure.

Following the decision in *Hawes v. Oakland*, and at the same term, the Court, to implement its decision, adopted [former] Equity Rule 94, which contained the same provision above quoted from Rule 23 F.R.C.P. The provision in [former] Equity Rule 94 was later embodied in [former] Equity Rule 27, of which the present Rule 23 is substantially a copy.

In *City of Quincy v. Steel* (1887) 120 U.S. 241, 245, the Court referring to *Hawes v. Oakland* said: "In order to give effect to the principles there laid down, this Court at that term adopted Rule 94 of the rules of practice for courts of equity of the United States."

Some other cases dealing with [former] Equity Rules 94 or 27 prior to the decision in *Erie R. Co. v. Tompkins* are *Dimpfel v. Ohio & Miss. R. R.* (1884) 110 U.S. 209; *Illinois Central R. Co. v. Adams* (1901) 180 U.S. 28, 34; *Venner v. Great Northern Ry.* (1908) 209 U.S. 24, 30; *Jacobson v. General Motors Corp.* (S.D.N.Y. 1938) 22 F.Supp. 255, 257. These cases generally treat *Hawes v. Oakland* as establishing a "principle" of equity, or as dealing not with jurisdiction but with the "right" to maintain an action, or have said that the defense under the equity rule is analogous to the defense that the plaintiff has no "title" and results in a dismissal "for want of equity."

Those state decisions which held that a shareholder acquiring stock after the event may maintain a derivative action are founded on the view that it is a right belonging to the shareholder at the time of the transaction and which passes as a right to the subsequent purchaser. See *Pollitz v. Gould* (1911) 202 N.Y. 11.

The first case arising after the decision in *Erie R. Co. v. Tompkins*, in which this problem was involved, was *Summers v. Hearst* (S.D.N.Y. 1938) 23 F.Supp. 986. It concerned [former] Equity Rule 27, as Federal Rule 23 was not then in effect. In a well considered opinion Judge Leibell reviewed the decisions and said: "The federal cases that discuss this section of Rule 27 support the view that it states a principle of substantive law." He quoted *Pollitz v. Gould* (1911) 202 N.Y. 11, as saying that the United States Supreme Court "seems to have been more concerned with establishing this rule as one of practice than of substantive law" but that "whether it be regarded as establishing a principle of law or a rule of practice, this authority has been subsequently followed in the United States courts."

He then concluded that, although the federal decisions treat the equity rule as "stating a principle of substantive law", if [former] "Equity Rule 27 is to be modified or revoked in view of *Erie R. Co. v. Tompkins*, it is not the province of this Court to suggest it, much less impliedly to follow that course by disregarding the mandatory provisions of the Rule."

Some other federal decisions since 1938 touch the question.

SpA.40

In *Piccard v. Sperry Corporation* (S.D.N.Y. 1941) 36 F.Supp. 1006, 1009–10, affirmed without opinion (C.C.A.2d, 1941) 120 F.(2d) 328, a shareholder, not such at the time of the transactions complained of, sought to intervene. The court held an intervenor was as much subject to Rule 23 as an original plaintiff; and that the requirement of Rule 23(b) was "a matter of practice," not substance, and applied in New York where the state law was otherwise, despite *Erie R. Co. v. Tompkins*. In *York v. Guaranty Trust Co. of New York* (C.C.A.2d, 1944) 143 F.(2d) 503, rev'd on other grounds (1945) 65 S.Ct. 1464, the court said: "Restrictions on the bringing of stockholders' actions, such as those imposed by F.R.C.P. 23 (b) or other state statutes are procedural," citing the *Piccard* and other cases.

In *Gallup v. Caldwell* (C.C.A.3d, 1941) 120 F.(2d) 90, 95, arising in New Jersey, the point was raised but not decided, the court saying that it was not satisfied that the then New Jersey rule differed from Rule 23(b), and that "under the circumstances the proper course was to follow Rule 23(b)."

In *Mullins v. De Soto Securities Co*. (W.D.La. 1942) 45 F.Supp. 871, 878, the point was not decided, because the court found the Louisiana rule to be the same as that stated in Rule 23(b).

In *Toebelman v. Missouri-Kansas Pipe Line Co*. (D.Del. 1941) 41 F.Supp. 334, 340, the court dealt only with another part of Rule 23(b), relating to prior demands on the stockholders and did not discuss *Erie R. Co. v. Tompkins*, or its effect on the rule.

In *Perrott v. United States Banking Corp*. (D.Del. 1944) 53 F.Supp. 953, it appeared that the Delaware law does not require the plaintiff to have owned shares at the time of the transaction complained of. The court sustained Rule 23(b), after discussion of the authorities, saying:

"It seems to me the rule does not go beyond procedure. * * * Simply because a particular plaintiff cannot qualify as a proper party to maintain such an action does not destroy or even whittle at the cause of action. The cause of action exists until a qualified plaintiff can get it started in a federal court."

In *Bankers Nat. Corp. v. Barr* (S.D.N.Y. 1945) 9 Fed.Rules Serv. 23b.11, Case 1, the court held Rule 23(b) to be one of procedure, but that whether the plaintiff was a stockholder was a substantive question to be settled by state law.

The New York rule, as stated in *Pollitz v. Gould, supra*, has been altered by an act of the New York Legislature (Chapter 667, Laws of 1944, effective April 9, 1944, General Corporation Law, §61) which provides that "in any action brought by a shareholder in the right of a . . . corporation, it must appear that the plaintiff was a stockholder at the time of the transaction of which he complains, or that his stock thereafter devolved upon him by operation of law." At the same time a further and separate provision was enacted, requiring under certain circumstances the giving of security for reasonable expenses and attorney's fees, to which security the corporation in whose right the action is brought and the defendants therein may

have recourse. (Chapter 668, Laws of 1944, effective April 9, 1944, General Corporation Law, §61–b.) These provisions are aimed at so-called "strike" stockholders' suits and their attendant abuses. *Shielcrawt v. Moffett* (Ct.App. 1945) 294 N.Y. 180, 61 N.E.(2d) 435, rev'g 51 N.Y.S.(2d) 188, aff'g 49 N.Y.S.(2d) 64; *Noel Associates, Inc. v. Merrill* (Sup.Ct. 1944) 184 Misc. 646, 53 N.Y.S. (2d) 143.

Insofar as §61 is concerned, it has been held that the section is procedural in nature. *Klum v. Clinton Trust Co*. (Sup.Ct. 1944) 183 Misc. 340, 48 N.Y.S.(2d) 267; *Noel Associates, Inc. v. Merrill, supra*. In the latter case the court pointed out that "The 1944 amendment to Section 61 rejected the rule laid down in the *Pollitz* case and substituted, in place thereof, in its precise language, the rule which has long prevailed in the Federal Courts and which is now Rule 23(b) . . ." There is, nevertheless, a difference of opinion regarding the application of the statute to pending actions. See *Klum v. Clinton Trust Co., supra* (applicable); *Noel Associates, Inc. v. Merrill, supra* (inapplicable).

With respect to §61–b, which may be regarded as a separate problem (*Noel Associates, Inc. v. Merrill, supra*), it has been held that even though the statute is procedural in nature—a matter not definitely decided—the Legislature evinced no intent that the provision should apply to actions pending when it became effective. *Shielcrawt v. Moffett, supra*. As to actions instituted after the effective date of the legislation, the constitutionality of §61–b is in dispute. See *Wolf v. Atkinson* (Sup.Ct. 1944) 182 Misc. 675, 49 N.Y.S.(2d) 703 (constitutional); *Citron v. Mangel Stores Corp*. (Sup.Ct. 1944) — Misc. —, 50 N.Y.S.(2d) 416 (unconstitutional); Zlinkoff, *The American Investor and the Constitutionality of Section 61–B of the New York General Corporation Law* (1945) 54 Yale L.J. 352.

New Jersey also enacted a statute, similar to Chapters 667 and 668 of the New York law. See P.L. 1945, Ch. 131, R.S.Cum.Supp. 14:3–15. The New Jersey provision similar to Chapter 668 (§61–b) differs, however, in that it specifically applies retroactively. It has been held that this provision is procedural and hence will not govern a pending action brought against a New Jersey corporation in the New York courts. *Shielcrawt v. Moffett* (Sup.Ct.N.Y. 1945) 184 Misc. 1074, 56 N.Y.S.(2d) 134.

See also generally, 2 *Moore's Federal Practice* (1938) 2250–2253, and Cum.Supplement §23.05.

The decisions here discussed show that the question is a debatable one, and that there is respectable authority for either view, with a recent trend towards the view that Rule 23(b)(1) is procedural. There is reason to say that the question is one which should not be decided by the Supreme Court *ex parte*, but left to await a judicial decision in a litigated case, and that in the light of the material in this note, the only inference to be drawn from a failure to amend Rule 23(b) would be that the question is postponed to await a litigated case.

The Advisory Committee is unanimously of the opinion that this course should be followed.

SpA.42

If, however, the final conclusion is that the rule deals with a matter of substantive right, then the rule should be amended by adding a provision that Rule 23(b)(1) does not apply in jurisdictions where state law permits a shareholder to maintain a secondary action, although he was not a shareholder at the time of the transactions of which he complains.

NOTES OF ADVISORY COMMITTEE ON RULES—1966 AMENDMENT

*Difficulties with the original rule*. The categories of class actions in the original rule were defined in terms of the abstract nature of the rights involved: the so-called "true" category was defined as involving "joint, common, or secondary rights"; the "hybrid" category, as involving "several" rights related to "specific property"; the "spurious" category, as involving "several" rights affected by a common question and related to common relief. It was thought that the definitions accurately described the situations amendable to the class-suit device, and also would indicate the proper extent of the judgment in each category, which would in turn help to determine the res judicata effect of the judgment if questioned in a later action. Thus the judgments in "true" and "hybrid" class actions would extend to the class (although in somewhat different ways); the judgment in a "spurious" class action would extend only to the parties including intervenors. See Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft*, 25 Geo.L.J. 551, 570–76 (1937).

In practice, the terms "joint," "common," etc., which were used as the basis of the Rule 23 classification proved obscure and uncertain. See Chaffee, *Some Problems of Equity* 245–46, 256–57 (1950); Kalven & Rosenfield, *The Contemporary Function of the Class Suit*, 8 U. of Chi.L.Rev. 684, 707 & n. 73 (1941); Keeffe, Levy & Donovan, *Lee Defeats Ben Hur*, 33 Corn.L.Q. 327, 329–36 (1948); *Developments in the Law: Multiparty Litigation in the Federal Courts*, 71 Harv.L.Rev. 874, 931 (1958); Advisory Committee's Note to Rule 19, as amended. The courts had considerable difficulty with these terms. See, e.g., *Gullo v. Veterans' Coop. H. Assn*., 13 F.R.D. 11 (D.D.C. 1952); *Shipley v. Pittsburgh & L. E. R. Co*., 70 F.Supp. 870 (W.D.Pa. 1947); *Deckert v. Independence Shares Corp*., 27 F.Supp. 763 (E.D.Pa. 1939), rev'd, 108 F.2d 51 (3d Cir. 1939), rev'd, 311 U.S. 282 (1940), on remand, 39 F.Supp. 592 (E.D.Pa. 1941), rev'd sub nom. *Pennsylvania Co. for Ins. on Lives v. Deckert*, 123 F.2d 979 (3d Cir. 1941) (see Chaffee, supra, at 264–65).

