# 24-1653(L)

### 24-1808(CON)

=====================================

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

=====================================

## IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION

=====================================

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK
### No. 05-1720

=====================================

## INITIAL BRIEF
## OF OBJECTOR-APPELLANT JACK RABBIT, LLC

| | |
|---|---|
| **Paul S. Rothstein** <br> **Florida Bar Number: 310123** <br> **Co-counsel for Appellant Jack Rabbit, LLC** <br> **Attorney Paul S. Rothstein, P.A.** <br> **626 NE 1st Street** <br> **Gainesville, FL 32601** <br> **(352) 376-7650** <br> **(352) 374-7133 (Fax)** <br> **E-Mail: psr@rothsteinforjustice.com** | **N. Albert Bacharach, Jr.** <br> **Florida Bar Number: 209783** <br> **Co-counsel for Appellant Jack Rabbit, LLC** <br> **N. Albert Bacharach, Jr., P.A.** <br> **4128 NW 13th Street** <br> **Gainesville, FL 32609-1807** <br> **(352) 378-9859** <br> **(352) 338-1858 (Fax)** <br> **E-Mail: N.A.Bacharach@att.net** |

## <u>LOCAL RULE 26.1(a) CORPORATE DISCLOSURE STATEMENT</u>

Appellant Jack Rabbit, LLC is not a subsidiary of a parent corporation, and no

publicly held corporation owns 10% or more of the stock in Appellant.

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **IV**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

**JURISDICTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

**STATEMENT OF ISSUES PRESENTED FOR REVIEW** . . . . . . . . . . . . . . **11**

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

**A. THE NATURE OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

**B. THE COURSE OF PROCEEDINGS AND DISPOSITION BELOW** . . . . **13**

**SUMMARY OF ARGUMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

**STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

**ARGUMENT**

**I.**     **BY FINDING THAT SQUARE'S SUB-MERCHANT-CUSTOMERS AND INTUIT'S SUB-MERCHANT-CUSTOMERS "ACCEPTED" PAYMENT CARDS AND ARE THEREFORE MEMBERS OF THE RULE 23(B)(3) CLASS, WITHOUT CONCOMITANTLY REQUIRING THE SUB-MERCHANTS BE ILLINOIS BRICK DIRECT PURCHASERS OF THE DEFENDANTS' PAYMENT CARD SERVICES, IMMENSELY INCREASED THE NUMBER OF BUSINESS ENTITIES IN THE RULE 23(B)(3) CLASS, AND VASTLY DILUTED APPELLANT JACK RABBIT'S, AND ALL OTHER PROPER CLASS MEMBERS' PRO RATA SHARE OF THE SETTLEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

**CERTIFICATE OF COMPLIANCE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

## TABLE OF AUTHORITIES

## CASES

*Apple v. Pepper* 139 SCt 1514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Consistent with Hanover Shoe, Incorporated v. United Shoe Machinery Corporation.,* 392 U.S. 481, 20 L. Ed. 2d 1231, 88SCt 2224 (1968) . . . . . . . .  36

*Hanover Shoe, Incorporated v. United Shoe Machinery Corp.,* 392 U.S. 481, 88SCt 2224, 20 L. Ed. 2d 1231 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  245, 31, 33

*Illinois Brick Company v. Illinois,* 431 U.S. 720, 97 SCt 2061, 52 L. Ed. 2d 707 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Ill. ex rel. Hartigan v. Panhandle Eastern Pipe Line Company,* 852 F.2d 891 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

*Kansas v. UtiliCorp United, Inc.*, 497 U.S.199 . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*Loeb Industries, Incorporated v. Sumitomo Corp.,* 306 F. 3d (CA7 2002). . . . . .  32

*Mid-West Paper Products Company v. Continental Group, Incorporated.,* 596 F.2d 573 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39, 40

*In re Mushroom Direct Purchaser Antitrust Litig.,* 319 F.R.D. 158 (E.D. Pa. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., Number 05-MD-1720,* 2018 U.S. District LEXIS 148316, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Official Committee of Unsecured Creditors of WorldCom, Incorporated v. SEC,* 467 F.3d 73 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119SCt 2295, 144 L. Ed. 2d 715 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 18

v

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litigation,* 986
  F. Supp. 2d 207 (E.D.N.Y. 2013), rev'd and vacated, 827 F.3d 223 (2d Cir.
  2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig., Number
  05-MD-1720,* 2012 WL 12929536. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litigation,
  Number 05-MD-1720,* 2017 U.S. District LEXIS 160045, 2017 WL 4325812
  (E.D.N.Y. Sept. 27, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig., Number
  05-MD-1720,* 2017 U.S. District LEXIS 170103, 2017 WL 4620988 (E.D.N.Y.
  Oct. 13, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Simon v. KeySpan Corporation,* 694 F.3d 196 (2d Cir. 2012) . . . . . . . . . 35, 37, 38

*Spokeo, Incorporated v. Robins,* 578 U.S. 330 (2016) . . . . . . . . . . . . . . . . . . . . 40

*Transunion LLC v. Ramirez,* 141SCt 2190 (2021) . . . . . . . . . . . . . . . . . . . . 26, 40

*Winn-Dixie Stores, Incorporated v. astern Mushroom Marketing Cooperative,
  Number 06-0620,* 2020 WL 5211035 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Winn-Dixie Stores, Incorporated v. Eastern Mushroom Marketing Coop., Number
  15-6480,* 2020 U.S. District LEXIS 158687 (E.D. Pa. Sep. 1, 2020) . . . . . . . . 38

vi

## FEDERAL STATUTES AND REGULATIONS

15 U.S.C. § 1, Section 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15 U.S.C. §§ 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

15 U.S.C. § 15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

15 U.S.C. § 18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

28 U.S.C. §§ 1331, 1332, 1337, 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. App. P. 32(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. App. P. 32(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. App. P. 32(a)(7)(b)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. App. P. 32(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**INTRODUCTION**

Before a business is able to accept Payment Card payments, the business must first establish access to the defendants Payment Card payment processing services. This can be accomplished either directly with an Acquiring Bank. Alternatively, small merchants who are not financially able to - or simply do not desire to establish a direct pay relationship with an Acquiring Bank, for various economic reasons not relevant to this appeal may contract with a Payment Facilitator to gain access to Payment Card processing services. Payment Facilitators[1], (also referred to as PayFacs), such as Square and Intuit, contract with small businesses, to provide those businesses with the hardware and software

---

[1] A PayFac, or payment facilitator, was originally defined by Visa® and Mastercard® to describe the entity that is officially doing business with the card brands. When PayFac became a buzzword among software platforms and the many businesses trying to sell to them, the meaning of the word started to blur.

