# 24-1653-cv

## United States Court of Appeals
### *for the*
## Second Circuit

In re: PAYMENT CARD INTERCHANGE FEE AND
MERCHANT DISCOUNT ANTITRUST LITIGATION.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF OF PAYMENT FACILITATORS INTUIT INC.; INTUIT
PAYMENT SOLUTIONS, LLC; BLOCK, INC., FORMERLY KNOWN
AS SQUARE, INC.; AND ACI PAYMENTS, INC. AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

MARC L. GREENWALD
STEIG D. OLSON
MANISHA M. SHETH
DAVID M. COOPER
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
marcgreenwald@quinnemanuel.com
steigolson@quinnemanuel.com
manishasheth@quinnemanuel.com
davidcooper@quinnemanuel.com

ADAM B. WOLFSON
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
adamwolfson@quinnemanuel.com

JUSTIN T. REINHEIMER
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600
justinreinheimer@quinnemanuel.com

*Attorneys for Amici Curiae*

October 22, 2024



## <u>CORPORATE DISCLOSURE STATEMENT</u>

**ACI Payments, Inc.** is a wholly owned subsidiary of ACI Worldwide Corp. ACI Worldwide Corp. is a wholly owned subsidiary of ACI Worldwide, Inc. No publicly held corporation owns 10% or more of ACI Worldwide, Inc.'s stock.

**Block, Inc.**, formerly known as Square, Inc., has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

**Intuit Inc.** has no parent company, and no publicly held corporation owns 10% or more of its stock.

Intuit Inc. is the sole parent corporation of **Intuit Payment Solutions, LLC**. No other publicly traded corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICI CURIAE* ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 2

BACKGROUND ...................................................................................... 7

    A.    A Payment Facilitator Is A Type Of Merchant That Facilitates Transactions For "Submerchants," And Is The Most Direct Payor Of Interchange Fees For Those Transactions ............................................. 7

    B.    In Applying Its Novel Interpretation Of "Accepted," The District Ignored Evidence Of How Payment Facilitation Works And Prevented PayFacs From Presenting That Evidence In The Future ....... 11

ARGUMENT ............................................................................................. 13

I.    BY IGNORING THIS COURT'S HOLDING THAT SETTLEMENT CLASS MEMBERSHIP WAS DEFINED BY DIRECT PAYOR STATUS, THE DISTRICT COURT ERRED AS A MATTER OF LAW AND INVITED THE CHAOS PREVIOUS OBJECTORS WARNED OF .......................................................................................... 13

    A.    The District Court Erred As A Matter Of Law And Violated Due Process By Disregarding This Court's Holding That Class Membership Is Based On Who Directly Pays Interchange Fees ........... 13

    B.    This Court Correctly Held That The Class Is Defined With Reference To The Federal Antitrust Laws And That The Direct Payor Is The Entity With A Federal Antitrust Claim ............................... 18

    C.    The PayFacs Are The Direct Payors And Purchasers; The Square Sellers Are Admittedly Indirect Payors and Purchasers ......................... 22

II.    EVEN IF THE DISTRICT COURT WAS CORRECT IN ITS APPROACH TO DEFINING SETTLEMENT CLASS MEMBERSHIP, IT ERRED BY REFUSING TO CONSIDER (AND INDICATING THE CLAIMS ADMINISTRATOR SHOULD IGNORE) MATERIAL FACTS SHOWING PAYMENT FACILITATORS "ACCEPT" PAYMENT CARDS ................................... 27

CONCLUSION ........................................................................................ 28

CERTIFICATE OF COMPLIANCE ...................................................... 30

CERTIFICATE OF SERVICE ............................................................... 31

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019).................................................................19, 27

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)........................................................................27

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989).........................................................................19

*Davis v. Blige*,
    505 F.3d 90 (2d Cir. 2007) .............................................................18

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) .....................................................*passim*

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)..................................................................19, 24

*In re Motorola Sec. Litig.*,
    644 F.3d 511 (7th Cir. 2011) ................................................. 18-19, 21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024) ...................................14

*Yick Man Mui v. United States*,
    614 F.3d 50 (2d Cir. 2010) .................................................... 14-15

## Statutes and Rules

15 U.S.C. § 15b..................................................................................17

FED. R. APP. P. 29................................................................................1

FED. R. CIV. P. 23......................................................................3, 18, 23

## Other Authorities

*Accept*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/accept (Oct. 22, 2024) ..............................................................3

ii

## INTEREST OF *AMICI CURIAE**

*Amici* Intuit Inc.; Intuit Payment Solutions, LLC (together, "Intuit"); Block, Inc., formerly known as Square, Inc. ("Square"); and ACI Payments, Inc. ("ACI") are payment facilitators that directly pay interchange and other fees for all card transactions they facilitate. As Appellants' brief explains, in this federal antitrust case regarding overcharges on interchange fees for payment card transactions, the central question on this appeal is how to define settlement class membership. Because each of *amici* (and any payment facilitator) directly pays interchange fees, and because this was a direct purchaser antitrust class action in which this Court previously held direct payors are settlement class members, *amici* contend they were included in the settlement class definition.