Nor did the rule provide an adequate guide to the proper extent of the judgments in class actions. First, we find instances of the courts classifying actions as "true" or intimating that the judgments would be decisive for the class where these results seemed appropriate but were reached by dint of depriving the word "several" of coherent meaning. See, e.g., *System Federation No. 91 v. Reed*, 180 F.2d 991 (6th Cir. 1950); *Wilson v. City of Paducah*, 100 F.Supp. 116 (W.D.Ky. 1951); *Citizens Banking Co. v. Monticello State Bank*, 143 F.2d 261 (8th Cir. 1944); *Redmond v. Commerce Trust Co*., 144 F.2d 140 (8th Cir. 1944), cert. denied, 323 U.S. 776 (1944); *United States v. American Optical Co*., 97 F.Supp. 66 (N.D.Ill. 1951); *National Hairdressers' & C. Assn. v. Philad. Co*., 34 F.Supp. 264 (D.Del. 1940); 41 F.Supp. 701 (D.Del. 1940), aff'd mem., 129 F.2d 1020 (3d Cir. 1942). Second, we find cases classified by the courts as "spurious" in which,

on a realistic view, it would seem fitting for the judgments to extend to the class. See, e.g., *Knapp v. Bankers Sec. Corp.*, 17 F.R.D. 245 (E.D.Pa. 1954); aff'd 230 F.2d 717 (3d Cir. 1956); *Giesecke v. Denver Tramway Corp.*, 81 F.Supp. 957 (D.Del. 1949); *York v. Guaranty Trust Co.*, 143 F.2d 503 (2d Cir. 1944), rev'd on grounds not here relevant, 326 U.S. 90 (1945) (see Chafee, supra, at 208); cf. *Webster Eisenlohr, Inc. v. Kalodner*, 145 F.2d 316, 320 (3d Cir. 1944), cert. denied, 325 U.S. 807 (1945). But cf. the early decisions, *Duke of Bedford v. Ellis* [1901], A.C. 1; *Sheffield Waterworks v. Yeomans*, L.R. 2 Ch.App. 8 (1866); *Brown v. Vermuden*, 1 Ch.Cas. 272, 22 Eng.Rep. 796 (1676).

The "spurious" action envisaged by original Rule 23 was in any event an anomaly because, although denominated a "class" action and pleaded as such, it was supposed not to adjudicate the rights or liabilities of any person not a party. It was believed to be an advantage of the "spurious" category that it would invite decisions that a member of the "class" could, like a member of the class in a "true" or "hybrid" action, intervene on an ancillary basis without being required to show an independent basis of Federal jurisdiction, and have the benefit of the date of the commencement of the action for purposes of the statute of limitations. See 3 *Moore's Federal Practice*, pars. 23.10[1], 23.12 (2d ed. 1963). These results were attained in some instances but not in others. On the statute of limitations, see *Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801 (1963); but cf. *P. W. Husserl, Inc. v. Newman*, 25 F.R.D. 264 (S.D.N.Y. 1960); *Athas v. Day*, 161 F.Supp. 916 (D.Colo. 1958). On ancillary intervention, see *Amen v. Black*, 234 F.2d 12 (10th Cir. 1956), cert. granted, 352 U.S. 888 (1956), dism. on stip., 355 U.S. 600 (1958); but. cf. *Wagner v. Kemper*, 13 F.R.D. 128 (W.D.Mo. 1952). The results, however, can hardly depend upon the mere appearance of a "spurious" category in the rule; they should turn no more basic considerations. See discussion of subdivision (c)(1) below.

Finally, the original rule did not squarely address itself to the question of the measures that might be taken during the course of the action to assure procedural fairness, particularly giving notice to members of the class, which may in turn be related in some instances to the extension of the judgment to the class. See Chafee, supra, at 230–31; Keeffe, Levy & Donovan, supra; *Developments in the Law*, supra, 71 Harv.L.Rev. at 937–38; Note, *Binding Effect of Class Actions*, 67 Harv.L.Rev. 1059, 1062–65 (1954); Note, *Federal Class Actions: A Suggested Revision of Rule 23*, 46 Colum.L.Rev. 818, 833–36 (1946); Mich.Gen.Court R. 208.4 (effective Jan. 1, 1963); Idaho R.Civ.P. 23(d); Minn.R.Civ.P. 23.04; N.Dak.R.Civ.P. 23(d).

*The amended rule* describes in more practical terms the occasions for maintaining class actions; provides that all class actions maintained to the end as such will result in judgments including those whom the court finds to be members of the class, whether or not the judgment is favorable to the class; and refers to the measures which can be taken to assure the fair conduct of these actions.

*Subdivision (a)* states the prerequisites for maintaining any class action in terms of the numerousness of the class making joinder of the members impracticable, the existence of questions common to the class, and the desired qualifications of the representative parties. See Weinstein, *Revision of Procedure; Some Problems in Class Actions*, 9 Buffalo L.Rev. 433, 458–59 (1960); 2 Barron & Holtzoff, *Federal Practice & Procedure* §562, at 265, §572, at 351–52 (Wright ed. 1961). These are necessary but not sufficient conditions for a class action. See, e.g., *Giordano v. Radio Corp. of Am*., 183 F.2d 558, 560 (3d Cir. 1950); *Zachman v. Erwin*, 186 F.Supp. 681 (S.D.Tex. 1959); *Baim & Blank, Inc. v. Warren Connelly Co., Inc*., 19 F.R.D. 108 (S.D.N.Y. 1956). Subdivision (b) describes the additional elements which in varying situations justify the use of a class action.

*Subdivision (b)(1)*. The difficulties which would be likely to arise if resort were had to separate actions by or against the individual members of the class here furnish the reasons for, and the principal key to, the propriety and value of utilizing the class-action device. The considerations stated under clauses (A) and (B) are comparable to certain of the elements which define the persons whose joinder in an action is desirable as stated in Rule 19(a), as amended. See amended Rule 19(a)(2)(i) and (ii), and the Advisory Committee's Note thereto; Hazard, *Indispensable Party; The Historical Origin of a Procedural Phantom*, 61 Colum.L.Rev. 1254, 1259–60 (1961); cf. 3 *Moore*, supra, par. 23.08, at 3435.

*Clause (A)*: One person may have rights against, or be under duties toward, numerous persons constituting a class, and be so positioned that conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern his conduct. The class action device can be used effectively to obviate the actual or virtual dilemma which would thus confront the party opposing the class. The matter has been stated thus: "The felt necessity for a class action is greatest when the courts are called upon to order or sanction the alteration of the status quo in circumstances such that a large number of persons are in a position to call on a single person to alter the status quo, or to complain if it is altered, and the possibility exists that [the] actor might be called upon to act in inconsistent ways." Louisell & Hazard, *Pleading and Procedure; State and Federal* 719 (1962); see *Supreme Tribe of Ben-Hur v. Cauble*, 255 U.S. 356, 366 –67 (1921). To illustrate: Separate actions by individuals against a municipality to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment, might create a risk of inconsistent or varying determinations. In the same way, individual litigations of the rights and duties of riparian owners, or of landowners' rights and duties respecting a claimed nuisance, could create a possibility of incompatible adjudications. Actions by or against a class provide a ready and fair means of achieving unitary adjudication. See *Maricopa County Mun. Water Con. Dist. v. Looney*, 219 F.2d 529 (9th Cir. 1955); *Rank v. Krug*, 142 F.Supp. 1, 154–59 (S.D.Calif. 1956), on app., *State of California v. Rank*, 293 F.2d 340, 348 (9th Cir. 1961); *Gart v. Cole*, 263 F.2d 244 (2d Cir. 1959), cert. denied 359 U.S. 978 (1959); cf. *Martinez v. Maverick Cty. Water Con. & Imp. Dist*., 219 F.2d 666 (5th Cir. 1955); 3 *Moore*, supra, par. 23.11[2], at 3458–59.

SpA.45

*Clause (B)*: This clause takes in situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual actions would lie in the fact that the other members of the class, thus practically concluded, would have had no representation in the lawsuit. In an action by policy holders against a fraternal benefit association attacking a financial reorganization of the society, it would hardly have been practical, if indeed it would have been possible, to confine the effects of a validation of the reorganization to the individual plaintiffs. Consequently a class action was called for with adequate representation of all members of the class. See *Supreme Tribe of Ben-Hur v. Cauble*, 255 U.S. 356 (1921); *Waybright v. Columbian Mut. Life Ins. Co*., 30 F.Supp. 885 (W.D.Tenn. 1939); cf. *Smith v. Swormstedt*, 16 How. (57 U.S.) 288 (1853). For much the same reason actions by shareholders to compel the declaration of a dividend the proper recognition and handling of redemption or pre-emption rights, or the like (or actions by the corporation for corresponding declarations of rights), should ordinarily be conducted as class actions, although the matter has been much obscured by the insistence that each shareholder has an individual claim. See *Knapp v. Bankers Securities Corp*., 17 F.R.D. 245 (E.D.Pa. 1954), aff'd, 230 F.2d 717 (3d Cir. 1956); *Giesecke v. Denver Tramway Corp*., 81 F.Supp. 957 (D.Del. 1949); *Zahn v. Transamerica Corp*., 162 F.2d 36 (3d Cir. 1947); *Speed v. Transamerica Corp*., 100 F.Supp. 461 (D.Del. 1951); *Sobel v. Whittier Corp*., 95 F.Supp. 643 (E.D.Mich. 1951), app. dism., 195 F.2d 361 (6th Cir. 1952); *Goldberg v. Whittier Corp*., 111 F.Supp. 382 (E.D.Mich. 1953); *Dann v. Studebaker-Packard Corp*., 288 F.2d 201 (6th Cir. 1961); *Edgerton v. Armour & Co*., 94 F.Supp. 549 (S.D.Calif. 1950); *Ames v. Mengel Co*., 190 F.2d 344 (2d Cir. 1951). (These shareholders' actions are to be distinguished from derivative actions by shareholders dealt with in new Rule 23.1). The same reasoning applies to an action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders or other beneficiaries, and which requires an accounting or like measures to restore the subject of the trust. See *Bosenberg v. Chicago T. & T. Co*., 128 F.2d 245 (7th Cir. 1942); *Citizens Banking Co. v. Monticello State Bank*, 143 F.2d 261 (8th Cir. 1944); *Redmond v. Commerce Trust Co*., 144 F.2d 140 (8th Cir. 1944), cert. denied, 323 U.S. 776 (1944); cf. *York v. Guaranty Trust Co*., 143 F.2d 503 (2d Cir. 1944), rev'd on grounds not here relevant, 326 U.S. 99 (1945).

In various situations an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund, meets the problem. Cf. *Dickinson v. Burnham*, 197 F.2d 973 (2d Cir. 1952), cert. denied, 344 U.S. 875 (1952); 3 Moore, supra, at par. 23.09. The same reasoning applies to an action by a creditor to set aside a fraudulent conveyance by the debtor and to appropriate the property to his claim, when the debtor's assets are insufficient to pay all creditors' claims. See *Hefferman*

*v. Bennett & Armour*, 110 Cal.App.2d 564, 243 P.2d 846 (1952); cf. *City & County of San Francisco v. Market Street Ry*., 95 Cal.App.2d 648, 213 P.2d 780 (1950). Similar problems, however, can arise in the absence of a fund either present or potential. A negative or mandatory injunction secured by one of a numerous class may disable the opposing party from performing claimed duties toward the other members of the class or materially affect his ability to do so. An adjudication as to movie "clearances and runs" nominally affecting only one exhibitor would often have practical effects on all the exhibitors in the same territorial area. Cf. *United States v. Paramount Pictures, Inc*., 66 F.Supp. 323, 341–46 (S.D.N.Y. 1946); 334 U.S. 131, 144 –48 (1948). Assuming a sufficiently numerous class of exhibitors, a class action would be advisable. (Here representation of subclasses of exhibitors could become necessary; see subdivision (c)(3)(B).)