Payment facilitation helps you monetize card payments by putting you into the payments flow. Most people think of it as just software, but card brands officially define PayFac as the merchant of record. Based on that definition, PayFacs take over the merchant underwriting process from the acquiring bank. That means you assume the risk associated with the transactions processed on your platform. If a business using your platform does not deliver the goods, you need to make it right with the purchaser.

If you're a PayFac based on the official card-brand definition, you're monetizing risk that would otherwise be assumed by an acquiring bank. You do that by negotiating card processing fees and charging businesses to use your service. ...
https://www.jpmorgan.com/insights/payments/acquiring-and-e-commerce/pathtopayfac

necessary to process monetary payments with Payment Cards. Thus, Payment Facilitators are classic wholesalers or middlemen.

To this end, the Payment Facilitator opens a merchant bank account with an acquiring Bank and receives a Master Merchant Identification Number which allows it to acquire and aggregate payments from its customers, generally known as sub-merchants. One of the important features of the Payment Facilitator system is that the sub-merchants' Payment Card transactions are aggregated under the Payment Facilitators' Master Merchant Identification Number. As a result, neither the acquiring Bank, nor defendants Visa and Mastercard have any direct purchase and sale relationship with the sub-merchant. Conversely, no sub-merchant is a Direct Purchaser of the defendants' Payment Card services.

On May 28, 2024 Chief Judge Margo K. Brodie of the USDC EDNY entered the Memorandum and Order being appealed from. In that Memorandum and Order the district court found that "Sellers," the district court's term for sub-merchants, who access the defendants payment card system by and through the payment card readers and transaction processing services provided by the Payment Facilitator's Square and Intuit, are *Illinois Brick* Direct Purchasers; and, as a result these sub-merchants are members of the Rule 23(b)(3) Class.

That Memorandum and Order, in violation of *Illinois Brick*, places

-9-

merchants, with direct Acquiring Bank relationships, and Cost-Plus Direct

Purchasers, such as appellant Jack Rabbit, on the same footing as the indirect

purchaser sub-merchants of Payment Facilitators.

Furthermore, by finding that sub-merchants of payment facilitators are Direct

Purchasers, the Memorandum and Order immensely increased the number of

business entities in the Rule 23(b)(3) Class, and vastly diluted Appellant Jack

Rabbit's pro rata share of the settlement.

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1332, 1337,

2201, and 2202. This Court has jurisdiction under 28 U.S.C. § 1291.

On May 28, 2024, the District Court entered: a memorandum and order

granting defendants' motion to enforce the Settlement Agreement and finding that

Square's merchant-customers and Intuit's merchant-customers "accepted" payment

cards and are therefore members of the Rule 23(b)(3) Class.

(D.E. Doc.9308)

Appellant Jack Rabbit, whose *pro rata* share of the Rule 23(b)(3) Class

settlement, was vastly diluted by the Memorandum and Order, has a plausible

-10-

affected interest[2], and timely filed a Notice of Appeal on June 27, 2024 (D.E. Doc. 9335).

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

1.     Whether by finding that Square's sub-merchant-customers and Intuit's sub-merchant-customers "accepted" payment cards and are therefore members of the rule 23(b)(3) class, without concomitantly requiring the sub- merchants be *Illinois Brick* Direct Purchasers of the defendants' payment card services, immensely increased the number of business entities in the rule 23(b)(3) class, and vastly diluted Appellant Jack Rabbit's, and all other proper class members' pro rata share of the settlement.

## STATEMENT OF THE CASE

## A. THE NATURE OF THE CASE

In 2005, a putative class of over twelve million merchants brought antitrust actions under the Sherman Act, 15 U.S.C. §§ 1 and 2, and state antitrust laws, against Defendants Visa and MasterCard networks, as well as various issuing and acquiring banks. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust*

---

[2] *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 78 (2d Cir. 2006)

-11-

*Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013), *rev'd and vacated*, 827 F.3d 223 (2d

Cir. 2016)[3].

This is an appeal from a Memorandum and Order that found Square's

merchant-customers and Intuit's merchant-customers "accepted" payment cards and

are therefore members of the Rule 23(b)(3) Class.  The Memorandum and Order,

which by finding "that Square's merchant-customers and Intuit's

merchant-customers 'accepted' payment cards and are therefore members of the

Rule 23(b)(3) Class," without a concurrent finding showing how the sub-merchants

are also *Illinois Brick* Direct Purchasers, diluted Appellant Jack Rabbit's, and all

other Direct Purchasers and Cost-plus Direct Purchasers pro rata share of the

settlement.

This matter arose from a consolidated class-action Complaint in which

sellers of goods and services, generically referred to as merchants in this litigation,

alleged antitrust claims against Visa and Mastercard, as well as their member

banks, relating to setting the Interchange Fee charged by the bank which issued the

Visa or Mastercard payment card to the purchaser. These Interchange Fees, are

---

[3] A factual and procedural history of this litigation, is set forth by Judge
Gleeson in In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,
986 F. Supp. 2d 207, 214-15 (E.D.N.Y. 2013), and by this Court as part of its
reversal in 2016, 827 F.3d 223 (2d Cir. 2016), cert. denied, 137 S. Ct. 1374, 197 L.
Ed. 2d 568 (2017)

normally imposed upon, as opposed to negotiated with, the seller. As a result, Defendants were able to set the Interchange Fee at an artificially high rate. Although the Interchange Fee may be higher on certain premium reward (cash back or points) cards, from the highest to the lowest level, the Interchange Fee is never competitive.