The District Court, however, held that payment facilitators are not and never were settlement class members due to an interpretation of the word "accepted" in the settlement class definition that ignores this Court's prior ruling and the law of direct purchaser standing, and instead turns on a misunderstanding of which party physically accepted a payment card. This interpretation had numerous adverse effects on payment facilitators and other parties that did *not* opt out of the settlement,

---

* Pursuant to FED. R. APP. P. 29(a)(4)(E) and Local Circuit Rule 29.1(b), *amici* state that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici* or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Pursuant to FED. R. APP. P. 29(a)(2), *amici* state that all parties consent to the filing of this brief.

1

as well as those that *did* opt out of the settlement and are currently pursuing their direct claims. *Amici*'s interest is therefore to highlight and explain why the correct approach to interpreting the settlement agreement is critical for the orderly application of antitrust and class action law, and to ensure due process to *amici* and others in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* are payment facilitators, also known as "PayFacs." PayFacs provide a service whereby they establish a merchant account with an acquiring bank and act as the merchant of record on all payment transactions they facilitate. Their clients are "submerchants" that use various software and hardware the PayFac provides, in order to receive payment through electronic means from their own customers. Submerchants, such as Appellants (*i.e.*, the Square Sellers), are smaller businesses without the resources or desire to establish their own merchant accounts with payment networks. Nor do they take on the obligations required of merchants in payment card transactions, such as paying interchange fees. Rather, the PayFacs directly pay all interchange fees and the PayFacs take on the responsibilities of a direct purchaser of card transaction services, by, *e.g.*, assuming liability for payment of transactions with acquiring banks.

Based on these undisputed facts, *amici* all understood they were settlement class members because they are "direct payors of the challenged [interchange] fees."

2

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716 (2d Cir. 2023). On that basis, *amici* Intuit and Square each timely opted out of the settlement class and filed direct claims against Defendants. In contrast, *amicus* ACI did not opt out and instead made a timely claim on the settlement common fund. This should have been a straightforward exercise of each of their rights under Rule 23. But the U.S. District Court for the Eastern District of New York (Brodie, J.) instead introduced the exact ambiguity it and this Court previously found does not exist in the settlement class definition.

The word "accept" has several different meanings. For example, it can (as the District Court noted below) mean "to take or receive (something offered) willingly." *See* SpA.22 (May 28, 2024 Mem. & Order) ("Order") (citing *Accept*, Oxford English Dictionary). But it can also mean, among other things, "to give admittance or approval to," "to make a favorable response to," or even "***to assume an obligation to pay***." *Accept*, Merriam-Webster, https://www.merriam-webster.com/dictionary/accept (Oct. 22, 2024) (emphasis added). What exactly "accept"—or, more specifically, the past tense of that verb, "accepted"—means in the context of the damages class settlement agreement in this case is extremely important, because it defines who was and was not a potential settlement class member, and therefore who was potentially bound by the settlement; could make

claims on the settlement common fund; and could release their federal antitrust claims, if they did not opt out.

The District Court and this Court previously resolved that ambiguity—and rejected objectors' argument that the class was not ascertainable—by holding that "the only entities that could fall within the class definition were those deemed to be direct payors of the challenged fees" and noting the "marching order" for the "special master [was to] identify the direct payor or payors in any given transaction." *Fikes*, 62 F.4th at 716, 718. This Court explained that this direct-payor test was required because the parties reached the settlement in a federal antitrust class action governed by federal direct purchaser standing requirements, and Class Counsel stated they only represented direct purchasers. *Id.* at 716.

The Order, however, ignored this Court's holding, fundamental principles of antitrust law, and the settled expectations of *amici* and others regarding whether they were members of the settlement class. It did so by granting a motion to enforce the settlement agreement Defendants filed after the *Fikes* decision, holding that "accepted" does *not* mean the "direct payor of the challenged fees" (as this Court held), but instead means the entity that could either physically take payment via a payment card or instead opt to receive cash. Nowhere did the Order explain how this new definition was consistent with a settlement in a federal antitrust class action requiring direct purchaser standing for damages stemming from overcharges on

interchange fees. The District Court implemented this incorrect interpretation in the Order, and reaffirmed it in multiple subsequent orders.

The District Court's about-face has had cascading effects on *amici*, who are emblematic of all PayFacs in this dispute. As noted, *amicus* ACI was going through the process to make a claim on the settlement fund, because it indisputably is the direct payor of interchange fees on the transactions it facilitates. But the claims administrator, acting on instructions from Class Counsel (who ostensibly represented direct purchasers) denied that ACI had the authority to file any claim— even claims for which ACI received claims forms from the claims administrator— and refuses to pay ACI its *pro rata* portion of the settlement fund. ACI is now in a position where it must either receive nothing for its antitrust claims, or must file a lawsuit it agreed to settle five years ago—but which may now be limited in scope due to the four-year statute of limitations for antitrust claims, absent application of hitherto untested tolling theories.