*Subdivision (b)(2)*. This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages. Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.

Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration. See *Potts v. Flax*, 313 F.2d 284 (5th Cir. 1963); *Bailey v. Patterson*, 323 F.2d 201 (5th Cir. 1963), cert. denied, 377 U.S. 972 (1964); *Brunson v. Board of Trustees of School District No. 1, Clarendon City, S.C*., 311 F.2d 107 (4th Cir. 1962), cert. denied, 373 U.S. 933 (1963); *Green v. School Bd. of Roanoke, Va*., 304 F.2d 118 (4th Cir. 1962); *Orleans Parish School Bd. v. Bush*, 242 F.2d 156 (5th Cir. 1957), cert. denied, 354 U.S. 921 (1957); *Mannings v. Board of Public Inst. of Hillsborough County, Fla*., 277 F.2d 370 (5th Cir. 1960); *Northcross v. Board of Ed. of City of Memphis*, 302 F.2d 818 (6th Cir. 1962), cert. denied 370 U.S. 944 (1962); *Frasier v. Board of Trustees of Univ. of N.C*., 134 F.Supp. 589 (M.D.N.C. 1955, 3-judge court), aff'd, 350 U.S. 979 (1956). Subdivision (b)(2) is not limited to civil-rights cases. Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential. So also a patentee of a machine, charged with selling or licensing the machine on condition that purchasers or licensees also purchase or obtain licenses to use an ancillary unpatented machine, could be sued on a class basis by a numerous group of purchasers or licensees, or by a numerous group of competing sellers or licensors of the unpatented machine, to test the legality of the "tying" condition.

*Subdivision (b)(3)*. In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above, but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote, uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Cf. Chafee, supra, at 201.

The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representation made or in the kinds or degrees of reliance by the persons to whom they were addressed. See *Oppenheimer v. F. J. Young & Co., Inc*., 144 F.2d 387 (2d Cir. 1944); *Miller v. National City Bank of N.Y*., 166 F.2d 723 (2d Cir. 1948); and for like problems in other contexts, see *Hughes v. Encyclopaedia Brittanica*, 199 F.2d 295 (7th Cir. 1952); *Sturgeon v. Great Lakes Steel Corp*., 143 F.2d 819 (6th Cir. 1944). A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. See *Pennsylvania R.R. v. United States*, 111 F.Supp. 80 (D.N.J. 1953); cf. Weinstein, supra, 9 Buffalo L.Rev. at 469. Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions. See *Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801 (1963); cf. *Weeks v. Bareco Oil Co*., 125 F.2d 84 (7th Cir. 1941); *Kainz v. Anheuser-Busch, Inc*., 194 F.2d 737 (7th Cir. 1952); *Hess v. Anderson, Clayton & Co*., 20 F.R.D. 466 (S.D.Calif. 1957).

That common questions predominate is not itself sufficient to justify a class action under subdivision (b)(3), for another method of handling the litigious situation may be available which has greater practical advantages. Thus one or more actions agreed to by the parties as test or model actions may be preferable to a class action; or it may prove feasible and preferable to consolidate actions. Cf. Weinstein, supra, 9 Buffalo L.Rev. at 438–54. Even when a number of separate actions are proceeding simultaneously, experience shows that the burdens on the parties and the courts can sometimes be reduced by arrangements for avoiding repetitious discovery or the like. Currently the Coordinating Committee on Multiple Litigation in the United States District Courts (a subcommittee of the Committee on Trial Practice and Technique of the Judicial Conference of the United States) is charged with

developing methods for expediting such massive litigation. To reinforce the point that the court with the aid of the parties ought to assess the relative advantages of alternative procedures for handling the total controversy, subdivision (b)(3) requires, as a further condition of maintaining the class action, that the court shall find that that procedure is "superior" to the others in the particular circumstances.

Factors (A)–(D) are listed, non-exhaustively, as pertinent to the findings. The court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. See *Weeks v. Bareco Oil Co*., 125 F.2d 84, 88–90, 93–94 (7th Cir. 1941) (anti-trust action); see also *Pentland v. Dravo Corp*., 152 F.2d 851 (3d Cir. 1945), and Chaffee, supra, at 273–75, regarding policy of Fair Labor Standards Act of 1938, §16(b), 29 U.S.C. §216(b), prior to amendment by Portal-to-Portal Act of 1947, §5(a). [The present provisions of 29 U.S.C. §216(b) are not intended to be affected by Rule 23, as amended.]

In this connection the court should inform itself of any litigation actually pending by or against the individuals. The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable. The burden that separate suits would impose on the party opposing the class, or upon the court calendars, may also fairly be considered. (See the discussion, under subdivision (c)(2) below, of the right of members to be excluded from the class upon their request.)

Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought. Finally, the court should consider the problems of management which are likely to arise in the conduct of a class action.

*Subdivision (c)(1)*. In order to give clear definition to the action, this provision requires the court to determine, as early in the proceedings as may be practicable, whether an action brought as a class action is to be so maintained. The determination depends in each case on satisfaction of the terms of subdivision (a) and the relevant provisions of subdivision (b).

An order embodying a determination can be conditional; the court may rule, for example, that a class action may be maintained only if the representation is improved through intervention of additional parties of a stated type. A determination once made can be altered or amended before the decision on the merits if, upon fuller development of the facts, the original determination appears unsound. A negative determination means that the action should be stripped of its character as a class action. See subdivision (d)(4). Although an action thus becomes a nonclass action, the court may still be receptive to interventions before the decision on the merits so that the litigation may cover as many interests as can be

conveniently handled; the questions whether the intervenors in the nonclass action shall be permitted to claim "ancillary" jurisdiction or the benefit of the date of the commencement of the action for purposes of the statute of limitations are to be decided by reference to the laws governing jurisdiction and limitations as they apply in particular contexts.

Whether the court should require notice to be given to members of the class of its intention to make a determination, or of the order embodying it, is left to the court's discretion under subdivision (d)(2).

*Subdivision (c)(2)* makes special provision for class actions maintained under subdivision (b)(3). As noted in the discussion of the latter subdivision, the interests of the individuals in pursuing their own litigations may be so strong here as to warrant denial of a class action altogether. Even when a class action is maintained under subdivision (b)(3), this individual interest is respected. Thus the court is required to direct notice to the members of the class of the right of each member to be excluded from the class upon his request. A member who does not request exclusion may, if he wishes, enter an appearance in the action through his counsel; whether or not he does so, the judgment in the action will embrace him.

The notice setting forth the alternatives open to the members of the class, is to be the best practicable under the circumstances, and shall include individual notice to the members who can be identified through reasonable effort. (For further discussion of this notice, see the statement under subdivision (d)(2) below.)

*Subdivision (c)(3)*. The judgment in a class action maintained as such to the end will embrace the class, that is, in a class action under subdivision (b)(1) or (b)(2), those found by the court to be class members; in a class action under subdivision (b)(3), those to whom the notice prescribed by subdivision (c)(2) was directed, excepting those who requested exclusion or who are ultimately found by the court not to be members of the class. The judgment has this scope whether it is favorable or unfavorable to the class. In a (b)(1) or (b)(2) action the judgment "describes" the members of the class, but need not specify the individual members; in a (b)(3) action the judgment "specifies" the individual members who have been identified and described the others.

Compare subdivision (c)(4) as to actions conducted as class actions only with respect to particular issues. Where the class-action character of the lawsuit is based solely on the existence of a "limited fund," the judgment, while extending to all claims of class members against the fund, has ordinarily left unaffected the personal claims of nonappearing members against the debtor. See 3 Moore, supra, par. 23.11[4].

Hitherto, in a few actions conducted as "spurious" class actions and thus nominally designed to extend only to parties and others intervening *before* the determination of liability, courts have held or intimated that class members might be permitted to intervene *after* a decision on the merits favorable to their interests, in order to secure the benefits of the decision for themselves, although they would presumably be unaffected by an unfavorable decision. See,

as to the propriety of this so-called "one-way" intervention in "spurious" actions, the conflicting views expressed in *Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801 (1963); *York v. Guaranty Trust Co.*, 143 F.2d 503, 529 (2d Cir. 1944), rev'd on grounds not here relevant, 326 U.S. 99 (1945); *Pentland v. Dravo Corp.*, 152 F.2d 851, 856 (3d Cir. 1945); *Speed v. Transamerica Corp.*, 100 F.Supp. 461, 463 (D.Del. 1951); *State Wholesale Grocers v. Great Atl. & Pac. Tea Co.*, 24 F.R.D. 510 (N.D.Ill. 1959); *Alabama Ind. Serv. Stat. Assn. v. Shell Pet Corp.*, 28 F.Supp. 386, 390 (N.D.Ala. 1939); *Tolliver v. Cudahy Packing Co.*, 39 F.Supp. 337, 339 (E.D.Tenn. 1941); Kalven & Rosenfield, supra, 8 U. of Chi.L.Rev. 684 (1941); Comment, 53 Nw.U.L.Rev. 627, 632–33 (1958); Developments in the Law, supra, 71 Harv.L.Rev. at 935; 2 Barron & Holtzoff, supra, §568; but cf. *Lockwood v. Hercules Powder Co.*, 7 F.R.D. 24, 28–29 (W.D.Mo. 1947); *Abram v. San Joaquin Cotton Oil Co.*, 46 F.Supp. 969, 976–77 (S.D.Calif. 1942); Chaffee, supra, at 280, 285; 3 *Moore*, supra, par. 23.12, at 3476. Under proposed subdivision (c)(3), one-way intervention is excluded; the action will have been early determined to be a class or nonclass action, and in the former case the judgment, whether or not favorable, will include the class, as above stated.

Although thus declaring that the judgment in a class action includes the class, as defined, subdivision (c)(3) does not disturb the recognized principle that the court conducting the action cannot predetermine the *res judicata* effect of the judgment; this can be tested only in a subsequent action. See Restatement, *Judgments* §86, comment (h), §116 (1942). The court, however, in framing the judgment in any suit brought as a class action, must decide what its extent or coverage shall be, and if the matter is carefully considered, questions of *res judicata* are less likely to be raised at a later time and if raised will be more satisfactorily answered. See Chaffee, supra, at 294; Weinstein, supra, 9 Buffalo L.Rev. at 460.

*Subdivision (c)(4)*. This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.

Two or more classes may be represented in a single action. Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class.

*Subdivision (d)* is concerned with the fair and efficient conduct of the action and lists some types of orders which may be appropriate.

The court should consider how the proceedings are to be arranged in sequence, and what measures should be taken to simplify the proof and argument. See subdivision (d)(1). The orders resulting from this consideration, like the others referred to in subdivision (d), may be combined with a pretrial order under Rule 16, and are subject to modification as the case proceeds.