At issue in the current appeal is the district court's decision that sub-merchants of Payment Facilitators are Direct Purchasers and not indirect purchasers pursuant to *Illinois Brick* and its progeny.

## B. THE COURSE OF PROCEEDINGS AND DISPOSITION BELOW

The facts and extensive procedural history as set forth in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213, 223 (E.D.N.Y. 2013) ("*Interchange Fees I*") *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) ("*Interchange Fees II*"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 U.S. Dist. LEXIS 160045, 2017 WL 4325812, (E.D.N.Y. Sept. 27, 2017), order set aside, No. 05-MD-1720, 2018 U.S. Dist. LEXIS 148316, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 U.S. Dist. LEXIS 170103, 2017 WL 4620988 (E.D.N.Y. Oct. 13, 2017).

A synopsis of that history shows that in 2005, a putative Rule 23(b)(3) class

-13-

of over twelve million nationwide merchants brought an antitrust action under the Sherman Act, 15 U.S.C. §§ 1 and 2, and state antitrust laws, against Defendants Visa and Mastercard networks, as well as various issuing and acquiring banks. Rule 23(b)(3) Plaintiffs are merchants that accept(ed) Visa-and Mastercard-branded cards, and have alleged that Defendants harmed competition and charged the merchants supracompetitive fees by creating unlawful contracts and rules and by engaging in various antitrust conspiracies. *Interchange Fees I* at 213*; Interchange Fees II*, 827 F.3d at 228-29.

In this MDL, Plaintiffs sought both injunctive and monetary relief. In 2012, after seven years of litigation, former District Judge Gleeson granted preliminary approval of a jointly submitted class settlement agreement (the "Original Settlement Agreement"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 12929536, at *1 (EDNY Nov. 27, 2012). Judge Gleeson also provisionally certified two separate classes for settlement purposes only – a mandatory Rule 23(b)(2) settlement class seeking injunctive relief, from which class members could not opt out, and a Rule 23(b)(3) opt out class seeking damages. *See id.* at 1-2. After publication of notice to the class and the passage of the requisite time within which class members were to object to, or opt out of the settlement, the parties moved for final approval of the

settlement.

After holding a fairness hearing on September 12, 2013, Judge Gleeson granted final approval of the Original Settlement Agreement on December 13, 2013. See *Interchange Fees I*, 986 F. Supp. 2d at 213, 240. Under the terms of the Original Settlement Agreement, the Defendants agreed to pay $7.25 billion, before reductions for opt outs, attorney's fees, attorneys' costs, and the expense of administration, to the Rule 23(b)(3) class members, and to implement reforms of the Defendants' rules and practices to settle the claims of the Rule 23(b)(2) class.

Objectors to the settlement and Plaintiffs that chose to opt out of the class prior to final approval appealed to this Court arguing that the "class action was improperly certified and that the settlement was unreasonable and inadequate.*"* *Interchange Fees* II, 827 F.3d at 227. This Court reversed after finding that the class was improperly certified, and finding that the class certification requirement of adequate representation under Rule 23(a)(4) had not been satisfied. *Id*.

This Court also found that **an inherent conflict of interest existed because a single set of counsel represented both the (b)(2) and (b)(3) class interests**. See *id*. at 233-35. As a result this Court concluded that "members of the (b)(2) class were inadequately represented . . . ." *Id*. at 231. Relying on Supreme Court precedent, this Court further held that settlement classes that consist of holders of

-15-

present claims, such as the (b)(3) class seeking monetary relief for past harm, and holders of future claims, such as the (b)(2) class seeking injunctive relief to reform current and future rules and policies of the defendants, must be divided "into homogenous subclasses . . . with separate representation." *Id*. at 234 (quoting *Ortiz v. Fibreboard Corp*., 527 U.S. 815, 856, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999)).

Additionally, this Court also found that the issues stemming from the failure to divide the class into homogenous subclasses with separate representation were exacerbated by the inability of members of the (b)(2) injunctive relief class to opt out of the settlement or from their release of claims against the Defendants. *See id*. at 231, 234; id. a A241 (Leval, J., concurring). This Court also expressed  concern that the injunctive relief secured for the (b)(2) class would not apply uniformly to benefit all (b)(2) class members. *See id.* at 238. This Court noted that (b)(2) merchants that operated in certain states would be prohibited by state law from surcharging costs to customers at the point of sale, as permitted under the Original Settlement Agreement, while merchants that operated in other states, without such restricted laws, would not be so prohibited. *See id.* at 230-31 (noting that "[t]he incremental value and utility of surcharging relief is limited, however, because many states, including New York, California, and Texas, prohibit surcharging as a

-16-

matter of state law." (citations omitted)); *Id. at 238-39* ("A significant proportion of merchants in the (b)(2) class are either legally or commercially unable to obtain [even] incremental benefit from the primary relief . . . and Class Counsel knew at the time the Settlement Agreement was entered into that this relief was virtually worthless to vast numbers of class members." (emphasis added).

Admittedly, this Court's decision was primarily focused on the representation of, and relief afforded to, the (b)(2) injunctive class.

This Court acknowledged the due diligence and extensive time and labor that accompanied the 2014 final approval process, stating:

> Discovery included more than 400 depositions, 17 expert reports, 32 days of expert deposition testimony, and the production of over 80 million pages of documents. The parties fully briefed a motion for class certification, a motion to dismiss supplemental complaints, and cross-motions for summary judgment. Beginning in 2008, the parties participated in concurrent settlement negotiations assisted by well-respected mediators. At the end of 2011, the district judge and the magistrate judge participated in the parties' discussions with the mediators. In October 2012, after several more marathon negotiations with the mediators (including one more with the district court and magistrate judges), the parties executed the [Original] Settlement Agreement." *Id*. at 229.

After remand, the district court addressed this Court's concerns regarding unitary representation of the classes, and, pursuant to Rule 23(g)(3), appointed two separate groups of interim co-lead counsel to represent (1) merchants seeking

certification under Rule 23(b)(2) for injunctive relief, and (2) merchants seeking certification under Rule 23(b)(3) for monetary damages. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2017 U.S. Dist. LEXIS 160045, 2017 WL 4325812.