*Amici* Intuit and Square are in a different position than ACI, because they opted out of the settlement class, were informed by the settlement administrator that their exclusion requests were timely and complete, filed their own cases, and never tried to make a claim on the settlement fund. However, the District Court's decision has created its own set of unnecessary problems for them. Specifically, Defendants argue that, even though PayFac submerchants never had standing to bring federal

antitrust claims for interchange fee overcharges, they nevertheless released Intuit's and Square's claims because (a) there is a limited agency relationship between a PayFac and its submerchants, and (b) the settlement agreement states that class members release their "agents'" claims. In response to Defendants' first attempt at this argument, the District Court rightly found there is a triable question of fact on the scope of the agency relationships at issue. But the critical point for this appeal is that this overall inquiry—whether indirect purchasers implicitly released the claims of direct purchasers in a direct-purchaser class action—arises only because of the District Court's error in treating Appellants as class members in the first place. And the inquiry continues to be an issue because Defendants have since raised it again in an attempt to avoid discovery on the PayFac portion of Intuit's and Square's claims.

For Defendants, the benefit of this confusion and change in settlement class membership definition is apparent. If left undisturbed, the Order will mean that millions of PayFac submerchants lose their state-law indirect purchaser claims and instead may receive only a $25 payment; the PayFacs that believed they were in the class and did not opt out will have to file their own separate claims and those claims may be diminished by the statute of limitations; and any PayFac that files suit (including those that timely opted out and filed years ago) will face an argument that their claims were released by the submerchants.

6

The District Court should have simply followed this Court's prior holding. By instead interpreting the word "accepted" in the settlement agreement to mean something other than the "direct payor of the challenged fees," the District Court created the very ascertainability problems it and this Court previously rejected, because the word "accepted" has no objective criteria tying it to federal antitrust law. Even if the District Court were right to interpret "accepted" without reference to direct purchaser standing, it also erred by ignoring extensive, undisputed evidence that PayFacs accept cards under the "take or receive (something offered) willingly" standard. Accordingly, this Court should reverse the Order granting Defendants' motion to enforce the settlement against Appellants.

## BACKGROUND

The Square Sellers set forth much of the relevant background in their opening brief, but *amici* provide the following additional facts, which are important in understanding *amici*'s role in the payment process and the effect of the decision below on *amici*.

### A. A Payment Facilitator Is A Type Of Merchant That Facilitates Transactions For "Submerchants," And Is The Most Direct Payor Of Interchange Fees For Those Transactions

At a high level, a PayFac enables consumers to make electronic payments at the PayFac customers' businesses. A.1622 (Intuit); A.3685-92 (Square). PayFac services have grown significantly in recent years. PayFac customers are typically

7

small businesses without the resources or desire to enter full-fledged merchant agreements with card networks for all the different types of electronic payments available today. A.1843; A.1907-8. A PayFac therefore enters those merchant agreements itself and takes on the obligation to pay all associated fees for every transaction it facilitates for its customers. *See* A.1622-23 (Intuit); A.1577-79 (Intuit); A.3676 (Square); A.3667-69 (Square). In that regard, it will act and be recorded as a "master merchant" or "merchant of record" on every single card transaction, and its customers—the submerchants—are not responsible for paying interchange fees, and do not do so. *See* A.1622 (Intuit); A.1860 (Intuit); A.3661 (Square); A.3670-71 (Square). Instead, in exchange for its services, the PayFac charges its submerchants a fee of its own, one that is purely between it and the submerchant. A.1622 (Intuit); A.3679 (Square). These fees reflect the suite of services and features that Intuit and Square provide their submerchants, such as payroll and inventory management and business analytics.

*Amicus* Intuit's approach is instructive. Its PayFac service is QuickBooks Payments, which QuickBooks users can utilize to issue invoices over the internet,

8

and receive payment via the same. A.1621-22. A generic version of a QuickBooks

Payments invoice from Intuit's website[1] is set forth below:



As this shows, in order to pay using any of the options specified (including

but not limited to payment cards), the party receiving such an invoice must agree to

"allow *Intuit* to charge [the amount] to my card"; must agree to *Intuit's* Terms of

Service; must acknowledge receipt of *Intuit's* Privacy Statement; and must use

*Intuit's* technology and software to complete the transaction.

---

[1]  Daniel Vaisman, *Enable faster customer payment with new QuickBooks Online Payment Portal*, QUICKBOOKS BLOG (Apr. 2, 2019), https://quickbooks.in-tuit.com/r/whats-new/enable-faster-customer-payment-with-new-quickbooks-online-payment-portal/.

Similarly, Square provides to its customers (Square Sellers) point-of-sale services and hardware that facilitate a consumer's ability to insert, swipe, or tap a payment card to make purchases from a Seller. When a consumer inserts, swipes, or taps a card (or other payment instrument, such as phone or watch) at a Square Reader, a request for authorization to conduct the transaction is submitted to Square. Square then passes the relevant transaction information to the appropriate acquiring bank with which Square has contracted, and that acquiring bank submits a request to the payment network affiliated with the consumer's card. A.3685-92; A.5408-09.

Intuit and Square are each obligated to pay the interchange fee on all transactions they facilitate. A.1579-80 (Intuit); A.3675 (Square). Intuit and Square each pay the interchange fee when an issuing bank deducts the applicable fee before the remaining funds are deposited into their respective accounts with their acquiring banks. A.1575-80 (Intuit); A.3668-69 (Square); A.3673 (Square). For the payment facilitation services they provide to their respective submerchants, Intuit and Square charge a separate fee that they alone set. A.1580-82 (Intuit); A.5410-11 (Square).