Subdivision (d)(2) sets out a non-exhaustive list of possible occasions for orders requiring notice to the class. Such notice is not a novel conception. For example, in "limited fund" cases, members of the class have been notified to present individual claims after the basic class decision. Notice has gone to members of a class so that they might express any opposition to the representation, see *United States v. American Optical Co.*, 97 F.Supp. 66 (N.D.Ill. 1951), and 1950–51 CCH Trade Cases 64573–74 (par. 62869); cf. *Weeks v. Bareco Oil Co.*, 125 F.2d 84, 94 (7th Cir. 1941), and notice may encourage interventions to improve the representation of the class. Cf. *Oppenheimer v. F. J. Young & Co.*, 144 F.2d 387 (2d Cir. 1944). Notice has been used to poll members on a proposed modification of a consent decree. See record in *Sam Fox Publishing Co. v. United States*, 366 U.S. 683 (1961).

Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion. In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum. These indicators suggest that notice under subdivision (d)(2) may be particularly useful and advisable in certain class actions maintained under subdivision (b)(3), for example, to permit members of the class to object to the representation. Indeed, under subdivision (c)(2), notice must be ordered, and is not merely discretionary, to give the members in a subdivision (b)(3) class action an opportunity to secure exclusion from the class. This mandatory notice pursuant to subdivision (c)(2), together with any discretionary notice which the court may find it advisable to give under subdivision (d)(2), is designed to fulfill requirements of due process to which the class action procedure is of course subject. See *Hansberry v. Lee*, 311 U.S. 32 (1940); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950); cf. *Dickinson v. Burnham*, 197 F.2d 973, 979 (2d Cir. 1952), and studies cited at 979 n. 4; see also *All American Airways, Inc. v. Elderd*, 209 F.2d 247, 249 (2d Cir. 1954); *Gart v. Cole*, 263 F.2d 244, 248–49 (2d Cir. 1959), cert. denied, 359 U.S. 978 (1959).

Notice to members of the class, whenever employed under amended Rule 23, should be accommodated to the particular purpose but need not comply with the formalities for service of process. See Chafee, supra, at 230–31; *Brendle v. Smith*, 7 F.R.D. 119 (S.D.N.Y. 1946). The fact that notice is given at one stage of the action does not mean that it must be given at subsequent stages. Notice is available fundamentally "for the protection of the members of the class or otherwise for the fair conduct of the action" and should not be used merely as a device for the undesirable solicitation of claims. See the discussion in *Cherner v. Transitron Electronic Corp.*, 201 F.Supp. 934 (D.Mass. 1962); *Hormel v. United States*, 17 F.R.D. 303 (S.D.N.Y. 1955).

In appropriate cases the court should notify interested government agencies of the pendency of the action or of particular steps therein.

Subdivision (d)(3) reflects the possibility of conditioning the maintenance of a class action, e.g., on the strengthening of the representation, see subdivision (c)(1) above; and recognizes that the imposition of conditions on intervenors may be required for the proper and efficient

conduct of the action.

As to orders under subdivision (d)(4), see subdivision (c)(1) above.

Subdivision (e) requires approval of the court, after notice, for the dismissal or compromise of any class action.

NOTES OF ADVISORY COMMITTEE ON RULES—1987 AMENDMENT

The amendments are technical. No substantive change is intended.

COMMITTEE NOTES ON RULES—1998 AMENDMENT

*Subdivision (f)*. This permissive interlocutory appeal provision is adopted under the power conferred by 28 U.S.C. §1292(e). Appeal from an order granting or denying class certification is permitted in the sole discretion of the court of appeals. No other type of Rule 23 order is covered by this provision. The court of appeals is given unfettered discretion whether to permit the appeal, akin to the discretion exercised by the Supreme Court in acting on a petition for certiorari. This discretion suggests an analogy to the provision in 28 U.S.C. §1292(b) for permissive appeal on certification by a district court. Subdivision (f), however, departs from the §1292(b) model in two significant ways. It does not require that the district court certify the certification ruling for appeal, although the district court often can assist the parties and court of appeals by offering advice on the desirability of appeal. And it does not include the potentially limiting requirements of §1292(b) that the district court order "involve[] a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

The courts of appeals will develop standards for granting review that reflect the changing areas of uncertainty in class litigation. The Federal Judicial Center study supports the view that many suits with class-action allegations present familiar and almost routine issues that are no more worthy of immediate appeal than many other interlocutory rulings. Yet several concerns justify expansion of present opportunities to appeal. An order denying certification may confront the plaintiff with a situation in which the only sure path to appellate review is by proceeding to final judgment on the merits of an individual claim that, standing alone, is far smaller than the costs of litigation. An order granting certification, on the other hand, may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability. These concerns can be met at low cost by establishing in the court of appeals a discretionary power to grant interlocutory review in cases that show appeal-worthy certification issues.

Permission to appeal may be granted or denied on the basis of any consideration that the court of appeals finds persuasive. Permission is most likely to be granted when the certification decision turns on a novel or unsettled question of law, or when, as a practical matter, the decision on certification is likely dispositive of the litigation.

SpA.53

The district court, having worked through the certification decision, often will be able to provide cogent advice on the factors that bear on the decision whether to permit appeal. This advice can be particularly valuable if the certification decision is tentative. Even as to a firm certification decision, a statement of reasons bearing on the probable benefits and costs of immediate appeal can help focus the court of appeals decision, and may persuade the disappointed party that an attempt to appeal would be fruitless.

The 10-day period for seeking permission to appeal is designed to reduce the risk that attempted appeals will disrupt continuing proceedings. It is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal. Permission to appeal does not stay trial court proceedings. A stay should be sought first from the trial court. If the trial court refuses a stay, its action and any explanation of its views should weigh heavily with the court of appeals.

Appellate Rule 5 has been modified to establish the procedure for petitioning for leave to appeal under subdivision (f).

*Changes Made after Publication (GAP Report)*. No changes were made in the text of Rule 23(f) as published.

Several changes were made in the published Committee Note. (1) References to 28 U.S.C. §1292(b) interlocutory appeals were revised to dispel any implication that the restrictive elements of §1292(b) should be read in to Rule 23(f). New emphasis was placed on court of appeals discretion by making explicit the analogy to certiorari discretion. (2) Suggestions that the new procedure is a "modest" expansion of appeal opportunities, to be applied with "restraint," and that permission "almost always will be denied when the certification decision turns on case-specific matters of fact and district court discretion," were deleted. It was thought better simply to observe that courts of appeals will develop standards "that reflect the changing areas of uncertainty in class litigation."

### Committee Notes on Rules—2003 Amendment

*Subdivision (c)*. Subdivision (c) is amended in several respects. The requirement that the court determine whether to certify a class "as soon as practicable after commencement of an action" is replaced by requiring determination "at an early practicable time." The notice provisions are substantially revised.

*Paragraph (1)*. Subdivision (c)(1)(A) is changed to require that the determination whether to certify a class be made "at an early practicable time." The "as soon as practicable" exaction neither reflects prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision. See Willging, Hooper & Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 26–36* (Federal Judicial Center 1996).

Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis. Active judicial supervision may be required to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between "certification discovery" and "merits discovery." A critical need is to determine how the case will be tried. An increasing number of courts require a party requesting class certification to present a "trial plan" that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof. See Manual For Complex Litigation Third, §21.213, p. 44; §30.11, p. 214; §30.12, p. 215.

Other considerations may affect the timing of the certification decision. The party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified. Time may be needed to explore designation of class counsel under Rule 23(g), recognizing that in many cases the need to progress toward the certification determination may require designation of interim counsel under Rule 23(g)(2)(A).

Although many circumstances may justify deferring the certification decision, active management may be necessary to ensure that the certification decision is not unjustifiably delayed.

Subdivision (c)(1)(C) reflects two amendments. The provision that a class certification "may be conditional" is deleted. A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met. The provision that permits alteration or amendment of an order granting or denying class certification is amended to set the cut-off point at final judgment rather than "the decision on the merits." This change avoids the possible ambiguity in referring to "the decision on the merits." Following a determination of liability, for example, proceedings to define the remedy may demonstrate the need to amend the class definition or subdivide the class. In this setting the final judgment concept is pragmatic. It is not the same as the concept used for appeal purposes, but it should be flexible, particularly in protracted litigation.

The authority to amend an order under Rule 23(c)(1) before final judgment does not restore the practice of "one-way intervention" that was rejected by the 1966 revision of Rule 23. A determination of liability after certification, however, may show a need to amend the class definition. Decertification may be warranted after further proceedings.

If the definition of a class certified under Rule 23(b)(3) is altered to include members who have not been afforded notice and an opportunity to request exclusion, notice—including an opportunity to request exclusion—must be directed to the new class members under Rule 23(c)(2)(B).

*Paragraph (2)*. The first change made in Rule 23(c)(2) is to call attention to the court's authority—already established in part by Rule 23(d)(2)—to direct notice of certification to a Rule 23(b)(1) or (b)(2) class. The present rule expressly requires notice only in actions certified under Rule 23(b)(3). Members of classes certified under Rules 23(b)(1) or (b)(2) have interests that may deserve protection by notice.

The authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care. For several reasons, there may be less need for notice than in a (b)(3) class action. There is no right to request exclusion from a (b)(1) or (b)(2) class. The characteristics of the class may reduce the need for formal notice. The cost of providing notice, moreover, could easily cripple actions that do not seek damages. The court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice.

When the court does direct certification notice in a (b)(1) or (b)(2) class action, the discretion and flexibility established by subdivision (c)(2)(A) extend to the method of giving notice. Notice facilitates the opportunity to participate. Notice calculated to reach a significant number of class members often will protect the interests of all. Informal methods may prove effective. A simple posting in a place visited by many class members, directing attention to a source of more detailed information, may suffice. The court should consider the costs of notice in relation to the probable reach of inexpensive methods.

If a Rule 23(b)(3) class is certified in conjunction with a (b)(2) class, the (c)(2)(B) notice requirements must be satisfied as to the (b)(3) class.

The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members. It is difficult to provide information about most class actions that is both accurate and easily understood by class members who are not themselves lawyers. Factual uncertainty, legal complexity, and the complication of class-action procedure raise the barriers high. The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms.

*Subdivision (e)*. Subdivision (e) is amended to strengthen the process of reviewing proposed class-action settlements. Settlement may be a desirable means of resolving a class action. But court review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement.

*Paragraph (1)*. Subdivision (e)(1)(A) expressly recognizes the power of a class representative to settle class claims, issues, or defenses.

Rule 23(e)(1)(A) resolves the ambiguity in former Rule 23(e)'s reference to dismissal or compromise of "a class action." That language could be—and at times was—read to require court approval of settlements with putative class representatives that resolved only individual claims. See Manual for Complex Litigation Third, §30.41. The new rule requires approval only if the claims, issues, or defenses of a certified class are resolved by a settlement, voluntary dismissal, or compromise.

Subdivision (e)(1)(B) carries forward the notice requirement of present Rule 23(e) when the settlement binds the class through claim or issue preclusion; notice is not required when the settlement binds only the individual class representatives. Notice of a settlement binding on the class is required either when the settlement follows class certification or when the decisions on certification and settlement proceed simultaneously.

Reasonable settlement notice may require individual notice in the manner required by Rule 23(c)(2)(B) for certification notice to a Rule 23(b)(3) class. Individual notice is appropriate, for example, if class members are required to take action—such as filing claims—to participate in the judgment, or if the court orders a settlement opt-out opportunity under Rule 23(e)(3).