On March 31, 2017, the Rule 23(b)(2) Class Counsel filed a complaint on behalf of the Rule 23(b)(2) representative Class Plaintiffs, and a putative Rule 23(b)(2) class. Thereafter, on October 30, 2017, the Rule 23(b)(3) Class Counsel filed a Third Consolidated Amended Class Action Complaint on behalf of the Rule 23(b)(3) representative Class Plaintiffs.

The Third Consolidated Amended Class Action Complaint alleges that Defendants, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), Section 7 of the Clayton Act (15 U.S.C. § 18), the California Cartwright Act (Section 16700 et seq. of the California Business and Professions Code), and the California Unfair Competition Law (Section 17200 et seq. of the California Business and Professions Code), entered into "contracts, combinations, conspiracies, and understandings" that harmed competition and the Rule 23(b)(3) Class Plaintiffs through supracompetitive fixed prices, unfair acts and practices, and unreasonable restraints of trade. Class Plaintiffs alleged that these practices resulted in a common antitrust injury to an entire class of merchants, and sought triple damages under Section 4

of the Clayton Act, 15 U.S.C. § 15.

After engaging in additional discovery and mediation efforts, the Rule 23(b)(3) Class Plaintiffs and Defendants reached an Superseding and Amended Definitive Settlement Agreement in principle in the Summer of 2018. That Fall the Rule 23(b)(3) Class Counsel, moved for preliminary approval of the SAD[4] Settlement Agreement. Ignoring this Court's previously expressed concerns in *Interchange Fees II*, *supra*, 23(b)(3) Class Counsel moved for preliminary certification of a unitary Rule 23(b)(3) settlement class.

The Superseding Settlement Agreement defines the proposed Rule 23(b)(3) Settlement Class as: "[a]ll persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or MasterCard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date Superseding and Amended Definitive Class Settlement Agreement."

The SAD Settlement Agreement provided for a settlement *res* of approximately $6.26 billion, before reductions of the fund for opt-outs, attorney's fees, costs litigation and the costs of class administration. Under the terms of the SAD settlement agreement, settlement fairness will be distributed on a *pro rata* basis and the "Rule 23(b)(3) Class Counsel propose distributing the Cash Fund to

---

[4] Superseding and Amended Definitive Class Settlement Agreement

members of the Rule 23(b)(3) Settlement Class entitled to receive a payment from the Cash Fund ("Claimants") through a process that: (a) is fair and equitable; (b) distributes the Cash Fund in accordance with the relative economic interests of the Claimants as measured by the Interchange Fee amounts attributable to their Visa- and MasterCard-Branded Card transactions during the Class Period ("Interchange Fees Paid"); and (c) ensures that the administration is as simple and cost-effective and imposes as minimal a burden on Claimants as possible.

In return, class members would release their claims arising out of or relating to conduct or acts that were alleged or raised or that could have been alleged or raised relating to the subject matter of this litigation, (*Id.* at 2), that have accrued through the date of the Court's preliminary approval of the settlement, *i.e.*, January 24, 2019, and that accrue no later than five years after the Settlement Final Date (SAD Settlement Agreement ¶ 31(a) (stating that class members 'fully, finally, and forever . . . release [Defendants] from . . . claims . . . that have accrued as of the Settlement Preliminary Approval Date or accrue no later than five years after the Settlement Final Date arising out of or relating to any conduct . . . alleged or otherwise raised . . . or that could have been alleged or raised . . .or arising out of or relating to a continuation or continuing effect of any such conduct . . . .")).  The released claims also encompass claims that were or could have been alleged in this

-20-

action relating to, among other things, interchange fees, anti-steering rules, and honor-all-card rules. (SAD Settlement Agreement ¶ 31(b)(i vi)).

After the November 7, 2019 fairness hearing, the district court entered: a Final Approval Order [Order and Final Judgment approving the Superseding Settlement Agreement], a Memorandum & Order approving the Superseding Settlement Agreement a Memorandum & Order granting attorney fees and expenses, and an Order granting expenses and service awards to the Rule 23(b)(3) Class Plaintiffs.

Jack Rabbit, then timely appealed to this Court.

In its March 15, 2023 decision this Court affirmed the district court's approval of the 2019 Settlement "in all respects," "with the exception that [the Court was] direct[ed] . . . to reduce the service award to class representatives" to account for time spent on lobbying activities. *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 721-23, 727 (2d Cir. 2023).   As the Court noted in footnote 5 "No party to this appeal disputes that "for any given transaction, only one interchange fee was paid and only one claimant is entitled to recover based on that fee."  Defendants' Br. at 31; see also Jack Rabbit Br. at 38, 55 ("Pursuant to Illinois Brick, there can only be one claim per antitrust injury.").

 We therefore accept that interpretation of federal antitrust law for the purposes of

-21-

this appeal, without opining on its soundness."

This Court also held "Until now, there has been no conflict between franchisors and franchisees. To the contrary, they have shared an interest in maximizing the recovery for all class members, which each claims to be. Going forward, however, franchisors and franchisees will become adverse to each other for resolution of the questions regarding which should be deemed to have accepted the cards and therefore to come within the class and receive settlement funds, and how those funds should be allocated. It appears that class counsel will be conflicted on those questions. The district court should ensure that franchisors and franchisees will be represented by counsel, enabling each side to present arguments to the special master and the district court as to why they should be favored over the adversary, and enabling them to negotiate toward settlements of the disputes affecting each adverse pair. Whether this will require designations of subclasses and appointment of further counsel to represent them or whether their existing privately retained counsel will adequately serve the needs, we leave to the good judgment of the district court."

Post remand by this Court, until the entry of the Memorandum and Order being appealed from, the district court had not rejected the application of the *Illinois Brick* Direct Purchaser rule to membership in the Rule 23(b)(3) Class. That

Memorandum and Order, which places merchants with direct Acquiring Bank relationships on the same footing as sub- merchants who only have a relationship with a Payment Facilitator, significantly increased the number of business entities in the Rule 23(b)(3) Class, and diluted Appellant Jack Rabbit's pro rata share of the settlement.