ACI provides analogous card acceptance and payment facilitation services through an online portal or interface to which patrons of ACI customers are redirected from the ACI customer webpage. ACI, not its customers, almost invariably directly pays the interchange fees associated with the acceptance, for a fee that it sets.

10

**B.    In Applying Its Novel Interpretation Of "Accepted," The District Ignored Evidence Of How Payment Facilitation Works And Prevented PayFacs From Presenting That Evidence In The Future**

As described in the Square Sellers' opening brief and below, the damages class action in MDL 1720 was always a direct purchaser antitrust class action, and both this Court and the District Court approved the settlement on the basis that class membership tracked direct purchaser standing.  Defendants subsequently moved to enforce the settlement by arguing PayFac submerchants were settlement class members (and, as relevant to *amici* Intuit and Square, therefore released their respective PayFacs' claims based on a limited agency relationship between them). Defendants did not argue—at all, ever—that PayFac submerchants are "direct payors of the challenged fees."  *See* Dkt. 9127 (Intuit Jan. 29, 2024 Reply in Supp. Of Cross-Mot. for Partial Summ. J.) at 1-4; Dkt. 9129 (Square Dec. 4, 2023 Opp'n Br.) at 17; Dkt. 9133 (Square Jan. 29, 2024 Reply Br.) at 4-6.  Instead, Defendants contended that direct payor status was entirely irrelevant, arguing, *inter alia*, that "this motion does not turn on which entities are direct or indirect purchasers under federal antitrust standing law," Dkt. 9100 (Defs.' Nov. 1, 2023 Mot. to Enforce) at 2, and that "Intuit's and Square's claim to 'direct purchaser' status is irrelevant to this motion."  *Id.* at 17.  In fact, Defendants expressly conceded that the Square Sellers and Intuit's submerchants were indirect purchasers.  Dkt. 9103 (Defs.' Jan. 8, 2024 Reply in Supp. Of Mot. to Enforce) at 21.  Intuit and the Square Sellers each

11

cross-moved for summary judgment on, respectively, Intuit's and Square's direct purchaser standing.

The District Court granted the motion to enforce and denied the motions for summary judgment. Rather than confirming its (and this Court's) prior rulings that who "accepted" payment cards for purposes of settlement class membership must turn on who was the "direct payor of the challenged fee," the District Court posited a "prototypical transaction" at a brick and mortar store and held instead that "accepted" referred to the entity that physically accepted a card, or could have taken cash instead. *See* SpA.22. In subsequent rulings following the Order, the District Court stated that this Court's "direct payor" test was merely "a proxy for the relevant inquiry: the direct purchaser of card-acceptance services." *See* Dkt. 9384 (Aug. 8, 2024 Order) at 8. But, even then, the District Court did not attempt to reconcile the direct-purchaser test with its holding that the submerchants were class members. Specifically, it did not find that the submerchants were direct purchasers, did not disagree with the undisputed evidence that PayFacs are direct payors of interchange fees while submerchants are not, and instead held that a factual dispute exists as to whether PayFacs were direct purchasers. *See* SpA.11-31.

The Order means that PayFacs who did not opt out of the settlement, such as *amicus* ACI, have been denied the opportunity to present the evidence of their direct payment and acceptance of payment cards to the claims administrator, and thus

denied the opportunity to collect their rightful share of the settlement common fund. It also means that PayFacs who did opt out of the settlement are facing what the District Court deemed a factual issue for trial regarding whether submerchants' inclusion in the class means that the submerchants implicitly released the PayFacs' claims.

## ARGUMENT

I. **BY IGNORING THIS COURT'S HOLDING THAT SETTLEMENT CLASS MEMBERSHIP WAS DEFINED BY DIRECT PAYOR STATUS, THE DISTRICT COURT ERRED AS A MATTER OF LAW AND INVITED THE CHAOS PREVIOUS OBJECTORS WARNED OF**

A. **The District Court Erred As A Matter Of Law And Violated Due Process By Disregarding This Court's Holding That Class Membership Is Based On Who Directly Pays Interchange Fees**

This Court's prior ruling in this litigation was unequivocal regarding how to determine who is in the class and who is not: identify the "direct payor." *Fikes*, 62 F.4th at 716. When objectors to the settlement argued that the class definition of entities that "accepted" Visa and/or MasterCard was not ascertainable, this Court recognized that "the word 'accepted' lends itself to ambiguity." *Id.* However, the ambiguity was resolved because "the district court properly concluded that 'the class definition is ... objectively guided by federal antitrust standards.'" *Id.* In particular, "the district court found that federal antitrust law clarified that ***the only entities that could fall within the class definition were those deemed to be direct payors of the challenged fees***." *Id.* (emphasis added); *see also id.* at 717 ("Appellants do not

13

contend that identifying the direct payor for each transaction is impossible. So, their ascertainability argument must fail."). This Court then emphasized that the "marching order" of the special master was simply to "identify the direct payor or payors in any given transaction." *Id.* at 718.