Subdivision (e)(1)(C) confirms and mandates the already common practice of holding hearings as part of the process of approving settlement, voluntary dismissal, or compromise that would bind members of a class.

Subdivision (e)(1)(C) states the standard for approving a proposed settlement that would bind class members. The settlement must be fair, reasonable, and adequate. A helpful review of many factors that may deserve consideration is provided by *In re: Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 316–324 (3d Cir. 1998). Further guidance can be found in the Manual for Complex Litigation.

The court must make findings that support the conclusion that the settlement is fair, reasonable, and adequate. The findings must be set out in sufficient detail to explain to class members and the appellate court the factors that bear on applying the standard.

Settlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses. Redefinition of a class certified under Rule 23(b)(3) may require notice to new class members under Rule 23(c)(2)(B). See Rule 23(c)(1)(C).

*Paragraph (2)*. Subdivision (e)(2) requires parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) to file a statement identifying any agreement made in connection with the settlement. This provision does not change the basic requirement that the parties disclose all terms of the settlement or compromise that the court must approve under Rule 23(e)(1). It aims instead at related undertakings that, although

seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others. Doubts should be resolved in favor of identification.

Further inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors. The court may direct the parties to provide to the court or other parties a summary or copy of the full terms of any agreement identified by the parties. The court also may direct the parties to provide a summary or copy of any agreement not identified by the parties that the court considers relevant to its review of a proposed settlement. In exercising discretion under this rule, the court may act in steps, calling first for a summary of any agreement that may have affected the settlement and then for a complete version if the summary does not provide an adequate basis for review. A direction to disclose a summary or copy of an agreement may raise concerns of confidentiality. Some agreements may include information that merits protection against general disclosure. And the court must provide an opportunity to claim work-product or other protections.

*Paragraph (3)*. Subdivision (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords class members a new opportunity to request exclusion from a class certified under Rule 23(b)(3) after settlement terms are known. An agreement by the parties themselves to permit class members to elect exclusion at this point by the settlement agreement may be one factor supporting approval of the settlement. Often there is an opportunity to opt out at this point because the class is certified and settlement is reached in circumstances that lead to simultaneous notice of certification and notice of settlement. In these cases, the basic opportunity to elect exclusion applies without further complication. In some cases, particularly if settlement appears imminent at the time of certification, it may be possible to achieve equivalent protection by deferring notice and the opportunity to elect exclusion until actual settlement terms are known. This approach avoids the cost and potential confusion of providing two notices and makes the single notice more meaningful. But notice should not be delayed unduly after certification in the hope of settlement.

Rule 23(e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

The opportunity to request exclusion from a proposed settlement is limited to members of a (b)(3) class. Exclusion may be requested only by individual class members; no class member may purport to opt out other class members by way of another class action.

The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion. The court may make this decision before directing notice to the class under Rule 23(e)(1)(B) or after the Rule 23(e)(1)(C) hearing. Many factors may influence the court's decision. Among these are changes in the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims.

The terms set for permitting a new opportunity to elect exclusion from the proposed settlement of a Rule 23(b)(3) class action may address concerns of potential misuse. The court might direct, for example, that class members who elect exclusion are bound by rulings on the merits made before the settlement was proposed for approval. Still other terms or conditions may be appropriate.

*Paragraph (4)*. Subdivision (e)(4) confirms the right of class members to object to a proposed settlement, voluntary dismissal, or compromise. The right is defined in relation to a disposition that, because it would bind the class, requires court approval under subdivision (e)(1)(C).

Subdivision (e)(4)(B) requires court approval for withdrawal of objections made under subdivision (e)(4)(A). Review follows automatically if the objections are withdrawn on terms that lead to modification of the settlement with the class. Review also is required if the objector formally withdraws the objections. If the objector simply abandons pursuit of the objection, the court may inquire into the circumstances.

Approval under paragraph (4)(B) may be given or denied with little need for further inquiry if the objection and the disposition go only to a protest that the individual treatment afforded the objector under the proposed settlement is unfair because of factors that distinguish the objector from other class members. Different considerations may apply if the objector has protested that the proposed settlement is not fair, reasonable, or adequate on grounds that apply generally to a class or subclass. Such objections, which purport to represent class-wide interests, may augment the opportunity for obstruction or delay. If such objections are surrendered on terms that do not affect the class settlement or the objector's participation in the class settlement, the court often can approve withdrawal of the objections without elaborate inquiry.

Once an objector appeals, control of the proceeding lies in the court of appeals. The court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement.

*Subdivision (g)*. Subdivision (g) is new. It responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than

introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision. This subdivision recognizes the importance of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel. The procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. The new subdivision also provides a method by which the court may make directions from the outset about the potential fee award to class counsel in the event the action is successful.

*Paragraph (1)* sets out the basic requirement that class counsel be appointed if a class is certified and articulates the obligation of class counsel to represent the interests of the class, as opposed to the potentially conflicting interests of individual class members. It also sets out the factors the court should consider in assessing proposed class counsel.

*Paragraph (1)(A)* requires that the court appoint class counsel to represent the class. Class counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests.

Paragraph (1)(A) does not apply if "a statute provides otherwise." This recognizes that provisions of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737 (1995) (codified in various sections of 15 U.S.C.), contain directives that bear on selection of a lead plaintiff and the retention of counsel. This subdivision does not purport to supersede or to affect the interpretation of those provisions, or any similar provisions of other legislation.

*Paragraph 1(B)* recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class. The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients. Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it. The class representatives do not have an unfettered right to "fire" class counsel. In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

*Paragraph (1)(C)* articulates the basic responsibility of the court to appoint class counsel who will provide the adequate representation called for by paragraph (1)(B). It identifies criteria that must be considered and invites the court to consider any other pertinent matters. Although couched in terms of the court's duty, the listing also informs counsel seeking appointment about the topics that should be addressed in an application for appointment or in the motion for class certification.

The court may direct potential class counsel to provide additional information about the topics mentioned in paragraph (1)(C) or about any other relevant topic. For example, the court may direct applicants to inform the court concerning any agreements about a prospective award of attorney fees or nontaxable costs, as such agreements may sometimes be significant in the selection of class counsel. The court might also direct that potential class counsel indicate how parallel litigation might be coordinated or consolidated with the action before the court.

The court may also direct counsel to propose terms for a potential award of attorney fees and nontaxable costs. Attorney fee awards are an important feature of class action practice, and attention to this subject from the outset may often be a productive technique. Paragraph (2)(C) therefore authorizes the court to provide directions about attorney fees and costs when appointing class counsel. Because there will be numerous class actions in which this information is not likely to be useful, the court need not consider it in all class actions.

Some information relevant to class counsel appointment may involve matters that include adversary preparation in a way that should be shielded from disclosure to other parties. An appropriate protective order may be necessary to preserve confidentiality.

In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case. For example, the resources counsel will commit to the case must be appropriate to its needs, but the court should be careful not to limit consideration to lawyers with the greatest resources.

If, after review of all applicants, the court concludes that none would be satisfactory class counsel, it may deny class certification, reject all applications, recommend that an application be modified, invite new applications, or make any other appropriate order regarding selection and appointment of class counsel.

*Paragraph (2)*. This paragraph sets out the procedure that should be followed in appointing class counsel. Although it affords substantial flexibility, it provides the framework for appointment of class counsel in all class actions. For counsel who filed the action, the materials submitted in support of the motion for class certification may suffice to justify appointment so long as the information described in paragraph (g)(1)(C) is included. If there are other applicants, they ordinarily would file a formal application detailing their suitability for the position.

In a plaintiff class action the court usually would appoint as class counsel only an attorney or attorneys who have sought appointment. Different considerations may apply in defendant class actions.

The rule states that the court should appoint "class counsel." In many instances, the applicant will be an individual attorney. In other cases, however, an entire firm, or perhaps numerous attorneys who are not otherwise affiliated but are collaborating on the action will

apply. No rule of thumb exists to determine when such arrangements are appropriate; the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure.

*Paragraph (2)(A)* authorizes the court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class. Rule 23(c)(1)(B) directs that the order certifying the class include appointment of class counsel. Before class certification, however, it will usually be important for an attorney to take action to prepare for the certification decision. The amendment to Rule 23(c)(1) recognizes that some discovery is often necessary for that determination. It also may be important to make or respond to motions before certification. Settlement may be discussed before certification. Ordinarily, such work is handled by the lawyer who filed the action. In some cases, however, there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate. Rule 23(g)(2)(A) authorizes the court to designate interim counsel to act on behalf of the putative class before the certification decision is made. Failure to make the formal designation does not prevent the attorney who filed the action from proceeding in it. Whether or not formally designated interim counsel, an attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole. For example, an attorney who negotiates a pre-certification settlement must seek a settlement that is fair, reasonable, and adequate for the class.

Rule 23(c)(1) provides that the court should decide whether to certify the class "at an early practicable time," and directs that class counsel should be appointed in the order certifying the class. In some cases, it may be appropriate for the court to allow a reasonable period after commencement of the action for filing applications to serve as class counsel. The primary ground for deferring appointment would be that there is reason to anticipate competing applications to serve as class counsel. Examples might include instances in which more than one class action has been filed, or in which other attorneys have filed individual actions on behalf of putative class members. The purpose of facilitating competing applications in such a case is to afford the best possible representation for the class. Another possible reason for deferring appointment would be that the initial applicant was found inadequate, but it seems appropriate to permit additional applications rather than deny class certification.

*Paragraph (2)(B)* states the basic standard the court should use in deciding whether to certify the class and appoint class counsel in the single applicant situation—that the applicant be able to provide the representation called for by paragraph (1)(B) in light of the factors identified in paragraph (1)(C).

If there are multiple adequate applicants, paragraph (2)(B) directs the court to select the class counsel best able to represent the interests of the class. This decision should also be made using the factors outlined in paragraph (1)(C), but in the multiple applicant situation the court is to go beyond scrutinizing the adequacy of counsel and make a comparison of the strengths of the various applicants. As with the decision whether to appoint the sole applicant

for the position, no single factor should be dispositive in selecting class counsel in cases in which there are multiple applicants. The fact that a given attorney filed the instant action, for example, might not weigh heavily in the decision if that lawyer had not done significant work identifying or investigating claims. Depending on the nature of the case, one important consideration might be the applicant's existing attorney-client relationship with the proposed class representative.

*Paragraph (2)(C)* builds on the appointment process by authorizing the court to include provisions regarding attorney fees in the order appointing class counsel. Courts may find it desirable to adopt guidelines for fees or nontaxable costs, or to direct class counsel to report to the court at regular intervals on the efforts undertaken in the action, to facilitate the court's later determination of a reasonable attorney fee.

*Subdivision (h).* Subdivision (h) is new. Fee awards are a powerful influence on the way attorneys initiate, develop, and conclude class actions. Class action attorney fee awards have heretofore been handled, along with all other attorney fee awards, under Rule 54(d)(2), but that rule is not addressed to the particular concerns of class actions. This subdivision is designed to work in tandem with new subdivision (g) on appointment of class counsel, which may afford an opportunity for the court to provide an early framework for an eventual fee award, or for the work of class counsel during the pendency of the action.