## SUMMARY OF ARGUMENT

Before a business is able to accept Payment Cards payments, the business must first establish an account for Payment Card processing services; This can be done directly with an Acquiring Bank. However, for various economic reasons not relevant to this appeal, many small merchants are not able to, or simply do not desire to, establish a direct relationship with an Acquiring Bank. To fill that economic niche Payment Facilitators, also referred to as PayFacs, contract with small businesses, and middlemen the processing of Payment Cards. To this end, the Payment Facilitator opens a merchant bank account and receives a Master Merchant Identification Number which allows it to acquire and aggregate payments for its customers, known as sub-merchants. One of the important features of the Payment Facilitator system is that the payment facilitators' sub-merchants' Payment Card transactions are aggregated under the Payment Facilitators' Master Merchant

Identification Number.

The relationship between a Payment Facilitator and its sub-merchants is that of a classic middleman who buys a good or service from a manufacturer service provider and then sells the same goods or services to its customers, at a profit. i.e. the Payment Facilitator acts as a middleman or wholesaler that purchases access to the Acquiring Bank by setting up a Master Merchant Account with an acquiring Bank; and then sells, a subaccount, owned and controlled by the Payment Facilitator, to small businesses sub-merchant.

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp*., 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968) ("*Hanover Shoe*") and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977) ("*Illinois Brick*") the U.S. Supreme Court created a bright line rule ("the *Illinois Brick* rule") to simplify determining damages in antitrust actions where an anti-competitively priced product or service sold by the manufacturer or service provider, may be sold, and resold, numerous times down the chain of distribution, linking the manufacturer or service provider to the ultimate consumer.

The *Illinois Brick* rule provides that for simplicity and manageability courts will presume that the antitrust injury, arising out of the purchase of an anticompetitively priced product or service, is only suffered by the first purchaser

-24-

who is directly injured by the purchase; i.e. the Direct Purchaser. Everyone else down the economic chain of distribution is deemed to be an indirect purchaser who has not suffered antitrust injury. Thus, pursuant to *Illinois Brick* the proper antitrust plaintiff is almost always the first purchaser.

In *Illinois Brick* the Supreme Court explained the cost-plus contract exception to the Direct Purchaser rule as: "In [a cost-plus contract] situation, the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because [1] its customer is committed to buying a fixed quantity regardless of price. [2] The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." 431 U.S. at 736.

Jack Rabbit, and the other Retail Gas Station franchisees meet the elements necessary to be identified as an *Illinois Brick* Cost-Plus Direct Purchaser. Sub-merchants a payment facilitators are not Direct Purchasers or a Cost-plus Direct Purchasers. As a result they are not members of Rule 23(b)(3) settlement class.

Pursuant to *Transunion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), "Every class member must have Article III standing in order to recover individual damages. 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.' *Tyson Foods, Inc. v. Bouaphakeo*, 577 U. S. 442, 466,

136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) **No concrete harm, no standing**."
(emphasis added).

In an antitrust matter article III standing is governed by *Illinois Brick* antitrust standing. i.e. although any business with the proper hardware and software may be able to "accept" payment cards, only those businesses who are either Direct Purchasers, or Illinois Brick Cost-Plus Direct Purchasers, has suffered antitrust damages; and are eligible for Rule 23(b)(3) Class status.

## STANDARD OF REVIEW

The applicable appellate standard of review for a district court's conclusions of law are reviewed *de novo. Interchange Fees II*, 827 F.3d at 231.

# ARGUMENT

## I.

**BY FINDING THAT SQUARE'S SUB-MERCHANT-CUSTOMERS AND INTUIT'S SUB-MERCHANT-CUSTOMERS "ACCEPTED" PAYMENT CARDS AND ARE THEREFORE MEMBERS OF THE RULE 23(B)(3) CLASS, WITHOUT CONCOMITANTLY REQUIRING THE SUB- MERCHANTS BE ILLINOIS BRICK DIRECT PURCHASERS OF THE DEFENDANTS' PAYMENT CARD SERVICES, IMMENSELY INCREASED THE NUMBER OF BUSINESS ENTITIES IN THE RULE 23(B)(3) CLASS, AND VASTLY DILUTED APPELLANT JACK RABBIT'S, AND ALL OTHER PROPER CLASS MEMBERS' PRO RATA SHARE OF THE SETTLEMENT**

Before business is able to Accept Payment Cards payments, the business must first establish an account for credit and debit card payment processing services; either directly with an Acquiring Bank. For various economic reasons not relevant to this appeal many small merchants are not able to, or simply do not desire to, establish a direct relationship with an Acquiring Bank. To fill that void Payment Facilitators, also referred to as PayFacs, contract with small businesses, and middlemen the processing of Payment Cards. To this end, the Payment Facilitator opens a merchant bank account and receives a Master Merchant Identification Number which allows it to acquire and aggregate payments for its customers, known as sub-merchants. One of the important features of the Payment Facilitator system is that the sub-merchants' Payment Card transactions are aggregated under the Payment Facilitators' Master Merchant Identification Number. As a result, the

Acquiring Bank has no direct customer relationship with the sub-merchant, and the sub-merchant does not purchase access directly from the Acquiring Bank

There are five steps to every electronic credit card payment when the merchant has an account with an Acquiring Bank. The steps are: (1.) the purchaser swipes a Visa or MasterCard payment card at the seller's point of sale terminal; (2.) the point of sale terminal sends the payment card information to the Acquiring Bank which process payment card purchases for the seller; (3.) the Acquiring Bank relays the credit card information over the Visa or MasterCard network to the Issuing Bank which issued the payment card to the purchaser; (4.) Assuming the purchaser is within their credit limit, the Issuing Bank authorizes the sale and immediately pays the Acquiring Bank the amount of cardholders' purchase, less the Interchange Fee; The Acquiring Bank then deducts its own fee, called the "Merchant Discount Fee" for its processing services, and pays the net to the seller.

On the other hand, when a sub-merchant contracts with a Payment Facilitators so that the sub-merchant can acquire the ability to accept Payment Cards, the sub- merchant is only indirectly purchasing services from the Acquiring Bank and the defendants. The direct purchaser of the services is the Payment Facilitator. In this economic relationship the payment facilitator is a middleman or wholesaler.