The Order now on review, however, states that "direct payor" was *not* the test for class membership. The only reference to "direct payor" in the Order is a citation to a prior order concluding that "a 'direct payor' test 'is not an appropriate substitute for the direct purchaser rule.'" SpA.28 n.29 (quoting *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1014159, at *12-13 (E.D.N.Y. Feb. 22, 2024)). Neither order even mentions this Court's holding that "direct payor" was the correct test, let alone attempts to reconcile its approach with this Court's holding. In a subsequent order, the District Court finally addressed this Court's holding by stating that "the Court understood the Second Circuit's references to the 'direct payors of the challenged fees' to be a proxy for the relevant inquiry: the direct purchaser of card-acceptance services." Dkt. 9384 (Aug. 8, 2024 Order) at 8. In short, the District Court first ignored this Court's holding and then claimed it is merely a "proxy" that can therefore be disregarded.

There was no legal basis to disregard this Court's holding and to apply anything other than a "direct payor" test for class membership. The "mandate rule bars re-litigation of issues already decided on direct appeal." *Yick Man Mui v.*

14

*United States*, 614 F.3d 50, 53 (2d Cir. 2010). This Court clearly and expressly resolved the question of how to determine who "accepted" Visa and/or MasterCard for purposes of settlement class membership, and it is by "identify[ing] the direct payor." That should be the end of the matter. To the extent Defendants attempt to challenge the issue now, "[o]f course, the law of the case rule governs re-litigation of an issue at the appellate level." *Id.*

It would also be impractical, unjust, and a violation of due process to change course now and impose a different definition of "accepted." Until May 28, 2024, when the Order on Defendants' motion to enforce came down, parties assessing their rights against Defendants had an easy way to determine whether they were members of the settlement class, *i.e.*, by asking if they were direct payors of the challenged interchange fees. They had good reason to believe that was how to assess their potential settlement class membership, since the District Court had stated that parties could objectively determine their settlement class membership based on who was the direct payor of interchange fees on affected transactions and this Court affirmed the settlement on that basis. This was all clear—until it was not. By changing its definition of settlement class membership from who directly paid the challenged interchange fees to something else, the Order injected ascertainability problems that either undo the entire settlement or (more appropriately) represent an error of law requiring reversal.

The decision on review has created chaos in the litigation and settlement claim process. The PayFacs, unlike the submerchants, received notice of the class settlement. *See* Appellants' Br. at 45-46. They accordingly believed based on that notice—as well as this Court's decision and the District Court's prior decisions—that they were class members. The settlement administrator confirmed this understanding when it informed the District Court that Intuit and Square had submitted "timely and complete" opt-outs. *See* Dkt. 7641-1 (Aug. 7, 2019 Report of Class Administrator), Ex. A at 9, 16. PayFacs like *amicus* ACI, that did not opt out of the settlement because they wanted to accept the amounts they would receive under the settlement, have been told they cannot make a claim on the settlement because they (supposedly) were never settlement class members. Payments in the settlement will soon begin to go out and parties like ACI that are unquestionably direct payors will not be able to collect on the settlement. And as Appellants have explained, submerchants also will have difficulty collecting because Defendants' data often includes only the PayFacs as the payors. *See* Appellants' Br. at 6, 7, 37, 41-42; *see also* Dkt. 9383 (Square Aug. 8, 2024 Letter re: Class Counsel's Request for Data) (noting that "Class Counsel's statements that there exist 'submerchants who had not yet received' claim forms and that the 'opt-out data provided by Square contained novel records not otherwise available'" in the settlement administrator's

data from Visa and Mastercard were "difficult to reconcile with representations made to the Court by Visa and Mastercard").

To the extent PayFacs who previously thought they could collect from the settlement fund would have to actively litigate their claims, the change in approach to settlement class membership also has substantial effects on the scope of their available damages. It has been five years since the opt-out deadline, *i.e.*, a year more than the four-year statute of limitations for antitrust claims. *See* 15 U.S.C. § 15b. Had there been any indication before May 28, 2024 that settlement class membership did *not* turn on who was the "direct payor of the challenged fees," PayFacs such as *amicus* ACI would have viewed this entire process through a drastically different lens, and acted accordingly by either filing litigation or seeking some other resolution with Defendants. If left undisturbed, the Order will have deprived them of that opportunity, even though they rightly believed they could participate in the settlement process as direct payors of interchange fees.

The change in approach to settlement class membership definition also impacts PayFacs, like *amici* Square and Intuit, that timely opted out of the settlement class. When those PayFacs sent in opt-out notices, no one—the Court, Defendants, Class Counsel, or the claims administrator—suggested that the opt-out was ineffective or that the PayFacs were otherwise outside the definition of the settlement class. But after settlement approval, Defendants have now argued that their opt-outs

17

are a nullity because Intuit's and Square's submerchants are supposedly settlement class members, the settlement agreement releases settlement class members' agents' claims, and thus Intuit's and Square's submerchants supposedly "released" their claims. *See* Dkt. 9100 (Defs.' Nov. 1, 2023 Mot. to Enforce) at 12-16. Thus, according to Defendants, parties that never directly paid interchange fees could nevertheless release direct payors' claims based on the settlement of a direct purchaser class action, negotiated by Class Counsel representing direct purchasers, and approved because direct payor status objectively defined the bounds of settlement class membership. They have never explained how this could possibly satisfy due process or Rule 23. And it plainly defies this Court's holding that "[s]ettlement agreements are not to be used as a device by which A and B, the parties to the decree, can (just because a judge is willing to give the parties' deal a judicial imprimatur) take away the legal rights of C, a nonparty." *Davis v. Blige*, 505 F.3d 90, 102-03 (2d Cir. 2007) (cleaned up).