Subdivision (h) applies to "an action certified as a class action." This includes cases in which there is a simultaneous proposal for class certification and settlement even though technically the class may not be certified unless the court approves the settlement pursuant to review under Rule 23(e). When a settlement is proposed for Rule 23(e) approval, either after certification or with a request for certification, notice to class members about class counsel's fee motion would ordinarily accompany the notice to the class about the settlement proposal itself.

This subdivision does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties. Against that background, it provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel. Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

This subdivision authorizes an award of "reasonable" attorney fees and nontaxable costs. This is the customary term for measurement of fee awards in cases in which counsel may obtain an award of fees under the "common fund" theory that applies in many class actions, and is used in many fee-shifting statutes. Depending on the circumstances, courts have

approached the determination of what is reasonable in different ways. In particular, there is some variation among courts about whether in "common fund" cases the court should use the lodestar or a percentage method of determining what fee is reasonable. The rule does not attempt to resolve the question whether the lodestar or percentage approach should be viewed as preferable.

Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process. Continued reliance on caselaw development of fee-award measures does not diminish the court's responsibility. In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility.

Courts discharging this responsibility have looked to a variety of factors. One fundamental focus is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members. The Private Securities Litigation Reform Act of 1995 explicitly makes this factor a cap for a fee award in actions to which it applies. See 15 U.S.C. §§77z–1(a)(6); 78u–4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"). For a percentage approach to fee measurement, results achieved is the basic starting point.

In many instances, the court may need to proceed with care in assessing the value conferred on class members. Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure. In some cases, it may be appropriate to defer some portion of the fee award until actual payouts to class members are known. Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class. On occasion the court's Rule 23(e) review will provide a solid basis for this sort of evaluation, but in any event it is also important to assessing the fee award for the class.

At the same time, it is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award. Cf. *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989) (cautioning in an individual case against an "undesirable emphasis" on "the importance of the recovery of damages in civil rights litigation" that might "shortchange efforts to seek effective injunctive or declaratory relief").

Any directions or orders made by the court in connection with appointing class counsel under Rule 23(g) should weigh heavily in making a fee award under this subdivision.

Courts have also given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion. Rule 54(d)(2)(B) provides: "If directed by the court, the motion shall also disclose the terms of

any agreement with respect to fees to be paid for the services for which claim is made." The agreement by a settling party not to oppose a fee application up to a certain amount, for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee. "Side agreements" regarding fees provide at least perspective pertinent to an appropriate fee award.

In addition, courts may take account of the fees charged by class counsel or other attorneys for representing individual claimants or objectors in the case. In determining a fee for class counsel, the court's objective is to ensure an overall fee that is fair for counsel and equitable within the class. In some circumstances individual fee agreements between class counsel and class members might have provisions inconsistent with those goals, and the court might determine that adjustments in the class fee award were necessary as a result.

Finally, it is important to scrutinize separately the application for an award covering nontaxable costs. If costs were addressed in the order appointing class counsel, those directives should be a presumptive starting point in determining what is an appropriate award.

*Paragraph (1)*. Any claim for an award of attorney fees must be sought by motion under Rule 54(d)(2), which invokes the provisions for timing of appeal in Rule 58 and Appellate Rule 4. Owing to the distinctive features of class action fee motions, however, the provisions of this subdivision control disposition of fee motions in class actions, while Rule 54(d)(2) applies to matters not addressed in this subdivision.

The court should direct when the fee motion must be filed. For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e). In cases litigated to judgment, the court might also order class counsel's motion to be filed promptly so that notice to the class under this subdivision (h) can be given.

Besides service of the motion on all parties, notice of class counsel's motion for attorney fees must be "directed to the class in a reasonable manner." Because members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances. In cases in which settlement approval is contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement, and the provision regarding notice to the class is parallel to the requirements for notice under Rule 23(e). In adjudicated class actions, the court may calibrate the notice to avoid undue expense.

*Paragraph (2)*. A class member and any party from whom payment is sought may object to the fee motion. Other parties—for example, nonsettling defendants—may not object because they lack a sufficient interest in the amount the court awards. The rule does not specify a time

limit for making an objection. In setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion.

The court may allow an objector discovery relevant to the objections. In determining whether to allow discovery, the court should weigh the need for the information against the cost and delay that would attend discovery. See Rule 26(b)(2). One factor in determining whether to authorize discovery is the completeness of the material submitted in support of the fee motion, which depends in part on the fee measurement standard applicable to the case. If the motion provides thorough information, the burden should be on the objector to justify discovery to obtain further information.

*Paragraph (3)*. Whether or not there are formal objections, the court must determine whether a fee award is justified and, if so, set a reasonable fee. The rule does not require a formal hearing in all cases. The form and extent of a hearing depend on the circumstances of the case. The rule does require findings and conclusions under Rule 52(a).

*Paragraph (4)*. By incorporating Rule 54(d)(2), this provision gives the court broad authority to obtain assistance in determining the appropriate amount to award. In deciding whether to direct submission of such questions to a special master or magistrate judge, the court should give appropriate consideration to the cost and delay that such a process might entail.

*Changes Made After Publication and Comment*. Rule 23(c)(1)(B) is changed to incorporate the counsel-appointment provisions of Rule 23(g). The statement of the method and time for requesting exclusion from a (b)(3) class has been moved to the notice of certification provision in Rule 23(c)(2)(B).

Rule 23(c)(1)(C) is changed by deleting all references to "conditional" certification.

Rule 23(c)(2)(A) is changed by deleting the requirement that class members be notified of certification of a (b)(1) or (b)(2) class. The new version provides only that the court may direct appropriate notice to the class.

Rule 23(c)(2)(B) is revised to require that the notice of class certification define the certified class in terms identical to the terms used in (c)(1)(B), and to incorporate the statement transferred from (c)(1)(B) on "when and how members may elect to be excluded."

Rule 23(e)(1) is revised to delete the requirement that the parties must win court approval for a precertification dismissal or settlement.

Rule 23(e)(2) is revised to change the provision that the court may direct the parties to file a copy or summary of any agreement or understanding made in connection with a proposed settlement. The new provision directs the parties to a proposed settlement to identify any agreement made in connection with the settlement.

Rule 23(e)(3) is proposed in a restyled form of the second version proposed for publication.

Rule 23(e)(4)(B) is restyled.

Rule 23(g)(1)(C) is a transposition of criteria for appointing class counsel that was published as Rule 23(g)(2)(B). The criteria are rearranged, and expanded to include consideration of experience in handling claims of the type asserted in the action and of counsel's knowledge of the applicable law.

Rule 23(g)(2)(A) is a new provision for designation of interim counsel to act on behalf of a putative class before a certification determination is made.

Rule 23(g)(2)(B) is revised to point up the differences between appointment of class counsel when there is only one applicant and when there are competing applicants. When there is only one applicant the court must determine that the applicant is able to fairly and adequately represent class interests. When there is more than one applicant the court must appoint the applicant best able to represent class interests.

Rule 23(h) is changed to require that notice of an attorney-fee motion by class counsel be "directed to class members," rather than "given to all class members."

#### Committee Notes on Rules—2007 Amendment

The language of Rule 23 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Amended Rule 23(d)(2) carries forward the provisions of former Rule 23(d) that recognize two separate propositions. First, a Rule 23(d) order may be combined with a pretrial order under Rule 16. Second, the standard for amending the Rule 23(d) order continues to be the more open-ended standard for amending Rule 23(d) orders, not the more exacting standard for amending Rule 16 orders.

As part of the general restyling, intensifiers that provide emphasis but add no meaning are consistently deleted. Amended Rule 23(f) omits as redundant the explicit reference to court of appeals discretion in deciding whether to permit an interlocutory appeal. The omission does not in any way limit the unfettered discretion established by the original rule.

#### Committee Notes on Rules—2009 Amendment

The time set in the former rule at 10 days has been revised to 14 days. See the Note to Rule 6.

### Committee Notes on Rules—2018 Amendment

Rule 23 is amended mainly to address issues related to settlement, and also to take account of issues that have emerged since the rule was last amended in 2003.

**Subdivision (c)(2)**. As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of class certification and approval of the proposed settlement justifies giving notice. This decision has been called "preliminary approval" of the proposed class certification in Rule 23(b)(3) actions. It is common to send notice to the class simultaneously under both Rule 23(e)(1) and Rule 23(c)(2)(B), including a provision for class members to decide by a certain date whether to opt out. This amendment recognizes the propriety of this combined notice practice.

Subdivision (c)(2) is also amended to recognize contemporary methods of giving notice to class members. Since Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974), interpreted the individual notice requirement for class members in Rule 23(b)(3) class actions, many courts have read the rule to require notice by first class mail in every case. But technological change since 1974 has introduced other means of communication that may sometimes provide a reliable additional or alternative method for giving notice. Although first class mail may often be the preferred primary method of giving notice, courts and counsel have begun to employ new technology to make notice more effective. Because there is no reason to expect that technological change will cease, when selecting a method or methods of giving notice courts should consider the capacity and limits of current technology, including class members' likely access to such technology.

Rule 23(c)(2)(B) is amended to take account of these changes. The rule continues to call for giving class members "the best notice that is practicable." It does not specify any particular means as preferred. Although it may sometimes be true that electronic methods of notice, for example email, are the most promising, it is important to keep in mind that a significant portion of class members in certain cases may have limited or no access to email or the Internet.

Instead of preferring any one means of notice, therefore, the amended rule relies on courts and counsel to focus on the means or combination of means most likely to be effective in the case before the court. The court should exercise its discretion to select appropriate means of giving notice. In providing the court with sufficient information to enable it to decide whether to give notice to the class of a proposed class-action settlement under Rule 23(e)(1), it would ordinarily be important to include details about the proposed method of giving notice and to provide the court with a copy of each notice the parties propose to use.

In determining whether the proposed means of giving notice is appropriate, the court should also give careful attention to the content and format of the notice and, if notice is given under

both Rule 23(e)(1) and Rule 23(c)(2)(B), any claim form class members must submit to obtain relief.

Counsel should consider which method or methods of giving notice will be most effective; simply assuming that the "traditional" methods are best may disregard contemporary communication realities. The ultimate goal of giving notice is to enable class members to make informed decisions about whether to opt out or, in instances where a proposed settlement is involved, to object or to make claims. Rule 23(c)(2)(B) directs that the notice be "in plain, easily understood language." Means, format, and content that would be appropriate for class members likely to be sophisticated, for example in a securities fraud class action, might not be appropriate for a class having many members likely to be less sophisticated. The court and counsel may wish to consider the use of class notice experts or professional claims administrators.

Attention should focus also on the method of opting out provided in the notice. The proposed method should be as convenient as possible, while protecting against unauthorized opt-out notices.

**Subdivision (e)**. The introductory paragraph of Rule 23(e) is amended to make explicit that its procedural requirements apply in instances in which the court has not certified a class at the time that a proposed settlement is presented to the court. The notice required under Rule 23(e)(1) then should also satisfy the notice requirements of amended Rule 23(c)(2)(B) for a class to be certified under Rule 23(b)(3), and trigger the class members' time to request exclusion. Information about the opt-out rate could then be available to the court when it considers final approval of the proposed settlement.

**Subdivision (e)(1)**. The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object. The parties must provide the court with information sufficient to determine whether notice should be sent. At the time they seek notice to the class, the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2) and that they intend to make available to class members. The amended rule also specifies the standard the court should use in deciding whether to send notice—that it likely will be able both to approve the settlement proposal under Rule 23(e)(2) and, if it has not previously certified a class, to certify the class for purposes of judgment on the proposal.