-28-

In the Payment Facilitator business model, the Payment Facilitator purchases access to the Acquiring Bank by setting up a Master Merchant Account with an acquiring Bank; it then sells, a subaccount, owned and controlled by the Payment Facilitator, to small business sub-merchants.  In this model the steps are: (1.) the purchaser swipes a Visa or Mastercard payment card at the sub-merchants seller's point of sale terminal,  provided by the Payment Facilitator; (2.) the point of sale terminal sends the payment card information to the Payment Facilitator which uses its Master Merchant Account to forward the transaction to the Payment Facilitators Acquiring Bank,  which process payment card purchases for the Payment Facilitator; (3.) the Acquiring Bank relays the credit card information over the Visa or Mastercard network to the Issuing Bank which issued the payment card to the purchaser; (4.) Assuming the purchaser is within their credit limit, the Issuing Bank authorizes the sale and immediately pays the Acquiring Bank the amount of cardholders' purchase, less the Interchange Fee; The Acquiring Bank then deducts its Merchant Discount Fee for its processing services, and pays the net to the Payment Facilitator; (5.) The Payment Facilitator then deducts its middleman fees - which may include monthly fees, per-transaction fees, equipment lease fees and statement fees - and transmits the net to the sub-merchant.  At no point does the Acquiring Bank even know who the sub-merchant is.   Clearly, the relationship

-29-

between a Payment Facilitator and its sub-merchants is that of a classic middleman or wholesaler that buys a good or service from a manufacturer or service provider and then sells the same goods or services to its customers, at a profit.

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968) ("*Hanover Shoe*") and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977) ("*Illinois Brick*") the U.S. Supreme Court created a bright line rule ("the *Illinois Brick* rule") to simplify determining damages in antitrust actions where an anti-competitively priced product or service sold by the manufacturer or service provider, may be sold, and resold, numerous times down the chain of distribution, linking the manufacturer or service provider to the ultimate consumer.

The *Illinois Brick* rule provides that for simplicity and manageability courts will presume that the antitrust injury, arising out of the purchase of an anticompetitively priced product or service, is only suffered by the first purchaser who is directly injured by the purchase; i.e. the Direct Purchaser. Everyone else down the economic chain of distribution is deemed to be an indirect purchaser who has not suffered antitrust injury. Thus, pursuant to Illinois Brick the proper antitrust plaintiff is almost always the first purchaser.

As Justice Kavanaugh noted in *Apple v. Pepper* 139 S. Ct. 1514 *; 203 L. Ed.

-30-

2d 802:

> *Section 2 of the Sherman Act* makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 26 Stat. 209, 15 U. S. C. §2. Section 4 of the Clayton Act in turn provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . the defendant . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 38 Stat. 731, 15 U. S. C. §15(a) (emphasis added). The broad text of §4—"any person" who has been "injured" by an antitrust violator may sue — readily covers consumers who purchase goods or services at higher-than-competitive prices from an allegedly monopolistic retailer.
>
> Second is precedent: Applying §4, we have consistently stated that "the immediate buyers from the alleged antitrust violators" may maintain a suit against the antitrust violators. *Kansas v. UtiliCorp United Inc.*, 497 U. S. 199, 207, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990); see also *Illinois Brick*, 431 U. S., at 745- 746, 97 S. Ct. 2061, 52 L. Ed. 2d 707. At the same time, incorporating principles of proximate cause into §4, we have ruled that indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue. Our decision in Illinois Brick established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers. Id., at 746, 97 S. Ct. 2061, 52 L. Ed. 2d 707. 1 **...** The bright-line rule of Illinois Brick, as articulated in that case and as we reiterated in UtiliCorp, means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue. By contrast, direct purchasers— that is, those who are "the immediate buyers from the alleged antitrust violators"—may sue. *UtiliCorp*, 497 U. S., at 207, 110 S. Ct. 2807, 111 L. Ed. 2d 169.
>
> For example, if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator. That is the straightforward rule of *Illinois Brick*. See *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F. 3d 469, 481-482 (CA7 2002) (Wood, J.) (Footnote omitted).

However, there are exceptions to the "almost always" first purchaser

simplicity of *Hanover Shoe and Illinois Brick*. Apropos to this appeal is the

Coat-Plus Direct Purchasers exception. Pursuant to *Hanover Shoe* and *Illinois Brick*

Cost-Plus exception to the Indirect Purchaser rule[5].  The exception applies when the

first purchaser of goods or services has avoided antitrust-injury by having

previously contracted to sell the product or service to a customer on a cost-plus

basis. i.e., whenever the first purchaser is economically unaffected by the

manufacturer's anticompetitive pricing because their customer is contractually

obligated to absorb all of the first purchaser's cost, plus an agreed profit, the first

purchaser's customer is the party directly injured by the manufacturer's, or service

providers', anticompetitive pricing.

The Supreme Court reasoned that because the cost-plus customer, and not the

first purchaser, has suffered the cognizable antitrust injury, it is the cost-plus

---

[5] "But this Court in *Hanover Shoe* **indicated the narrow scope it intended for any exception to its rule barring pass-on defenses by citing, as the only example of a situation where the defense might be permitted, a preexisting cost-plus contract**. In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case. **The competitive bidding process by which the concrete block involved in this case was incorporated into masonry structures and then into entire buildings can hardly be said to circumvent complex market interactions as would a cost-plus contract**. *Ill. Brick Co. v. Illinois*, 431 U.S. 720 at 736, 97 S. Ct. 2061at 2069 (1977). (emphasis added)

-32-

purchaser who has sustained the antitrust injury; which in turn gives rise to the Article III and antitrust standing. As a result, the cost plus buyer, as a Cost Plus Direct Purchaser becomes the proper plaintiff to pursue the antitrust defendant.

In an antitrust matter the Article III standing issue is informed by *Illinois Brick* antitrust standing. i.e. although any business with the proper hardware and software may be able to accept payment cards, only those businesses who are either Direct Purchasers, or *Illinois Brick* Cost-plus Direct Purchasers, have suffered antitrust damages; and as a result are Rule 23(b)(3) Class members because they have Article III standing.