### B. This Court Correctly Held That The Class Is Defined With Reference To The Federal Antitrust Laws And That The Direct Payor Is The Entity With A Federal Antitrust Claim

Beyond the fact that the issue was already decided and that changing course would be improper, this Court's "direct payor" standard is correct. "[A]s a general rule, a class definition is interpreted according to the substantive law that provides the basis for the class action." *Fikes*, 62 F.4th at 716 (quoting *In re Motorola Sec.*

18

*Litig.*, 644 F.3d 511, 517 (7th Cir. 2011)).  That is why, for instance, the Supreme Court held in a class-action settlement of both federal and state-law antitrust claims, "whatever amount is allocable to federal claims will be distributed only to direct purchasers." *California v. ARC Am. Corp.*, 490 U.S. 93, 104-05 (1989).

This rule necessarily follows from the fact that a class comprised of those with claims under the substantive law and those without would inevitably be conflicted. In particular, those with claims would, understandably, not want to share the proceeds of a judgment or settlement with those who had no valid claims.  And those without valid claims may prefer to pursue litigation in another forum in which they did have a valid claim.  That is precisely the situation here:  It is well established that only the "direct purchaser" has a Sherman Act claim.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Apple Inc. v. Pepper*, 587 U.S. 273 (2019).  *Amici* are direct purchasers that do not want to be lumped in with indirect purchasers, while Appellants are indirect purchasers that wish to pursue their own actions.  The District Court never addressed how class counsel could represent indirect purchasers in this direct-purchaser class action, let alone how settlement distributions could be the same for direct and indirect purchasers.

Moreover, as this Court noted in upholding the damages class settlement, the parties all agreed (and still agree) that "for any given transaction, only one interchange fee was paid and only one claimant is entitled to recover based on that

fee" from the settlement. *Fikes*, 62 F.4th at 716 n.5. That is because the antitrust claims in this MDL have only ever been about overpayment of interchange fees. Accordingly, the class definition must reflect the one and only claimant entitled to recover for a given interchange fee. In deciding who will be that claimant, this Court instructed that federal antitrust law regarding which entity has the claim governs.

The District Court, however, did not follow this principle. Instead, it interpreted the word "accepted" in the settlement agreement as a matter of contract, found the term "ambiguous," and looked at "extrinsic evidence to determine the intent of the parties." SpA.16-19. The District Court noted that it should be guided by federal antitrust standards, *see id.* at 19-21, but ultimately held that those standards—and, in particular, the direct-purchaser rule—were *not* controlling. *See id.* at 27 n.27 (a factual dispute over who was the direct purchaser does not impact the court's "conclusion regarding Defendants' motion to enforce the Settlement Agreement," which "relies on an interpretation of who 'accepted' payment cards under the Settlement Agreement"). Instead of deciding who was the direct purchaser or payor, the District Court relied on evidence that submerchants like the Square Sellers supposedly agree *with their PayFac* (not Defendants) that the submerchants "accept" payment cards and that "accept[ance]" should focus on who "take[s] or receive[s]" a payment card. *See id.* at 22. On this basis, the District Court concluded that PayFac submerchants must therefore "accept" cards for purposes of the

settlement class definition, notwithstanding overwhelming evidence to the contrary. *Id.* at 21-26. However, what the District Court did not hold is that this evidence addressed who *directly paid interchange fees*. *See generally id.*

As discussed above, this analysis is impermissible because it conflicts with this Court's mandate that the entity that "accepts" for purposes of the settlement agreement is the direct payor. And by simply resorting to extrinsic evidence, the District Court defied this Court's holding that the class was ascertainable—and therefore acceptable—only because the ambiguity was resolved with reference to the clear, administrable, direct-payor test.

In any event, the District Court's approach also conflicts with this Court's holding regarding the importance of applying the direct-purchaser rule of federal antitrust law in defining the class. As the Seventh Circuit explained in a decision this Court cited approvingly in *Fikes*, 62 F.4th at 716, using ordinary tools of contract interpretation does not allow a court to ignore the substantive law in defining a class.

> [I]t does not follow that the class definition should be interpreted differently simply by virtue of having been incorporated into a settlement agreement enforceable as a contract under state law. … Federal securities law governed the interpretation of the class definition at the time the class was certified, and unless modified, that meaning should prevail notwithstanding the incorporation of the class definition into a settlement agreement enforceable under Illinois contract law.

*In re Motorola Sec. Litig.*, 644 F.3d at 518.

**C.   The PayFacs Are The Direct Payors And Purchasers; The Square Sellers Are Admittedly Indirect Payors and Purchasers**

The District Court did not address who qualified as direct payors because, as discussed above, it wrongly held that this Court's direct payor test was a mere suggestion or "proxy" for some other analysis. Applying the correct test, however, the undisputed evidence establishes that the PayFacs—not the submerchants like Square Sellers that use PayFacs—are the direct payors.