The subjects to be addressed depend on the specifics of the particular class action and proposed settlement. But some general observations can be made.

One key element is class certification. If the court has already certified a class, the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted. But if a class has not been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class. Although the standards for certification differ for settlement and litigation purposes, the court cannot make the decision regarding the prospects for certification without a suitable basis in the record. The ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement. If the settlement is not approved, the parties' positions regarding certification for settlement should not be considered if certification is later sought for purposes of litigation.

Regarding the proposed settlement, many types of information might appropriately be provided to the court. A basic focus is the extent and type of benefits that the settlement will confer on the members of the class. Depending on the nature of the proposed relief, that showing may include details of the contemplated claims process and the anticipated rate of claims by class members. Because some funds are frequently left unclaimed, the settlement agreement ordinarily should address the distribution of those funds.

The parties should also supply the court with information about the likely range of litigated outcomes, and about the risks that might attend full litigation. Information about the extent of discovery completed in the litigation or in parallel actions may often be important. In addition, as suggested by Rule 23(b)(3)(B), the parties should provide information about the existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal.

The proposed handling of an award of attorney's fees under Rule 23(h) ordinarily should be addressed in the parties' submission to the court. In some cases, it will be important to relate the amount of an award of attorney's fees to the expected benefits to the class. One way to address this issue is to defer some or all of the award of attorney's fees until the court is advised of the actual claims rate and results.

Another topic that normally should be considered is any agreement that must be identified under Rule 23(e)(3).

The parties may supply information to the court on any other topic that they regard as pertinent to the determination whether the proposal is fair, reasonable, and adequate. The court may direct the parties to supply further information about the topics they do address, or to supply information on topics they do not address. The court should not direct notice to the class until the parties' submissions show it is likely that the court will be able to approve the proposal after notice to the class and a final approval hearing.

**Subdivision (e)(2)**. The central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. Courts have generated lists of factors to shed light on this concern. Overall, these factors focus on comparable considerations, but each circuit has developed its own vocabulary for expressing these concerns. In some circuits, these lists have remained essentially unchanged for thirty or forty years. The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.

A lengthy list of factors can take on an independent life, potentially distracting attention from the central concerns that inform the settlement-review process. A circuit's list might include a dozen or more separately articulated factors. Some of those factors—perhaps many—may not be relevant to a particular case or settlement proposal. Those that are relevant may be more or less important to the particular case. Yet counsel and courts may feel it necessary to address every factor on a given circuit's list in every case. The sheer number of factors can distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2).

This amendment therefore directs the parties to present the settlement to the court in terms of a shorter list of core concerns, by focusing on the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal.

Approval under Rule 23(e)(2) is required only when class members would be bound under Rule 23(c)(3). Accordingly, in addition to evaluating the proposal itself, the court must determine whether it can certify the class under the standards of Rule 23(a) and (b) for purposes of judgment based on the proposal.

**Paragraphs (A) and (B)**. These paragraphs identify matters that might be described as "procedural" concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement. Attention to these matters is an important foundation for scrutinizing the substance of the proposed settlement. If the court has appointed class

counsel or interim class counsel, it will have made an initial evaluation of counsel's capacities and experience. But the focus at this point is on the actual performance of counsel acting on behalf of the class.

The information submitted under Rule 23(e)(1) may provide a useful starting point in assessing these topics. For example, the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base. The pendency of other litigation about the same general subject on behalf of class members may also be pertinent. The conduct of the negotiations may be important as well. For example, the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests. Particular attention might focus on the treatment of any award of attorney's fees, with respect to both the manner of negotiating the fee award and its terms.

**Paragraphs (C) and (D)**. These paragraphs focus on what might be called a "substantive" review of the terms of the proposed settlement. The relief that the settlement is expected to provide to class members is a central concern. Measuring the proposed relief may require evaluation of any proposed claims process; directing that the parties report back to the court about actual claims experience may be important. The contents of any agreement identified under Rule 23(e)(3) may also bear on the adequacy of the proposed relief, particularly regarding the equitable treatment of all members of the class.

Another central concern will relate to the cost and risk involved in pursuing a litigated outcome. Often, courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results. That forecast cannot be done with arithmetic accuracy, but it can provide a benchmark for comparison with the settlement figure.

If the class has not yet been certified for trial, the court may consider whether certification for litigation would be granted were the settlement not approved.

Examination of the attorney-fee provisions may also be valuable in assessing the fairness of the proposed settlement. Ultimately, any award of attorney's fees must be evaluated under Rule 23(h), and no rigid limits exist for such awards. Nonetheless, the relief actually delivered to the class can be a significant factor in determining the appropriate fee award.

Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.

Paragraph (D) calls attention to a concern that may apply to some class action settlements— inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.

**Subdivisions (e)(3) and (e)(4)**. Headings are added to subdivisions (e)(3) and (e)(4) in accord with style conventions. These additions are intended to be stylistic only.

**Subdivision (e)(5)**. The submissions required by Rule 23(e)(1) may provide information critical to decisions whether to object or opt out. Objections by class members can provide the court with important information bearing on its determination under Rule 23(e)(2) whether to approve the proposal.

**Subdivision (e)(5)(A)**. The rule is amended to remove the requirement of court approval for every withdrawal of an objection. An objector should be free to withdraw on concluding that an objection is not justified. But Rule 23(e)(5)(B)(i) requires court approval of any payment or other consideration in connection with withdrawing the objection.

The rule is also amended to clarify that objections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them. One feature required of objections is specification whether the objection asserts interests of only the objector, or of some subset of the class, or of all class members. Beyond that, the rule directs that the objection state its grounds "with specificity." Failure to provide needed specificity may be a basis for rejecting an objection. Courts should take care, however, to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards.

**Subdivision (e)(5)(B)**. Good-faith objections can assist the court in evaluating a proposal under Rule 23(e)(2). It is legitimate for an objector to seek payment for providing such assistance under Rule 23(h).

But some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process. At least in some instances, it seems that objectors—or their counsel—have sought to obtain consideration for withdrawing their objections or dismissing appeals from judgments approving class settlements. And class counsel sometimes may feel that avoiding the delay produced by an appeal justifies providing payment or other consideration to these objectors. Although the payment may advance class interests in a particular case, allowing payment perpetuates a system that can encourage objections advanced for improper purposes.

The court-approval requirement currently in Rule 23(e)(5) partly addresses this concern. Because the concern only applies when consideration is given in connection with withdrawal of an objection, however, the amendment requires approval under Rule 23(e)(5)(B)(i) only when consideration is involved. Although such payment is usually made to objectors or their counsel, the rule also requires court approval if a payment in connection with forgoing or withdrawing an objection or appeal is instead to another recipient. The term "consideration" should be broadly interpreted, particularly when the withdrawal includes some arrangements beneficial to objector counsel. If the consideration involves a payment to counsel for an objector, the proper procedure is by motion under Rule 23(h) for an award of fees.

Rule 23(e)(5)(B)(ii) applies to consideration in connection with forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal. Because an appeal by a class-action objector may produce much longer delay than an objection before the district court, it is important to extend the court-approval requirement to apply in the appellate context. The district court is best positioned to determine whether to approve such arrangements; hence, the rule requires that the motion seeking approval be made to the district court.

Until the appeal is docketed by the circuit clerk, the district court may dismiss the appeal on stipulation of the parties or on the appellant's motion. See Fed. R. App. P. 42(a). Thereafter, the court of appeals has authority to decide whether to dismiss the appeal. This rule's requirement of district court approval of any consideration in connection with such dismissal by the court of appeals has no effect on the authority of the court of appeals to decide whether to dismiss the appeal. It is, instead, a requirement that applies only to providing consideration in connection with forgoing, dismissing, or abandoning an appeal.

**Subdivision (e)(5)(C)**. Because the court of appeals has jurisdiction over an objector's appeal from the time that it is docketed in the court of appeals, the procedure of Rule 62.1 applies. That procedure does not apply after the court of appeals' mandate returns the case to the district court.

SpA.74

**Subdivision (f)**. As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of eventual class certification justifies giving notice. But this decision does not grant or deny class certification, and review under Rule 23(f) would be premature. This amendment makes it clear that an appeal under this rule is not permitted until the district court decides whether to certify the class.

The rule is also amended to extend the time to file a petition for review of a class-action certification order to 45 days whenever a party is the United States, one of its agencies, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. In such a case, the extension applies to a petition for permission to appeal by any party. The extension recognizes—as under Rules 4(i) and 12(a) and Appellate Rules 4(a)(1)(B) and 40(a)(1)—that the United States has a special need for additional time in regard to these matters. It applies whether the officer or employee is sued in an official capacity or an individual capacity. An action against a former officer or employee of the United States is covered by this provision in the same way as an action against a present officer or employee. Termination of the relationship between the individual defendant and the United States does not reduce the need for additional time.

‹ Rule 22. Interpleader up Rule 23.1. Derivative Actions ›

💼 Federal Rules of Civil Procedure Toolbox

- Wex: Civil Procedure: Overview



Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy



# 28 U.S.C. § 1332 - U.S. Code - Unannotated Title 28. Judiciary and Judicial Procedure § 1332. Diversity of citizenship; amount in controversy; costs [Statutory Text & Notes of Decisions subdivisions I to V]

Current as of January 01, 2024 | Updated by FindLaw Staff (https://www.findlaw.com/company/our-team.html)

**(a)** The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

**(1)** citizens of different States;

**(2)** citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

**(3)** citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

**(4)** a foreign state, defined in section 1603(a) (https://1.next.westlaw.com/Link/Document/FullText?findType=Y&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=RB&originatingDoc=I307a2390e62611edad0bf30ad635 of this title, as plaintiff and citizens of a State or of different States.

**(b)** Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

**(c)** For the purposes of this section and section 1441 (https://1.next.westlaw.com/Link/Document/FullText?findType=L&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=LQ&originatingDoc=I3082fd30e62611edad0bf30ad635f9 of this title--

**(1)** a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of--

**(A)** every State and foreign state of which the insured is a citizen;

**(B)** every State and foreign state by which the insurer has been incorporated; and

**(C)** the State or foreign state where the insurer has its principal place of business; and

**(2)** the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

**(d)(1)** In this subsection--

**(A)** the term "class" means all of the class members in a class action;

**(B)** the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

**(C)** the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

**(D)** the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

**(2)** The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--

**(A)** any member of a class of plaintiffs is a citizen of a State different from any defendant;

**(B)** any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

**(C)** any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

**(3)** A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of--

**(A)** whether the claims asserted involve matters of national or interstate interest;

**(B)** whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

**(C)** whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

**(D)** whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

**(E)** whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

**(F)** whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

**(4)** A district court shall decline to exercise jurisdiction under paragraph (2)--

**(A)(i)** over a class action in which--

**(I)** greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

**(II)** at least 1 defendant is a defendant--

**(aa)** from whom significant relief is sought by members of the plaintiff class;

**(bb)** whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

**(cc)** who is a citizen of the State in which the action was originally filed; and

**(III)** principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

**(ii)** during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

**(B)** two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

**(5)** Paragraphs (2) through (4) shall not apply to any class action in which--

**(A)** the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

**(B)** the number of members of all proposed plaintiff classes in the aggregate is less than 100.

**(6)** In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

**(7)** Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

**(8)** This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

**(9)** Paragraph (2) shall not apply to any class action that solely involves a claim--

**(A)** concerning a covered security as defined under 16(f)(3) [1] of the Securities Act of 1933 (15 U.S.C. 78p(f)(3) (https://1.next.westlaw.com/Link/Document/FullText?findType=Y&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=RB&originatingDoc=I30f6cda0e62611edad0bf30ad63 [2]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E) (https://1.next.westlaw.com/Link/Document/FullText?findType=Y&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=RB&originatingDoc=I30f6cda0e62611edad0bf30ad63

**(B)** that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

**(C)** that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1) (https://1.next.westlaw.com/Link/Document/FullText?findType=Y&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=RB&originatingDoc=I31017c01e62611edad0bf30ad63 and the regulations issued thereunder).