The *Illinois Brick* cost-plus exception to the Direct Purchaser rule refers to a contractual relationship wherein the seller's price for goods or services includes all of the seller's costs plus a percentage, or flat amount, in addition.

For example, the oil distributor franchisor contracts with Jack Rabbit, the Retail Gas Station franchisee, for the purchase of a minimum of 50,000 gallons per month of gasoline. The contract then goes on to provide for a schedule of costs of the gasoline. In addition, with regard to credit cards, the contract provides that Jack Rabbit (as "the Purchaser) and Seller agree that all Transaction [Payment] Card sales at the Premises shall be made pursuant to Supplier's point of sale ("POS") system for processing Transaction Cards, and that Jack Rabbit shall pay any

Transaction Card processing fee that may be assessed for providing such services."

In *Illinois Brick* the Supreme Court explained the cost-plus contract exception to the Direct Purchaser rule as: "In [a cost-plus contract] situation, the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because [1] its customer is committed to buying a fixed quantity regardless of price. [2] The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." 431 U.S. at 736.

Jack Rabbit, and the other Retail Gas Station franchisees meet the elements necessary to be identified as an *Illinois Brick* Cost-plus Payment Facilitator. (*see*, the declaration of Jack Kidd, (D.E Doc. 8843-1); and the August 6, 2016 contract between Jack Rabbit and Superior Transport (D.E. Doc. 8843-2)

The cases rejecting cost-plus direct purchaser status: *Kansas v. UtiliCorp United, Inc.*, 497 U.S.199, 216–18 (1990)*, Simon v. KeySpan Corp.*, 694 F.3d 196, 202 (2d Cir. 2012); and *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 06-0620, 2020 WL 5211035, at *6–7 (E.D. Pa. Sept. 1, 2020) are easily distinguishable.

*In Kansas v. UtiliCorp United, Inc.*, natural gas wholesalers and a natural gas pipeline company were sued by several public utilities, who were Direct Purchasers,

-34-

as well as the states of Kansas and Missouri, acting in *parens patriae* for their citizens, who, without question were indirect purchasers of the natural gas. The Tenth Circuit held, pursuant to *Illinois Brick*, that only the public utilities had standing under the Clayton Act and that Kansas and Missouri had no antitrust standing. That decision conflicted with the Seventh Circuit's decision in *Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.*, 852 F.2d 891 (7th Cir. 1988) ("*The suit on behalf of the residential customers is within the scope of the cost-plus exception to the rule of Illinois Brick as we understand it, and we therefore affirm the denial by the district court of the defendant's motion to dismiss the complaint insofar as the complaint seeks damages on behalf of CILCO's residential customers. We reverse insofar as the court allowed suit on behalf of the industrial customers for damages. We express no view of the antitrust merits or of the propriety of the requests for injunctive relief, and we award no costs in this court.*" (emphasis added)

The Supreme Court in resolving the circuit conflict said:

We must decide who may sue under § 4 [of the Clayton Act,] when, in violation of the antitrust laws, suppliers overcharge a public utility for natural gas and the utility passes on the overcharge to its customers. Consistent with *Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 20 L. Ed. 2d 1231, 88 S. Ct. 2224 (1968)*, and *Illinois Brick Co. v. Illinois, 431 U.S. 720, 52 L. Ed. 2d 707, 97 S. Ct. 2061 (1977)*, we hold that only the utility has the cause of action because it alone has suffered injury within the meaning of § 4." **...** The petitioners argue that the regulations and tariffs requiring the respondent to pass on its costs to the consumers place this case within the cost-plus contract exception. We disagree. The respondent did not sell the gas to its customers

under a pre-existing cost-plus contract. Even if we were to create an exception for situations that merely resemble those governed by such a contract, we would not apply the exception here. Our statements above show that we might allow indirect purchasers to sue only when, by hypothesis, the direct purchaser will bear no portion of the overcharge and otherwise suffer no injury. That certainty does not exist here. The utility customers made no commitment to purchase any particular quantity of gas, and the utility itself had no guarantee of any particular profit.

Unlike the natural gas utility customers in *Kansas v. UtiliCorp United, Inc*, who "made no commitment to purchase any particular quantity of natural gas, appellant Jack Rabbit has a contractual commitment to purchase a minimum amount of gasoline per month. Thus, even during an economic downturn when gasoline sales are way down, Jack Rabbit is obligated to buy 50,000 gallons of gasoline. Furthermore, Jack Rabbit's contract provides that all Transaction [Payment] Card sales at Jack Rabbit shall be made pursuant to Supplier's point of sale ("POS") system for processing Transaction Cards, and that Jack Rabbit Shall Pay any Transaction Card processing fee that may be assessed for providing such services.

In *Simon v. KeySpan Corp*., 694 F.3d 196, (2012), Charles Simon, purchased electric power from Con Ed, a regulated public utility. Simon sued KeySpan Corporation, which generated electricity and sold it to Con Ed, which in turn sold the electricity to plaintiff Simon. Simon alleged that in violation of the antitrust laws, KeySpan colluded with one of its rivals, to increase the cost of electricity to Con Ed, which, as a result, increased the cost per unit of electricity purchased by

-36-

Simon. The action was dismissed by the district court and Mr. Simon appealed to

the this Court.  This Court noted that Mr. Simon's claims were governed by *Kansas*

*v. UtiliCorp United, Inc*., 497 U.S.199, 216–18 (1990), which had established that

only the utilities, as Direct Purchasers, were proper antitrust plaintiffs; and declined

to create an exception to the indirect purchaser rule for situations where regulated

public utilities pass on 100% of their costs to consumers.