To begin with, no one has ever disputed that Appellants are *not* direct payors and that the PayFacs *are* more direct payors. Appellants and *amici* have presented extensive proof about how PayFacs—and not the submerchants—directly pay the interchange fee. A.1577-80 (Intuit); A.3667-73 (Square). In response, Defendants never argued that submerchants are more direct payors of interchange fees. Indeed, Defendants expressly conceded—and all parties agree—that submerchants are indirect purchasers. *See* Dkt. 9103 (Defs.' Jan. 8, 2024 Reply in Supp. of Mot. to Enforce) at 21. ("Opposing Parties spill much ink arguing that the merchants that engage Square or Intuit as payment facilitators [*i.e.*, Square Sellers] are indirect purchasers. Defendants agree.").[2] And while Defendants have argued that only the

---

[2]   In a recent letter to the District Court, Defendants continue not to dispute this issue, and state that it is "beside the point." Dkt. 9460 (Oct. 11, 2014 Letter) at 2 n.2 ("Intuit makes much of the fact that the merchants for which Intuit and Square provide payment facilitator services are 'indirect purchasers,' but that misses the point. Defendants' motion for injunction is premised on the fact that these merchants are members of the Rule 23(b)(3) class settlement in MDL 1720 and as such have

acquiring banks are direct purchasers, the District Court repeatedly has recognized that Defendants waived this argument for purposes of the settlement.  *See* SpA.11 n.16 ("Defendants also make various arguments relating to Square's and Intuit's statuses as indirect purchasers.  They contend that Acquirers are the only direct purchasers in the payment chain, but concede that they have waived this argument for purposes of reaching a settlement."); Dkt. 9384 (Aug. 8, 2024 Order) at 8 n.4 ("The party who accepts a payment card is deemed a direct purchaser for purposes of the Settlement Agreement because Defendants waived their direct purchaser arguments in order to reach a settlement."); Dkt. 9406 (Sept. 5, 2024 Order) at 16 (Defendants "have always maintained that 'all merchants are indirect purchasers,' but 'waived that position for the limited purpose of the (b)(3) settlement alone.'"). Moreover, the acquiring banks were expressly excluded from the settlement class. *See, e.g.*, A.6580, A.7480 (quoting settlement agreement) ("the Rule 23(b)(3) Settlement Class shall not include…financial institutions that have…acquired Visa-Branded Card transactions or Mastercard-Branded Card transactions").

Defendants not only waived their argument that only acquiring banks were the direct payors, but expressly conceded that as between the entities other than acquiring banks, the "***more direct payor***" of the interchange fee qualified as a

---

released the claims of their agents, including Intuit and Square, not on whether these merchants or Square and Intuit are more or less 'direct' purchasers.").

settlement class member. Defs.' 2d Cir. Br. in *Fikes* (20-339-cv, Dkt. 209 (Oct. 15, 2020)) ("Defs.' *Fikes* Br.") at 32-33. Indeed, Defendants **do not contend PayFac submerchants are direct purchasers of card payment transaction services**. *See* Dkt. 9127 (Intuit's Reply in Supp. of Cross-Motion for Partial Summ. J.) at 4.[3] Defendants suggested to the District Court that they had conceded only that the more direct payor between two **merchants** was a class member, Dkt. 9103 (Defs.' Jan. 8, 2024 Reply in Supp. of Mot. to Enforce) at 8, but that is incorrect. Rather, Defendants previously told this Court: "[W]ith the understanding of the parties in reaching the settlement, only the **claimant** that is the **more direct payor** of interchange fees as between two claimants owns the claim. Any more remote entity in the payment chain is not a class member based on that transaction." Defs.' *Fikes* Br. 32-33 (emphases added); *see also id.* 24 ("the familiar rule of federal antitrust law that indirect payors generally cannot sue for antitrust damages"). The Class Plaintiffs said the same. *See* Class Pls.' 2d Cir. Br. in *Fikes* (20-339-cv, Dkt. 208 (Oct. 15, 2020)) at 41 ("in the context of this case, *Illinois Brick* means that the only entity entitled to recovery under the Sherman Act" is the "first payor of the interchange fees") (quotation marks omitted).

---

[3] The District Court *sua sponte* found that submerchants might be direct purchasers, *see* SpA.28-31, even though *Defendants* disavowed that position.

This Court likewise did not limit its "direct payor" holding to merchants, rather stating that "the only *entities* that could fall within the class definition were those deemed to be *direct payors* of the challenged fees." *Fikes*, 62 F.4th at 716 (emphases added). There is nothing in the settlement agreement or any order suggesting such a distinction, whereby the more direct payor between merchants would be a class member, but the more direct payor as between other entities would not. Indeed, the settlement agreement did not limit the settlement class to "merchants," but rather was more broadly defined to include "'all persons, businesses, and other entities' that have accepted Visa-Branded Cards and/or Mastercard-Branded Cards" in the United States. *See, e.g.*, A.3652, A.3666 (quoting settlement agreement).