**(10)** For purposes of this subsection and section 1453 (https://1.next.westlaw.com/Link/Document/FullText?findType=L&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=LQ&originatingDoc=I31072150e62611edad0bf30ad635 an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

**(11)(A)** For purposes of this subsection and section 1453 (https://1.next.westlaw.com/Link/Document/FullText?findType=L&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=LQ&originatingDoc=I3111a8a0e62611edad0bf30ad63 a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

**(B)(i)** As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2) (https://1.next.westlaw.com/Link/Document/FullText?findType=Y&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=RB&originatingDoc=I311c7e10e62611edad0bf30ad6 in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

**(ii)** As used in subparagraph (A), the term "mass action" shall not include any civil action in which--

**(I)** all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

**(II)** the claims are joined upon motion of a defendant;

**(III)** all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

**(IV)** the claims have been consolidated or coordinated solely for pretrial proceedings.

**(C)(i)** Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407 (https://1.next.westlaw.com/Link/Document/FullText?findType=L&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=LQ&originatingDoc=I31313e90e62611edad0bf30ad6 or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407 (https://1.next.westlaw.com/Link/Document/FullText?findType=L&originatingContext=document&transitionType=DocumentItem&pubNum=1000546&refType=LQ&originatingDoc=I31313e91e62611edad0bf30ad6

**(ii)** This subparagraph will not apply--

**(I)** to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

**(II)** if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

**(D)** The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

**(e)** The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

---

1 So in original. Reference to "16(f)(3)" probably should be preceded by "section".

2 So in original. Probably should be "77p(f)(3)".

‹ **Back to chapter list** (https://codes.findlaw.com/us/title-28-judiciary-and-judicial-procedure/)

**Previous part of** (https://codes.findlaw.com/us/title-28-judiciary-and-judicial-

**Next part** (h

code    procedure/28-usc-sect-1331/)    of   pr
code

Cite this article: FindLaw.com - 28 U.S.C. § 1332 - U.S. Code - Unannotated Title 28. Judiciary and Judicial Procedure § 1332. Diversity of citizenship; amount in controversy; costs [Statutory Text & Notes of Decisions subdivisions I to V] - *last updated January 01, 2024* | https://codes.findlaw.com/us/title-28-judiciary-and-judicial-procedure/28-usc-sect-1332/ (https://codes.findlaw.com/us/title-28-judiciary-and-judicial-procedure/28-usc-sect-1332/)   ⧉ Copy


Read this complete 28 U.S.C. § 1332 - U.S. Code - Unannotated Title 28. Judiciary and Judicial Procedure § 1332. Diversity of citizenship; amount in controversy; costs [Statutory Text & Notes of Decisions subdivisions I to V] on Westlaw (https://1.next.westlaw.com/Document/I3E044F30275411EEA7E587A4A24ECCED/View/FullText.html?originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default))

FindLaw Codes may not reflect the most recent version of the law in your jurisdiction. Please verify the status of the code you are researching with the state legislature or via Westlaw before relying on it for your legal needs.

Was this helpful?    Yes 👍    No 👎

---

**Search all U.S. Codes**

Citation or keyword *

[                                        ⊗]

**View results ▸**



## Welcome to FindLaw's Cases & Codes

A free source of state and federal court opinions, state laws, and the United States Code. For more information about the legal concepts addressed by these cases and statutes, visit FindLaw's Learn About the Law.

**Go to Learn About the Law** ›(https://www.findlaw.com/law.html)

### Latest Blog Posts

> Ballot Battles Over ... Selfies? (https://www.findlaw.com/legalblogs/courtside/ballot-battles-over-selfies/)

> Ohio Court of Appeals Holds Law Firm Can Sue Over False Reviews (https://www.findlaw.com/legalblogs/practice-of-law/ohio-court-of-appeals-holds-law-firm-can-sue-over-false-reviews/)

> The Hidden Risk of Your Next Uber Ride (https://www.findlaw.com/legalblogs/law-and-life/the-hidden-risk-of-your-next-uber-ride/)

> Explaining VP Candidate Walz's School Nutrition Scandal (https://www.findlaw.com/legalblogs/courtside/explaining-vp-candidate-walzs-school-nutrition-scandal/)

### For Legal Professionals

> Practice Management (https://www.findlaw.com/legal/practice.html)

> Corporate Counsel (https://corporate.findlaw.com/)

> Legal Technology (https://www.findlaw.com/legal/technology.html)

> Law Students (https://www.findlaw.com/legal/law-students.html)

## Learn About the Law

Get help with your legal needs

FindLaw's Learn About the Law features thousands of informational articles to help you understand your options. And if you're ready to hire an attorney, find one in your area (https://lawyers.findlaw.com/) who can help.

**Go to Learn About the Law** ›(https://www.findlaw.com/law.html)



## Need to find an attorney?

**Search our directory by legal issue**

Enter information in one or both fields (Required)

**Legal issue**               **I need help near** (city, ZIP code or country)

| [                        ⊗ ] | [ Great Neck, New York    ⊗ ] | **Find a lawyer ›** |

⬆ BACK TO TOP

FindLaw

**Questions?**

At FindLaw.com, we pride ourselves on being the number one source of free legal information and resources on the web. Contact us. (https://www.findlaw.com/company/contact-us/contacts.html)

**Stay up-to-date with how the law affects your life.** Sign up for our consumer newsletter.

ENTER YOUR EMAIL ADDRESS

[                              ] ›

**ABOUT US › (https://www.findlaw.com/company.html)**

Our Team (https://www.findlaw.com/company/our-team.html)

Accessibility (https://www.findlaw.com/company/our-commitment-to-accessibility.html)

Contact Us (https://www.findlaw.com/company/contact-us/contacts.html)

**FIND A LAWYER › (https://lawyers.findlaw.c**

By Location (https://lawyers.findlaw.com/#browse-location)

By Legal Issue (https://lawyers.findlaw.com/legal-issues/)

By Lawyer Profiles (https://lawyers.findlaw.com/profile/lawyer/a/1.ht

By Name (https://lawyers.findlaw.com/name-search/)

**SELF-HELP RESOURCES**

Legal Forms & Services (https://www.findlaw.com/forms.html)

(https://www.youtube.com/watch?
v=WQiNbzazOhw)

Copyright © 2024, Thomson Reuters. All rights reserved.

Terms (https://www.findlaw.com/company/findlaw-terms-of-service.html) | Privacy (https://www.findlaw.com/company/privacy/privacy-statement.html)

| Disclaimer (https://www.findlaw.com/company/disclaimer.html) | Cookies (https://www.thomsonreuters.com/en/privacy-statement.html#cookies)

| Do Not Sell My Information (https://privacyportal-cdn.onetrust.com/dsarwebform/dbf5ae8a-0a6a-4f4b-b527-7f94d0de6bbc/5dc91c0f-f1b7-4b6e-9d42-76043adaf72d.html)

In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,

No. 1:05-md-01720-MKB-JAM (E.D.N.Y.)


DOCKET TEXT:


| 01/16/2024 | ORDER approving schedule as set forth in 9044 Joint Letter. The Court adopts the parties' proposed schedule for filing motion papers, provision of courtesy copies, and filing of redacted materials. Ordered by Judge Margo K. Brodie on 1/16/2024. (STS) (Entered: 01/16/2024) |
|---|---|

# Arnold&Porter

**Matthew A. Eisenstein**
+1 202.942.6606 Direct
Matthew.Eisenstein@arnoldporter.com

January 12, 2024

**VIA ECF**

The Honorable Margo K. Brodie
The Honorable Joseph A. Marutollo
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 05-md-1720 (MKB) (JAM) – *Intuit Inc. et al. v. Visa Inc. et al.*, 1:21-cv-01175; *Block, Inc. v. Visa Inc. et al.*, 1:23-cv-05377; *Lanning et al. v. Visa, Inc. et al.*, 1:21-cv-02360; *Camp Grounds Coffee, LLC et al. v. Visa, Inc. et al.*, 1:21-cv-03401

Dear Chief Judge Brodie and Judge Marutollo:

We represent the Visa Defendants and write on behalf of all parties in the above-referenced actions. In light of the upcoming deadline for service of Plaintiffs' reply briefs related to Plaintiffs' cross-motions for partial summary judgment, and the volume of motions papers associated with those motions and Defendants' motion to enforce the settlement agreement, we write to request the entry of an order adopting the parties' joint proposal regarding sealed filing, courtesy copies, and redacted filing of those motions, as set forth below. The parties' proposal is consistent with this Court's previous orders with respect to filing and submission of summary judgment materials in this MDL. *See, e.g.*, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 05-md-1720, Minute Order dated Dec. 4, 2020 (granting and adopting parties' proposal in Dkt. 8053) and Minute Order dated May 14, 2021 (requiring filing of exhibits); *Grubhub, et al. v. Visa Inc., et al.*, 19-cv-06555, Minute Order dated Aug. 25, 2023 (granting and adopting parties' proposal in Dkt. 87).

As the Court is aware, Defendants served their motion, memorandum in support, and associated papers on November 1, 2023; Plaintiffs served their cross-motions, memoranda in support of their cross-motions and in opposition to Defendants' motion, and

# Arnold&Porter

January 12, 2024
Page 2

associated papers on December 4, 2023; and Defendants served their reply papers in support of their motion and in opposition to Plaintiffs' cross-motions on January 8, 2024. Plaintiffs' reply papers are due to be served on January 29, 2024, and briefing will be complete at that time. The motion papers and associated 56.1 statements reflect significant discussion of materials that have been designated Highly Confidential, and the accompanying exhibits are overwhelmingly so designated.

Given the various materials to be filed and the significant confidentiality concerns, and in light of the Court's prior approach to these issues, the parties propose the following streamlined schedule and process for filing on ECF, provision of courtesy copies, and filing of redacted materials, subject to the Court's direction:

- **Monday, January 29, 2024**: Plaintiffs serve reply papers on Defendants.

- **Wednesday, January 31, 2024**:

  o Defendants provide to Chief Judge Brodie's chambers four printed courtesy copies of the memoranda of law and 56.1 statements;

  o Parties file on ECF their respective notices of motions (publicly), memoranda of law (under seal), 56.1 statements (under seal), declarations (under seal), and exhibits (under seal).

- **Wednesday, February 14, 2024**: Parties publicly file redacted versions of their respective memoranda of law, 56.1 statements, and declarations.

Sincerely,

/s/ Matthew A. Eisenstein

Matthew A. Eisenstein

cc:     Counsel of Record via ECF