> For all of these reasons, we hold that Simon cannot qualify for federal antitrust standing as an indirect purchaser. **He Did Not Contract to Buy a Fixed Monthly Quantity of Electricity from Con Ed in Advance**, and we cannot determine whether Con Ed would have been able to seek and obtain a rate increase in the absence of the overcharge. The cost- plus contract exception to the bar on indirect purchaser standing is therefore not applicable in this case. *Simon* 694 F.3d 196, *203 (emphasis added)

In *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop*., No. 15-6480, 2020

U.S. Dist. LEXIS 158687 (E.D. Pa. Sep. 1, 2020) the district court had been dealing

with protracted consolidated antitrust litigation involving the growers of Agaricus

Bisporus mushrooms (more familiarly, depending on age, known as White, Button,

Cremini, or Portobelo mushrooms); *In re Mushroom Direct Purchaser Antitrust*

*Litig*.  In 2015, Winn-Dixie and its parent company, Bi-Lo filed an add on suit

claiming to have purchased Agaricus mushrooms directly from one or more of the

*In re Mushroom Direct Purchaser Antitrust* Litig defendants.  Subsequently, on

November 22, 2016 the district court certified class of Direct Purchasers, *In re*

*Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158 (E.D. Pa. 2016).

Pursuant to the class settlement notice, Winn-Dixie and Bi-Lo opted out. Apropos to this case, sans a number of legal issues irrelevant to the case at bar, the district court ruled against the Winn-Dixie and Bi-Lo plaintiffs, on the defendant's motion for summary judgment.

> Defendants argue that there is no dispute of material fact that Bi-Lo does not have antitrust standing on the basis of its own purchase of allegedly overpriced mushrooms. They argue that there is no evidence Bi-Lo ever purchased mushrooms from an alleged conspirator, and therefore this action is barred by the rule forbidding antitrust damage actions by parties who do not directly purchase goods from the alleged antitrust violators. The Court agrees. **...** Bi-Lo argues that, despite its status as an indirect purchaser, there is nonetheless a factual controversy over whether it falls into the "cost-plus" exception to Illinois Brick. The Court finds no evidence to support this claim.

> The Supreme Court has recognized an exception to Illinois Brick, "where there is a preexisting, fixed-quantity, cost-plus contract between the direct purchaser and its customer . . . so that the [indirect purchaser] plaintiff has absorbed the illegal overcharge in its entirety." Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573, 577 (3d Cir. 1979) (discussing Hanover Shoe and Illinois Brick). The term "cost-plus" refers to an arrangement where the price the seller of a good charges to the buyer is calculated by taking the amount the seller paid for the good and adding a predetermined markup. **...** Bi-Lo freely admits, and as is clear from the face of the contract, Bi-Lo's agreement with C&S was not for a "fixed quantity" of mushrooms. While Bi-Lo was required to purchase its mushroom "requirements" from C&S, **the contract does not specify a fixed quantity of mushrooms.** As a result, Bi-Lo's contract with C&S does not qualify it for an exception to Illinois Brick's bar on antitrust damage actions by indirect purchasers. (emphasis added)

> In an attempt to get around this fact, Bi-Lo contends that an indirect purchaser with a requirements contract can quality for the cost-plus exception to Illinois Brick. (Pl.'s Resp. in Opp. to Def.'s Summ. J. Mot. Against Bi-Lo [Bi-Lo's

-38-

Brief], at 16-17.) Bi-Lo's reasoning is that, because its contract with C&S was a requirements contract, Bi-Lo "could not reduce its mushroom purchases in response to higher mushroom [*28] prices", making its contract effectively one for a fixed quantity of mushrooms. The Court is unpersuaded.

As an initial matter, the Court must strictly follow the requirements of the cost-plus exception. HN6 The Third Circuit has explicitly described "fixed-quantity" as a necessary element of the cost-plus exception. Mid-West Paper Products Co., 596 F.2d at 580.

Moreover, Bi-Lo is incorrect when it contends that it qualifies for the cost-plus exception even though it did not contract with C&S for a fixed quantity of mushrooms. HN7 A requirements contract is one "pursuant to which a seller agrees to supply a sufficient quantity of an item to meet a buyer's requirements. ..." Banks, 28A N.Y. Prac., Contract Law § 26:37.8 **Under a requirements contract, a buyer may vary the quantity of goods purchased from a seller so long as the variance is reasonable and done in good faith**.

Bi-Lo, the purchaser of fresh mushrooms pursuant to a requirements contract, did not contract to buy a fixed monthly quantity of mushrooms from C&S. Bi-Lo's only obligation was to buy whatever quantity of fresh mushrooms that it determined they required, from C&S. Thus, the contract did not require a fixed amount or quantity of mushrooms to be purchased.

Not every violation of federal law will create a basis for Article III standing. Instead, "Article III standing requires a concrete injury even in the context of a statutory violation," and an "injury in law is not an injury in fact." *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

Furthermore, pursuant to *Transunion LLC v. Ramirez*, 141 S. Ct. 2190 (2021),

-39-

"Every class member must have Article III standing in order to recover individual damages. 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.' *Tyson Foods, Inc. v. Bouaphakeo*, 577 U. S. 442, 466, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) **No concrete harm, no standing**." (emphasis added).

Under the well-established case law governing who has suffered antitrust damages, and as a result has Article III standing it is error as a matter of law to hold that sub-merchants of payment facilitators are members of the Rule 23(b)(3) settlement class.

## CONCLUSION

For all of the foregoing reasons the Memorandum and Order of the district court, which disregards the antitrust standing requirements of *Illinois Bricks*, should be reversed and this matter should be remanded with instructions to the district court that only Direct Purchasers or a Cost-plus Direct Purchasers are members of Rule 23(b)(3) settlement class.


Respectfully submitted,

Dated: October 16, 2024                    **/s/** N. Albert Bacharach, Jr.
                                           N. Albert Bacharach, Jr.


-40-

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a) Fed. R. App. P</u>

**Certificate of Compliance With Type-Volume Limitation,
<u>Typeface Requirements, and Type Style Requirements</u>**

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(b)(i) because this brief contains less than 13,000 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced

typeface using WordPerfect's 21 point Times New Roman font.

Dated October 16, 2024.

<u>/s/ N. Albert Bacharach, Jr.</u>
N. Albert Bacharach, Jr.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2024 I filed the foregoing Initial Brief via the ACMF filing system for the United States Court of Appeals for the Second Circuit, and that as a result each counsel of record received an electronic copy of this Initial Brief on October 16, 2024.

<u>/s/ N. Albert Bacharach, Jr.</u>
N. Albert Bacharach, Jr.