The undisputed evidence confirms what the parties all agree upon: that PayFacs—not their submerchants—are more direct payors of interchange fees. Submerchants do not pay interchange fees, and cannot be direct payors when there is literally no payment of fees from submerchants to anyone but the PayFacs. In contrast, PayFacs directly pay interchange fees. That is why the PayFacs, not the submerchants, are listed as the merchants of record for all relevant transactions. *See, e.g.*, A.3661 (with respect to Square), A.3670-71 (same); A.1622 (Intuit); A.1860 (same). For instance, Square and Visa entered into contracts that provided, among other things, that Square pays the interchange rates set by Visa. A.4131 at §§1.2.1–

25

1.2.2.  Likewise, Intuit's PayFac contract provides, among other things, that Intuit must pay all interchange fees.  A.1579.  In contrast, neither Visa nor Mastercard can identify any contracts with submerchants obliging them to pay anything, much less the interchange fees associated with card acceptance.  Simply put, there is no argument—and no party has suggested one—that submerchants are more direct payors when the submerchants only pay the PayFacs, who in turn pay the interchange fee.

The District Court held that there was a disputed fact over whether PayFacs are direct purchasers, SpA.28, which shows the error in treating submerchants as class members.  Any given interchange fee can count only once for purposes of the class settlement.  That means the district court's inclusion of submerchants as settlement class members would necessarily exclude PayFacs, despite the District Court's own recognition that a PayFac might be the direct purchaser of a given interchange fee.

While the District Court treated this issue as one of disputed fact, there is no need for remand on the issue of settlement class membership because the dispute of fact was based on a supposed distinction between direct *purchasers* and direct *payors*.  *See* SpA.28.  This Court already held that the direct *payor* is within the settlement class definition and PayFacs are undisputedly the more direct payor.  There is no legal basis for distinguishing direct purchasers and payors here given

26

that the antitrust violation was in supracompetitive pricing for a specific fee. Thus, the payor of that fee is necessarily the direct purchaser with antitrust standing under the federal antitrust laws. *See Apple*, 587 U.S. at 280. Any imposition of a complex rule regarding the direct purchaser as someone other than the direct payor would conflict with the Supreme Court's pellucid instruction that "the task of disentangling overlapping damages claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 475, n.11 (1982). *See also Apple*, 587 U.S. at 285. In any event, even under the District Court's definition of direct purchaser, the PayFacs are the direct purchasers because they not only paid the interchange fee but also more broadly purchased the card processing services under their contractual relationships with Visa and Mastercard and their acquiring banks. A.1577-80 (Intuit); A.3667-73 (Square); *see also* Appellants' Br. at 21-34.

## II.   EVEN IF THE DISTRICT COURT WAS CORRECT IN ITS APPROACH TO DEFINING SETTLEMENT CLASS MEMBERSHIP, IT ERRED BY REFUSING TO CONSIDER (AND INDICATING THE CLAIMS ADMINISTRATOR SHOULD IGNORE) MATERIAL FACTS SHOWING PAYMENT FACILITATORS "ACCEPT" PAYMENT CARDS

Even applying the District Court's interpretation of "accepted," PayFacs, not submerchants, "accept" cards. If "accepted" means the entity actually taking or receiving the payment card, as the District Court held, the evidence shows that the PayFac was unquestionably that party. The District Court relied on the idea that

27

"[i]n the prototypical transaction, the cardholder hands her card to a Seller." SpA.22. But the evidence refutes this assumption, for which the court cited no evidence. In the prototypical in-person transaction at a PayFac submerchant, the cardholder simply inserts, taps, or swipes the credit card at the PayFac's card reader, with the submerchant not needing to touch the credit card at all. *See* Dkt. 9133 (Square Jan. 29, 2024 Reply Br.) at 4. Similarly, in online transactions, the customer submits card payment information to the PayFac via the PayFac's software, which accepts the card, processes the payment, pays all associated interchange fees, and disburses funds to the submerchant. A.1577-81; A.1621-23. Thus, there is no evidence to show that the submerchant "accepts" the credit card even under the District Court's interpretation of acceptance. The District Court's refusal even to allow PayFacs to show that they in fact accept cards under the court's new definition is erroneous and improper.

## **CONCLUSION**

The District Court's Order should be reversed.

Dated: October 22, 2024                    Respectfully submitted,

                                               /s/ *Marc L. Greenwald*
                                               Marc L. Greenwald*
                                               Steig D. Olson
                                               Manisha M. Sheth
                                               David M. Cooper
                                               QUINN EMANUEL URQUHART
                                                  & SULLIVAN, LLP

51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel. (212) 849-7000
marcgreenwald@quinnemanuel.com
steigolson@quinnemanuel.com
manishasheth@quinnemanuel.com
davidcooper@quinnemanuel.com

*Counsel for Amicus Curiae Block, Inc.*

*\*Counsel for Amicus Curiae ACI Payments, Inc.*

Justin T. Reinheimer
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Tel. (415) 875-6600
justinreinheimer@quinnemanuel.com

*Counsel for Amicus Curiae Block, Inc.*

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Tel. (213) 443-3000
adamwolfson@quinnemanuel.com

*Counsel for Amici Curiae Intuit Inc. and Intuit Payment Solutions, LLC*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Second Circuit Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief is 6,594 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated:  October 22, 2024                    */s/ Marc L. Greenwald*                    
                                                     Marc L. Greenwald

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 22, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served via the CM/ECF system.


Dated: October 22, 2024                    */s/ Marc L. Greenwald*
                                           Marc L. Greenwald