# 24-1653(L)

24-1808(CON)

# In the United States Court of Appeals for the Second Circuit

IN RE: PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT LITIGATION

On Appeal from the United States District Court for the
Eastern District of New York (No. 05-1720)
(Hon. Margo K. Brodie, J.)

**PUBLIC, REDACTED BRIEF OF DEFENDANTS-APPELLEES**

Kenneth A. Gallo
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street NW
Washington, DC  20006
(202) 223-7300
kgallo@paulweiss.com

*Counsel for Mastercard
Incorporated*

Matthew A. Eisenstein
Rosemary Szanyi
R. Stanton Jones
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC  20001
(202) 942-5000
matthew.eisenstein@arnoldporter.com

*Counsel for Visa Inc.*

*(additional counsel listed on inside page)*

Brette Tannenbaum
Nina Kovalenko
Gary Carney
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000
nkovalenko@paulweiss.com

*Counsel for Mastercard Incorporated*

Michael S. Shuster
Demian A. Ordway
Jayme Jonat
HOLWELL SHUSTER &
  GOLDBERG LLP
425 Lexington Avenue
New York, NY  10017
(646) 837-5151
mshuster@hsgllp.com
dordway@hsgllp.com
jjonat@hsgllp.com

*Counsel for Visa Inc.*

## CORPORATE DISCLOSURE STATEMENT

Defendants-Appellees are Visa Inc. and Mastercard Incorporated.

Defendant-Appellee Visa Inc. is a publicly traded entity without a parent corporation, and no publicly held company owns 10% or more of its stock.

Defendant-Appellee Mastercard Incorporated does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION ...........................................................4

STATEMENT OF THE ISSUES ..............................................................6

STATEMENT OF THE CASE .................................................................6

    A.   Factual Background .................................................................6

    B.   Procedural History..................................................................9

        1.   The class action litigation and initial settlement ........................9

        2.   The approved Rule 23(b)(3) class settlement.............................11

        3.   Lawsuits by the Lanning plaintiffs, Square, and Intuit ............14

        4.   The decision below..............................................................16

SUMMARY OF ARGUMENT.................................................................18

STANDARD OF REVIEW ....................................................................20

ARGUMENT ....................................................................................20

I.   The District Court Correctly Concluded that Merchants Serviced By Square and Intuit Are Members of the Rule 23(b)(3) Settlement Class Because They "Accepted" Payment Cards .................20

    A.   The Settlement Agreement Should Be Construed in Accordance With the Settling Parties' Intent .................................21

    B.   Overwhelming Evidence Establishes that Square's and Intuit's Merchant Customers "Accepted" Payment Cards ............................24

        1.   The operative class complaint and Settlement Agreement.......25

        2.   Visa's and Mastercard's operating rules ...................................28

        3.   Square's and Intuit's merchant agreements ..............................31

        4.   Lanning plaintiffs' own complaints and declarations................32

        5.   Square's and Intuit's own complaints ......................................33

        6.   The class notice plan ..........................................................34

II.  The Opposing Parties' Argument that Square and Intuit
     "Directly" Pay Interchange Is Both Irrelevant and Wrong .................... 37

     A.  The Claim that Square and Intuit "Directly" Pay Interchange
         Fees Is Irrelevant ............................................................. 38

     B.  The Claim that Square and Intuit "Directly" Pay Interchange
         Fees Is Incorrect in Any Event ............................................ 42

         1.  Square and Intuit do not pay interchange fees directly ........... 43

         2.  Controlling precedent establishes that Square and Intuit
             are indirect payors of interchange fees ........................... 47

CONCLUSION ........................................................................... 52

CERTIFICATE OF COMPLIANCE ................................................... 54

# TABLE OF AUTHORITIES

**Cases** Page(s)

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
  2010 WL 11530589 (S.D.N.Y. Aug. 11, 2010), *aff'd in part,*
  *vacated in part*, 672 F.3d 113 (2d Cir. 2011)....................................25

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011) .........................................5, 20, 21, 23, 25

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019) ................................................................48

*In re ATM Fee Antitrust Litig.*,
  686 F.3d 741 (9th Cir. 2012)........................................................51

*Collins v. Harrison-Bode*,
  303 F.3d 429 (2d Cir. 2002) ....................................................22, 23

*Contant v. AMA Cap., LLC*,
  66 F.4th 59 (2d Cir. 2023)...........................................................22

*Evans v. Famous Music Corp.*,
  1 N.Y.3d 452 (2004) ....................................................................22

*Ezrasons, Inc. v. Travelers Indem. Co.*,
  89 F.4th 888 (2d Cir. 2023)..........................................................23

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
  62 F.4th 704 (2d Cir. 2023)...........................7, 14, 26, 35, 36, 37, 39, 40, 41, 48

*Greenfield v. Philles Records, Inc.*,
  98 N.Y.2d 562 (2002) .............................................................22, 23

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008).......................................................51

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994)........................................................................5

*N.Y. State Telecomm. Ass'n, Inc. v. James,*
  101 F.4th 135 (2d Cir. 2024) ........................................................5

*Omega Eng'g, Inc. v. Omega, S.A.,*
  432 F.3d 437 (2d Cir. 2005) ........................................................22

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.,*
  467 F.3d 283 (2d Cir. 2006) ............................................48, 49, 51

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust
  Litig.,*
  330 F.R.D. 11 (E.D.N.Y. 2019) ..........................................35, 38, 39

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust
  Litig.,*
  986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...........................................10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust
  Litig.,*
  2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) ........................................9

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust
  Litig.,*
  2012 WL 12929536 (E.D.N.Y. Nov. 27, 2012) ................................10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust
  Litig.,*
  2016 WL 8138988 (E.D.N.Y. Nov. 30, 2016) ..................................11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust
  Litig.,*
  2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019)................11, 12, 13, 35

*Revitalizing Auto Communities Env't Response Tr. v. Nat'l
  Grid USA,*
  92 F.4th 415 (2d Cir. 2024)....................................................22, 23

*Salveson* v. *JP Morgan Chase & Co.,*
  663 F. App'x 71 (2d Cir. 2016) ....................................................51

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992) ...............................................................23

*Serby v. First Alert, Inc.*,
    664 F. App'x 105 (2d Cir. 2016), *as amended* (Dec. 22, 2016) .....................23

*Spinner Consulting LLC v. Stone Point Cap. LLC*,
    623 B.R. 671 (D. Conn. 2020), *aff'd*, 843 F. App'x 411 (2d Cir. 2021) ...............................................................................................50, 51

*Williams v. Buffalo Pub. Schs.*,
    2024 WL 1460134 (2d Cir. Apr. 4, 2024) ........................................22

*In re World Trade Ctr. Disaster Site Litig.*,
    754 F.3d 114 (2d Cir. 2014) ...............................................................22

## Statutes

28 U.S.C. § 1331 ...................................................................................4

## Miscellaneous

Brief of Defs.-Appellees (Oct. 15, 2020), *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 20-339-cv(L) (2d Cir.), Dkt. 209 ..................................................39, 40, 43, 44

Compl., *Block, Inc. v. Visa Inc.*, No. 1:23-cv-05377 (E.D.N.Y. July 14, 2023), ECF No. 1 ...............................................................15, 33

Compl., *Intuit Inc. v. Visa Inc.*, No. 1:21-cv-01175 (E.D.N.Y. Feb. 19, 2021), ECF No. 1 .......................................................15, 33, 34

## INTRODUCTION

This putative class action was brought in 2021 on behalf of millions of merchants that accepted Visa- and Mastercard-branded payment cards through the payment facilitator Square. Plaintiffs-Appellants (the "*Lanning* plaintiffs") filed that action even though in 2018, Defendants-Appellees Visa and Mastercard had settled, under Rule 23(b)(3), with a class of all merchants that accepted those payment cards. The district court correctly found that the *Lanning* plaintiffs and other merchants serviced by payment facilitators are members of the Rule 23(b)(3) settlement class that released their claims. Neither the *Lanning* plaintiffs, the *Jack Rabbit* appellants, nor their payment-facilitator *amici* offer any valid justification to disturb that conclusion.[1]

Since the inception of this multi-district litigation regarding the rules and fees associated with merchant acceptance of Visa and Mastercard cards, and through the Rule 23(b)(3) class settlement, the Rule 23(b)(3) class was defined to include merchants that "have accepted" Visa and Mastercard payment

---

[1] The *Lanning* plaintiffs—the principal appellants here, sometimes referred to below as "Square Sellers"—are the plaintiffs in two lawsuits: *Lanning v. Visa, Inc.*, Case No. 21-cv-02360 (E.D.N.Y.), and *Camp Grounds Coffee, LLC v. Visa, Inc.*, Case No. 21-cv-03401 (E.D.N.Y.). The "*Jack Rabbit* appellants" are a separate group of merchants that also appealed, on the basis that the decision below dilutes their pro rata share of the settlement fund.

cards. As shown by the Rule 23(b)(3) class complaints over time, the class definition does not include—and has never included—payment facilitators like Square and Intuit, third-party processors, or other intermediaries that provide payment-related services to merchants. Thus, when Defendants settled the Rule 23(b)(3) class action for roughly $5.6 billion, they settled with the class of millions of merchants identified in the class complaints against which Defendants had spent nearly 15 years litigating. In exchange for the right to participate in the class settlement, merchants that did not opt out agreed to release claims related to the Visa and Mastercard transactions at those merchants—whether those claims were brought by the merchants themselves or by "any of … their agents," including payment-facilitator agents.

Against this backdrop, the district court correctly concluded that merchants serviced by the payment facilitators Square and Intuit are members of the Rule 23(b)(3) settlement class because those merchants—not their payment facilitators—are the entities that "accepted" Visa and Mastercard payment cards. This common-sense conclusion is confirmed not only by the Settlement Agreement and operative class complaint, but also by Square's and Intuit's agreements with their merchant customers, Visa's and Mastercard's

2

operating rules, and other evidence of acceptance practices, including the *Lanning* plaintiffs' own declarations and Square's and Intuit's own complaints.

The opposing parties seek to avoid this straightforward conclusion by invoking principles of antitrust standing. They claim that Square and Intuit are the "direct payors" of interchange fees for transactions in which they serve as payment facilitators and that Square's and Intuit's merchant customers are indirect payors. On this basis, the *Lanning* plaintiffs—merchants that accept payment cards using a payment facilitator—argue that Square and Intuit are members of the Rule 23(b)(3) class, while the merchants themselves are not.

But this appeal does not turn on which entities are direct or indirect payors under federal antitrust standing law. Instead, the relevant inquiry is whether the settling parties intended for the Settlement Agreement's class definition to include merchants serviced by payment facilitators. The clear answer is yes, as shown by the evidence described above. The class complaint alone—to which the Settlement Agreement refers—makes clear that the Rule 23(b)(3) class counsel never represented payment facilitators; indeed, it states that payment facilitators were not even harmed by the challenged conduct. Class counsel instead litigated on behalf of a class of merchants that includes

the merchants serviced by payment facilitators. Those merchants are the class members that settled with Defendants and released their claims.

Federal antitrust standing law does not support the opposing parties' indirect-payor arguments in any event. *All* entities other than acquiring banks are indirect payors that are barred from seeking damages under federal law. Defendants compromised their indirect-payor defense solely to reach a settlement with the class of millions of merchants against which Defendants had been litigating for years (including Square's and Intuit's merchant customers), but to this day have maintained the defense for all other purposes.

As members of the Rule 23(b)(3) settlement class, Square's and Intuit's merchant customers that did not opt out—including the *Lanning* plaintiffs— released claims related to Visa and Mastercard transactions at those merchants. The release bars the *Lanning* plaintiffs from asserting those claims now. This Court should affirm the district court's ruling that the *Lanning* plaintiffs and other merchants serviced by Square and Intuit as payment facilitators are class members and accordingly have released the claims at issue.

## STATEMENT OF JURISDICTION

The district court has jurisdiction over this litigation under 28 U.S.C. § 1331. In its Final Approval Order and Judgment, the court retained

jurisdiction to enforce the terms of the Rule 23(b)(3) class settlement agreement. D. Ct. Dkt. 7832 ¶¶ 18–20; *see also In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 134–35 (2d Cir. 2011) (federal court retained jurisdiction to enforce class settlement agreement by expressly retaining jurisdiction in final judgment (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994))).

This Court's jurisdiction is uncertain. Although the district court's May 28, 2024 decision under review establishes that the *Lanning* plaintiffs' claims are barred by the settlement release because they are class members, the district court has not dismissed those claims. SpA.1–31. After this appeal was filed, Defendants offered to stipulate to the dismissal of the *Lanning* plaintiffs' claims to ensure this Court's jurisdiction over their appeal. *See N.Y. State Telecomm. Ass'n, Inc. v. James*, 101 F.4th 135, 142–48 (2d Cir. 2024) (finding appellate jurisdiction where parties stipulated to entry of judgment after district court's interlocutory order plainly rejected legal basis for New York's defense of plaintiff's claims). The *Lanning* plaintiffs did not agree.

A separate group of merchants, referred to in this brief as the "*Jack Rabbit* appellants," also filed an appeal (No. 24-1808(CON)). The *Jack Rabbit* appellants do not dispute that they are members of the Rule 23(b)(3) class, but

they claim that the decision below improperly includes in that class "indirect purchaser sub-merchants of Payment Facilitators," which "diluted" the *Jack Rabbit* appellants' pro rata share of the settlement fund. Jack Rabbit Br. 9–10. But their central argument—that, unlike the *Lanning* plaintiffs, "Jack Rabbit, and the other Retail Gas Station franchisees meet the elements necessary to be identified as an *Illinois Brick* Cost-plus [Direct Payor]," *id.* at 34—is an issue not presented in this appeal, and any impact on their potential share of the settlement fund is tenuous at best.

## STATEMENT OF THE ISSUES

Whether the district court correctly concluded that the *Lanning* plaintiffs and other merchants serviced by the payment facilitators Square and Intuit are members of the Rule 23(b)(3) settlement class because those merchants, not their payment facilitators, are the entities that "accepted" Visa- and Mastercard-branded payment cards.

## STATEMENT OF THE CASE

### A.  Factual Background

Visa and Mastercard operate competing payment-card networks. In a typical payment-card transaction on these networks, the customer presents a payment card to the merchant; the merchant relays the card information to its

bank (the "acquiring bank"); the acquiring bank forwards that information to the appropriate network (Visa or Mastercard); the network relays the information to the bank that issued the customer's card (the "issuing bank"); and the issuing bank confirms that the customer has sufficient credit or funds to cover the purchase. Then, "the issuing bank transmits its approval back through the chain to the acquiring bank, which relays it to the merchant at the point of sale." SpA.8; *see also Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 713 (2d Cir. 2023).

Next, the issuing bank provides the funds via the appropriate network to the acquiring bank, less an "interchange fee" that the acquiring bank is obligated to pay, which the issuing bank keeps in the settlement process. While issuing and acquiring banks are free to agree on an applicable interchange fee, Visa and Mastercard each set default interchange fee schedules to apply in the absence of such an agreement. The merchant's acquiring bank, in turn, pays the merchant under their own contractual arrangement, with the acquiring bank charging the merchant a "merchant discount fee," which typically covers the interchange fee and an additional amount to compensate the acquiring bank for its own services. *See* SpA.8; *Fikes Wholesale*, 62 F.4th at 713.

This appeal involves a slight twist on the typical transaction. Some merchants, typically small- and medium-sized businesses, choose not to contract directly with an acquiring bank to accept payment cards. Instead, these merchants contract with a payment facilitator like Square or Intuit, which enables them to accept payment cards. As an example, Square provides its merchant customers with white, square card readers that enable cardholders to "insert, swipe, or tap" their payment cards when making purchases from Square's merchant customers. Square has contracts with two acquiring banks to acquire transactions on behalf of its merchant customers, and it serves as an intermediary by sending transaction information to an acquiring bank, which, in turn, sends the information across the payment-card network (Visa or Mastercard). Square also acts as a "payments agent" for its merchant customers, settling funds for them that it receives from issuing banks via its accounts at acquiring banks. Visa's and Mastercard's rules describe Square and Intuit as "Payment Facilitators" or "PayFacs." Intuit's payment-facilitation services operate similarly, although primarily for merchants that accept payment cards for online (rather than in-person) purchases. *See* SpA.8–9.

8

### B.  Procedural History

#### 1.  The class action litigation and initial settlement

In October 2005, several complaints asserting similar antitrust claims against Visa, Mastercard, and various card-issuing banks were consolidated for pretrial purposes and transferred to the Eastern District of New York, where they were joined by other similar cases. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008). The consolidated cases included both class actions and individual actions—all relating to Visa's and Mastercard's respective default interchange fees and certain of Visa's and Mastercard's respective rules. *Id.* In April 2006, plaintiffs in the putative class actions ("Class Plaintiffs") filed a consolidated amended class complaint that defined two classes: one seeking damages and the other seeking equitable relief. *Id.* at *1–2.

As detailed below, the operative Third Amended Complaint (the "TAC") distinguishes between "Merchant[s]" (the class members on whose behalf the case was brought and litigated), J.A.7982, 7986, 7988-89 ¶¶ 4, 9.p, and "Payment Facilitator[s]" (which according to the TAC "have not been harmed" by the conduct that allegedly harmed the class), J.A.8029 ¶¶ 9.dd, 161–63. The TAC states that the Class Plaintiffs "represent a class of millions of Merchants

9

that have accepted and currently accept Visa and MasterCard Credit and Signature Debit Cards and Interlink PIN-Debit Cards as forms of payment ...." J.A.7982 ¶ 4. It defines "Merchant" as "an individual, business, or other entity that accepts payments ...." J.A.7986 ¶ 9.p.

Earlier iterations of the Rule 23(b)(3) class complaint, going back to the inception of the litigation, likewise distinguished between "Merchants" that were in the class and "Third-Party Processors" that were alleged not to have been harmed by the challenged conduct. First Consolidated Am. Class Action Compl., D. Ct. Dkt. 317 ¶¶ 3, 8.dd, 97; Second Consolidated Am. Class Action Compl., D. Ct. Dkt. 1138 ¶¶ 3, 8.q, 8.jj, 108, 186–88.

In November 2012, the district court provisionally certified a class and preliminarily approved the parties' class settlement agreement. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2012 WL 12929536, at *1–2 (E.D.N.Y. Nov. 27, 2012). In 2013, the district court approved the settlement. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 241 (E.D.N.Y. 2013). But in 2016, this Court vacated certification of the class and reversed approval of the settlement. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 240 (2d Cir. 2016).

10

### 2.    The approved Rule 23(b)(3) class settlement

In November 2016, the district court appointed counsel to two separate putative classes under Rule 23: a Rule 23(b)(2) equitable-relief class and Rule 23(b)(3) damages class. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2016 WL 8138988, at *1 (E.D.N.Y. Nov. 30, 2016). In December 2019, the district court granted final approval to a new settlement agreement between Defendants and the damages class. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *36 (E.D.N.Y. Dec. 16, 2019).

The Rule 23(b)(3) class settlement agreement (the "Settlement Agreement") defines the damages class as "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [of January 24, 2019]" (the "Settlement Class"). J.A.7577–78 ¶ 4. It further provides that each class member that files a claim will receive a pro rata share of the roughly $5.6 billion settlement fund "in accordance with the relative economic interests of the [class member] as measured by the Interchange Fee amounts attributable to their Visa- and Mastercard-Branded Card transactions during the Class Period." J.A.7526 § I(a)(i).

In exchange, each class member released all claims, on behalf of both "themselves and any of their … agents," J.A.7586–87 ¶ 29, "arising out of or relating to" any conduct or acts that were or could have been alleged in the litigation (*e.g.*, interchange fees and certain network rules). J.A.7590–91 ¶ 31(a), (b).

The Settlement Agreement provided that notice of the class settlement "will feature a prominent headline" stating: "A settlement of as much as [$6.24] Billion and not less than [$5.54] Billion will provide payments to merchants that accepted Visa and Mastercard since 2004." J.A.7728 App. F ¶ 55.

Before final approval of the Settlement Agreement, objections were filed by a group of merchants that own or operate gas stations and convenience stores that sell petroleum products produced and branded by major oil refiners such as Shell and ConocoPhillips. *In re Payment Card*, 2019 WL 6875472, at *5. These branded operators expressed concern that some portion of them would be excluded from the Settlement Class because the major oil suppliers and brands with which they separately contracted would claim to be the merchant class members. *Id.* Among the branded operators that objected were Fikes Wholesale, Inc., Midwest Petroleum Company, and Slidell Oil Company, LLC, which "own and operate dozens of gas stations and convenience stores." Obj. to Class Action Settlement filed by Fikes Wholesale Objectors 1, D. Ct.

Dkt. 7559. In the objectors' view, "[t]he settlement and notice [could] be read to advise both Branded Operators and Oil Brands that they are proper claimants to the same portion of settlement funds corresponding to the same transactions." *Id.* at 12. Nevertheless, the objectors argued that "they are entities that accepted Visa- and MasterCard-branded cards at their stores and paid the alleged overcharges; therefore, they are quintessential settlement class members." *Id.* at 1.

The district court interpreted the branded operators' challenge as one under Rule 23(a) for "ascertainability" of the class definition and concluded that "[t]he term 'accepts' is objective enough by its plain English usage to satisfy the ascertainability requirement." *In re Payment Card*, 2019 WL 6875472, at *30–31. The district court agreed that "disputes will inevitably arise" and that "proof of who holds a claim may ultimately need to be analyzed during a claims administration process," but held that this was "not a sufficient basis to reject class certification," especially where "the class definition is also objectively guided by federal antitrust standards." *Id.* at *31. Accordingly, the district court held that the class definition was objectively defined, granted class certification for purposes of a settlement class, and granted final approval of the Settlement Agreement. *Id.* at *32, *36.

13

In March 2023, this Court affirmed in all material respects the certification of the settlement class and approval of the Settlement Agreement. *Fikes Wholesale*, 62 F.4th at 727. The class was sufficiently ascertainable, the Court held, because "[t]he only relevant inquiry is whether determinations as to class membership are 'objectively *possible*.'" *Id.* at 717. This Court also affirmed the district court's decision to refer any disputes over class membership to a special master, subject to *de novo* review by the district court. *Id.* at 719.

### 3. Lawsuits by the *Lanning* plaintiffs, Square, and Intuit

Sometimes, Square and Intuit operate as merchants, accepting payment cards from consumers for products and services that Intuit and Square themselves sell to those consumers, such as Turbo Tax products sold by Intuit or payment terminals sold by Square. Other times, Square and Intuit instead operate as payment-facilitator agents for millions of other merchants, which themselves accept payment cards from consumers for products and services that those merchants sell to consumers. J.A.152–53 ¶¶ 30–36. Square and Intuit both timely opted out of the Rule 23(b)(3) settlement class in the merchant class action, as they were entitled to do in their capacities as merchants that accepted Visa and Mastercard cards. J.A.153–54 ¶ 37. But Square and Intuit had no authority to opt out, in addition to themselves, the merchant class

14

members for which they processed payment card transactions as payment-facilitator agents.

Intuit filed suit in 2021, and Square in 2023, purporting to assert damages claims based not only on Visa- and Mastercard-branded payment card transactions they accepted in their capacity as merchants, but also on transactions they helped administer for millions of other merchants as payment facilitators. Compl. ¶¶ 1–19, 175–78, *Intuit Inc. v. Visa Inc.*, No. 1:21-cv-01175 (E.D.N.Y. Feb. 19, 2021), ECF No. 1; Compl. ¶¶ 1–3, 22–23, 86–87, *Block, Inc. v. Visa Inc.*, No. 1:23-cv-05377 (E.D.N.Y. July 14, 2023), ECF No. 1.[2]

The *Lanning* plaintiffs—a group of merchants that accepted Visa or Mastercard payment cards through Square—did not opt out of the Rule 23(b)(3) Settlement Class. J.A.5412. Nevertheless, they also sued Visa and Mastercard asserting state-law claims arising from payment-card

---

[2] It is undisputed that Square and Intuit each properly opted out of the Settlement Class for transactions in which it operated as a merchant (*e.g.*, selling terminals and other hardware and services to its customers); the disputed transactions relevant to this appeal are the ones for which Square and Intuit operated as payment facilitators. Defendants have always acknowledged that the Settlement Agreement does not release claims brought by Square and Intuit in their capacities as merchants because they properly opted out of the Settlement Class with respect to those transactions.

transactions they accepted using Square's payment-facilitation services. J.A.28–82 (*Lanning* Compl.); J.A.83–137 (*Camp Grounds* Compl.).

### 4. The decision below

Defendants moved the district court to enforce the Rule 23(b)(3) Settlement Agreement, or in the alternative for summary judgment, seeking to dismiss the PayFac claims asserted by Square and Intuit—that is, their claims based on transactions in which they served as payment-facilitator agents for class members (*i.e.*, their merchant customers). J.A.138–41; *see also* SpA.1–31. Square and Intuit opposed the motion. D. Ct. Dkt. 9061, 9066. The *Lanning* plaintiffs cross-moved for partial summary judgment seeking a ruling that they are not members of the Settlement Class. J.A.5402–04. Intuit cross-moved for partial summary judgment seeking a ruling that it has federal antitrust standing to bring its claims based on PayFac transactions. J.A.1568–69.

On March 13, 2024, the district court directed class counsel for the Rule 23(b)(3) Settlement Class to provide "its position regarding whether Square and Intuit's merchant-customers (*e.g.*, 'Square Sellers') are members of the Settlement Class as defined by the Superseding Class Settlement Agreement." J.A.7505. Class counsel thereafter submitted a letter stating their

position that "the merchant, rather than Square or Intuit, is the Rule 23(b)(3) class member." J.A.7506.

On May 28, 2024, the district court agreed and granted Defendants' motion to enforce the Settlement Agreement. SpA.3. After reviewing the language of the Settlement Agreement, the terms of Square's and Intuit's merchant agreements, applicable Visa and Mastercard operating rules, and other evidence of acceptance practices, the court concluded that "the merchants serviced by Square and Intuit (*i.e.*, Sellers), including the *Lanning* Plaintiffs, are members of the Settlement Class." SpA.26. The court also concluded that, in their roles as payment facilitators, "Square and Intuit are not members of the Settlement Class." SpA.11.[3]

---

[3] Despite ruling that the *Lanning* plaintiffs are class members bound by the settlement release, the district court did not dismiss the *Lanning* plaintiffs' claims or Square's and Intuit's PayFac claims. In fact, the court subsequently stated that it "did not dismiss any claims or any portion of claims brought by Intuit or [Square], including any claims for damages based on transactions for which Intuit or [Square] served as a payment facilitator." J.A.7556. Defendants thus have filed a motion in the district court for an injunction compelling dismissal of the released claims of Square and Intuit based on transactions in which they acted as payment-facilitator agents of Rule 23(b)(3) class members. D. Ct. Dkt. 9512. That motion is fully briefed and pending decision by the court below. For purposes of this appeal—which presents the question whether the *Lanning* plaintiffs are class members—this Court does not need to address the separate question whether the release also covers PayFac claims asserted by Square and Intuit on the ground that they were "agents" of class members.

17

The *Lanning* plaintiffs appealed. No. 24-1653(L). A separate group of merchants that accepted payment cards without using payment facilitators, the *Jack Rabbit* appellants, also appealed on the theory that if Square's and Intuit's merchant customers are class members, it reduces the *Jack Rabbit* appellants' pro rata share of the settlement fund. No. 24-1808(CON). Square and Intuit (along with another payment facilitator, ACI Payments, Inc.) filed an *amicus* brief arguing that they—not their merchant customers—are the entities that "accepted" payment cards in PayFac transactions.

## SUMMARY OF ARGUMENT

I. The district court correctly concluded that the *Lanning* plaintiffs and other merchants serviced by the payment facilitators Square and Intuit are members of the Rule 23(b)(3) Settlement Class because those merchants— not their payment facilitators—are the entities that "accepted" Visa and Mastercard payment cards. As a contract, the Settlement Agreement must be construed in accordance with the parties' intent. And here, the Settlement Agreement's terms and extensive other evidence confirm that the settling parties intended to include merchants, not payment facilitators, in the class. The operative class complaint establishes the point; indeed, it alleges that payment facilitators were not even harmed by the challenged conduct. Other evidence

of card-acceptance practices is in accord, including Square's and Intuit's merchant agreements, Visa's and Mastercard's operating rules, the *Lanning* plaintiffs' declarations, and Square's and Intuit's complaints. All of this evidence shows that merchants serviced by payment facilitators, including the *Lanning* plaintiffs, are class members that released their claims.

II.     Attempting to avoid this conclusion, the opposing parties invoke principles of antitrust standing. But their argument that payment facilitators like Square and Intuit "directly" pay interchange fees is both irrelevant and wrong. It is irrelevant because this appeal does not turn on which entities are direct or indirect payors under federal antitrust standing law. It turns on the settling parties' intent as expressed in the Settlement Agreement, which was to include merchants that accepted payment cards—not their payment facilitators—in the class. And this is not a situation, like the one this Court addressed in *Fikes Wholesale*, where two entities can both credibly claim to be the merchant that accepted payment cards as to the same transactions.

The opposing parties' direct-payor argument is also wrong because Square and Intuit, in their roles as payment facilitators, do not pay interchange fees "directly." Acquiring banks are the sole entities that directly pay interchange, and the fees Square and Intuit pay to their acquiring banks are

separate and negotiable. Applying decisions of the Supreme Court and this Court, Square and Intuit, in their roles as payment facilitators, are indirect payors of interchange fees. There is accordingly no support for the argument that Square and Intuit, in their roles as payment facilitators, are class members based on principles of antitrust standing.

## STANDARD OF REVIEW

In reviewing a district court's interpretation of a settlement agreement, this Court reviews the district court's conclusions of law *de novo* and its findings of fact for clear error. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 135 (2d Cir. 2011).

## ARGUMENT

**I.  The District Court Correctly Concluded that Merchants Serviced By Square and Intuit Are Members of the Rule 23(b)(3) Settlement Class Because They "Accepted" Payment Cards**

The Rule 23(b)(3) Settlement Agreement defines the Settlement Class as "entities that have accepted any Visa-Branded and/or Mastercard-Branded Cards in the United States" during the specified time period. J.A.7577 ¶ 4. The district court correctly concluded, based on the evidence, that the *Lanning* plaintiffs and other merchants serviced by the payment facilitators Square and Intuit are members of the Settlement Class (assuming they did

not individually opt out) because those merchants, rather than their payment facilitators, are the entities that "accepted" payment cards.

As a contract, the Settlement Agreement must be construed in accordance with the parties' intent. The operative class complaint, which is referenced in the Settlement Agreement and informs the meaning of its terms, makes clear that the Rule 23(b)(3) class counsel always represented merchants that accepted payment cards and never represented payment facilitators like Square and Intuit. That conclusion is reinforced by extensive evidence of payment-card acceptance practices, including the terms of Square's and Intuit's merchant agreements, Visa's and Mastercard's respective operating rules, and submissions in this litigation by both the *Lanning* plaintiffs and Square and Intuit. The opposing parties' contrary arguments fail.

## A. The Settlement Agreement Should Be Construed in Accordance With the Settling Parties' Intent

The district court retained jurisdiction to enforce the Rule 23(b)(3) Settlement Agreement, including its release of claims. D. Ct. Dkt. 7832 ¶¶ 18–20. A district court "has the power to enforce an ongoing order … to protect the integrity of a complex class settlement over which it retained jurisdiction." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 134 (2d Cir. 2011).

It is undisputed that the Rule 23(b)(3) Settlement Agreement is governed by New York law.  SpA.9 n.15 (decision below); J.A.7619 ¶ 79 (Settlement Agreement).  Under New York law, "[a] settlement agreement is a contract that is interpreted according to general principles of contract law." *Contant v. AMA Cap., LLC*, 66 F.4th 59, 66 (2d Cir. 2023) (quoting *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)); *see also In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 121 (2d Cir. 2014) ("*In re WTC*") (citing *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)).

As a contract, the Settlement Agreement should be construed "in accordance with the parties' intent."  *In re WTC*, 754 F.3d at 122 ((quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)); *Williams v. Buffalo Pub. Schs.*, 2024 WL 1460134, at *1 (2d Cir. Apr. 4, 2024) ("[I]t is well-settled that a court's role 'is to ascertain the intention of the parties at the time they entered into the contract.'" (quoting *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004)).  "The best evidence of what the parties intended 'is what they say in their writing.'" *In re WTC*, 754 F.3d at 122 (quoting *Greenfield*, 98 N.Y.2d at 569).  "If a contract is ambiguous, extrinsic evidence of the parties' intent may be considered." *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 442 (2d Cir. 2024) (citing

*Greenfield*, 98 N.Y.2d at 569)); *see also Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 888, 396 (2d Cir. 2023) ("[I]f the contract is ambiguous, then relevant extrinsic evidence should be admitted and considered by the factfinder to resolve the ambiguity.").

In the context of enforcing a settlement agreement, the district court is the finder of fact for purposes of determining the settling parties' intent. *See Collins*, 303 F.3d at 433 (finding settlement agreement term ambiguous and remanding "for the trial court to consider and weigh extrinsic evidence to determine what the parties intended" (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 430 (2d Cir. 1992)); *Serby v. First Alert, Inc.*, 664 F. App'x 105, 108–09 (2d Cir. 2016), *as amended* (Dec. 22, 2016) (finding settlement agreement term ambiguous and remanding to district court "to consider and weigh the parties' extrinsic evidence as to the meaning of" that term); *see also In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 135 (district court's factual findings in this context are subject to clear-error review).

Here, the district court considered the evidence to ascertain the parties' intent with respect to the Settlement Agreement's class definition—specifically the meaning of the word "accepted." Based on the evidence, the court correctly found that Square's and Intuit's merchant customers are the entities

that "accepted" payment cards and thus are class members; Square and Intuit are not. The factual findings the court made to reach that conclusion were not in error (let alone clearly erroneous), and they confirm that the parties intended for merchants serviced by payment facilitators to be class members.

### B. Overwhelming Evidence Establishes that Square's and Intuit's Merchant Customers "Accepted" Payment Cards

To begin with, common sense dictates that Square's and Intuit's merchant customers are the entities that "accepted" payment cards. As the district court explained, "the way real-world transactions are conducted supports the conclusion that [Square's and Intuit's merchant customers] 'accept' payment cards." SpA.22. In the typical transaction, the cardholder presents her card to the merchant, who "accepts" it for payment, just as the merchant could have instead accepted cash or a check from the customer.

Notably, *all* parties to the Settlement Agreement—both Defendants and the Rule 23(b)(3) class counsel—agree that their intent was to include Square's and Intuit's merchant customers, rather than Square or Intuit in their roles as payment facilitators, in the settlement class. In the court below, the Rule 23(b)(3) class counsel stated their position that "the merchant, rather than Square or Intuit, is the Rule 23(b)(3) class member." J.A.7506.

24

But there is much more. As detailed below, the operative class complaint and other evidence of card acceptance practices confirm the common-sense conclusion that it is the merchants—not their payment facilitators—that "accept" payment cards and thus are members of the Settlement Class.

### 1. The operative class complaint and Settlement Agreement

In the context of a motion to enforce a class settlement agreement, the class complaint informs the meaning of the agreement's terms. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 2010 WL 11530589, at *1 (S.D.N.Y. Aug. 11, 2010), *aff'd in part, vacated in part*, 672 F.3d 113 (2d Cir. 2011). This Court in *In re American Express Financial Advisors Securities Litigation* relied on both the class complaint and the class notice to determine the meaning of "Released Claims" in the class settlement agreement being enforced. 672 F.3d at 138.

Here, the Third Amended Complaint ("TAC") is directly relevant to the question presented in this appeal: the TAC confirms that the Settlement Agreement's class definition includes only merchants that accepted payment cards, not their payment-facilitator agents that merely facilitated such acceptance. The Settlement Agreement specifically references the TAC in providing the factual background of the settlement, J.A.7572 at 3(ii), and modifies the class definition in the TAC to ensure that the class definitions in the

25

Settlement Agreement and TAC are "the same," J.A.7578 ¶ 5. Specifically, the class definition in the Settlement Agreement changes the end date of the class period to be the Settlement Preliminary Approval Date and modifies the exclusions to clarify that the Dismissed Plaintiffs[4] and all Visa issuers, Mastercard issuers, and acquirers are excluded from the class. *Compare* J.A.7577–78 (Settlement Agreement ¶ 4), *with* J.A.8006 (TAC ¶ 66). The district court's Judgment approving the Settlement Agreement accordingly ordered that the class definition in the TAC "is hereby amended to be the same as the" class definition in the Settlement Agreement, D. Ct. Dkt. 7832 ¶ 5, further confirming that the TAC is relevant in interpreting the Settlement Agreement. Neither the Settlement Agreement nor the Judgment changes or in any way contradicts the TAC's allegations that exclude Payment Facilitators from the class definition.

The TAC affirmatively distinguishes between "Merchants" that make up the class and "Payment Facilitators" that are not class members. The TAC describes the class as consisting of "Merchants," defined as "an individual, business, or other entity that accepts payments in exchange for goods or

---

[4] The term "Dismissed Plaintiffs" is "defined in the Settlement Agreement to include entities that opted out via a separate agreement." *Fikes Wholesale*, 62 F.4th at 719.

services rendered ….” J.A.7986 ¶ 9.p. These “Merchant” class members are distinct from a “Payment Facilitator,” which the TAC explains “is a type of ‘Third-Party Processor’ that ‘allows a Merchant to connect to a Payment-Card network.’” J.A.7988–89, 7990, 8017–18 ¶¶ 9.dd, 9.ll, 105. The TAC also cites Visa’s and Mastercard’s respective operating rules (discussed below) that distinguish “Merchants” and “Payment Facilitators.” J.A.7988–89 ¶ 9.dd.

Importantly, the TAC expressly pleads that the Payment Facilitators—which include Square and Intuit—“have not been harmed” by the conduct that allegedly harmed the class of “Merchants” that “accept” payment cards. J.A.8029 ¶¶ 161-63. By contrast, the TAC pleads that “Merchants” in the class were injured by interchange fees. J.A.7981, 8006 ¶¶ 1, 66. It is inconceivable that the parties intended to include Payment Facilitators in the settlement class when the operative class complaint expressly alleges that Payment Facilitators had no injury on which to base any claim.

Consistent with the TAC, the Settlement Agreement confirms that the Rule 23(b)(3) class consists of merchants that accepted payment cards—not their payment facilitators or other intermediaries. The Settlement Agreement, like the TAC, distinguishes between a “merchant” and a “processor,” and describes the merchant (and not the processor) as “accept[ing]” payment

27

cards. J.A.7570 ¶ 3(z) (citing a "processor fee" as one form of "Merchant Fee" deducted from a merchant's settlement amounts or "otherwise charged to or paid by a merchant"); J.A.7594 ¶ 34(c) (discussing "technical specifications for a merchant's acceptance" of payment cards).

Earlier iterations of the class complaint were similar in distinguishing merchants from payment processors. *See supra* at 10. For years, the parties litigated in reliance on the Rule 23(b)(3) plaintiffs' claim that they represented a class of merchants, and that processors and other intermediaries providing payment-related services for merchants and acquirers (including Payment Facilitators) were not injured by the challenged practices. Defendants settled with the class of merchants against which they had been litigating, and payment facilitators servicing those merchants were never in that class.

### 2. Visa's and Mastercard's operating rules

As the district court found, Visa's and Mastercard's respective rules reinforce that Square's and Intuit's merchant customers—not the payment facilitators—are the entities that "accepted" payment cards and thus are members of the Settlement Class. SpA.23–25.

Visa's October 2016 rules, which were in effect at the time the TAC was filed and are referenced in the TAC, set forth criteria used to "classif[y]" an

entity as either "a Payment Facilitator" or "a Merchant." J.A.1141 (Rule 5.3.1.2). A "Merchant" serviced by a Payment Facilitator (as opposed to a merchant that contracts directly with an acquiring bank) is referred to as a "Sponsored Merchant" and is "treated as a Merchant of its Payment Facilitator's Acquirer." *Id.*; J.A.1219 (Glossary at 842) (defining "Sponsored Merchant" as "[a]n entity for which Visa payment services are provided by a Payment Facilitator"). It is undisputed that "Sponsored Merchants" are the merchants for which Square and Intuit provide payment-facilitation services. SpA.24. This rule thus provides that Square's and Intuit's merchant customers are regarded as "Merchants" for purposes of other applicable Visa rules.

A Payment Facilitator, on the other hand, is treated under Visa's rules as a "third party agent." J.A.1258. Specifically, "[a] Payment Facilitator ... is a third party agent that may … [r]eceive settlement of transaction proceeds from an acquirer, on behalf of a sponsored merchant." J.A.1258. While an entity may operate as a Merchant for some transactions and a Payment Facilitator for others, an entity cannot simultaneously act on the same transaction as both a Payment Facilitator and a Merchant. Specifically, Visa's rules provide: "An entity that acts as both a Payment Facilitator and a Merchant must

comply with Payment Facilitator rules when acting as a Payment Facilitator and with Merchant rules when acting as a Merchant." J.A.1141.

Visa's rules further provide: "An entity that deposits a Transaction, receives settlement from, or contracts with an Acquirer on behalf of a Merchant is classified as a Merchant if all of the following apply": (1) "The entity represents itself as selling the goods or services to the Cardholder"; (2) "The entity uses its name primarily to identify its Merchant Outlet to the Cardholder"; and (3) "The entity provides recourse to the Cardholder in the event of a dispute. Otherwise, the entity is classified as a Payment Facilitator." J.A.1141. Under this rule, when acting as payment facilitators, Square and Intuit are classified as Payment Facilitators, providing services to Merchants that in turn accept payment cards. This is because Square's and Intuit's merchant customers (including the *Lanning* plaintiffs)—not Square and Intuit—are the ones that (1) represent themselves as selling the goods or services to cardholders; (2) use their names to identify themselves to cardholders; and (3) provide recourse to cardholders in the event of a dispute. SpA.24.

Mastercard's rules operate similarly, distinguishing between merchants that accept cards and their payment-facilitator agents, which enable such acceptance. Mastercard's 2016 rules, which were in effect when the TAC was

30

filed and are referenced in the TAC, refer to a "merchant that, pursuant to an agreement with a Payment Facilitator, is authorized to ***accept*** Cards" as a "Submerchant." J.A.1343 (emphasis added). Mastercard's rules separately define a "Payment Facilitator" as a "Service Provider" that "facilitate[s] the acquiring of Transactions by the Acquirer from Submerchants." J.A.1339. Under Mastercard's rules, a Payment Facilitator is required to pay Submerchants for the transactions that the Payment Facilitator submits "on the Submerchant's behalf." J.A.1311.

These Visa and Mastercard rules further support the conclusion that Defendants settled with a class of merchants that "have accepted" payment cards, and that the Settlement Class does not include payment facilitators.

### 3. Square's and Intuit's merchant agreements

As the district court correctly explained, "Square's and Intuit's agreements with their customers reinforce that Sellers 'accept' payment cards." SpA.21. Square's Payment Terms provide: "Square is a payment facilitator that allows you [merchant] to ***accept*** Cards from customers for the payment for goods and services." J.A.402 § 1 (emphasis added). Square's terms further state that the merchant "authorize[s] [Square] to act as [the merchant's] agent

for payment processing," and that Square merely "hold[s], receiv[es], and disburs[es] funds on [the merchant's] behalf." J.A.403 § 2.

Similarly, Intuit's publicly available form Merchant Agreement provides: "You [merchant] agree to ***accept*** all valid credit and debit card types and brands properly presented by a payor or cardholder for payment for goods or services without discrimination." J.A.212 § N (emphasis added). It also provides that, "In connection with enabling you [merchant] to receive payments from your customers through QuickBooks Payments, you hereby appoint Intuit as your limited payments agent for the purpose of receiving, holding, and settling payments to you pursuant to this Agreement." J.A.204 § N.

Like the operative class complaint and applicable Visa and Mastercard rules, Square's and Intuit's merchant agreements confirm that Square's and Intuit's merchant customers are the entities that "accepted" payment cards.

### 4. *Lanning* plaintiffs' own complaints and declarations

In their own complaints, the *Lanning* plaintiffs describe themselves as "merchants" that "accept[]" payment cards. *See, e.g.*, J.A.29, 32 (*Lanning* Compl. ¶¶ 1, 8–11); J.A.84, 87 (*Camp Grounds* Compl. ¶¶ 1, 8–11). Likewise, in declarations they submitted below in response to Defendants' motion to enforce the Settlement Agreement, the *Lanning* plaintiffs admitted that they

"accept" payment cards. Hayley Lanning attested that she "operate[s] a cosmetology business and accept[s] all major credit and debit cards." J.A.5421 ¶ 2. The other *Lanning* plaintiff declarations contain similar attestations. *See, e.g.*, J.A.5415 (Fox Decl. ¶ 2) ("Dell Fox Jewelry accepts all major credit and debit cards."); J.A. 5418 (Sieverson Decl. ¶ 2) ("I operate Andersonville Cryotherapy and Athletic Recovery Center and accept all major credit and debit cards.").[5]

### 5. Square's and Intuit's own complaints

Square's and Intuit's complaints in their own cases likewise admit that their merchant customers "accept" payment cards as enabled by Square's and Intuit's payment-facilitation services. Square's complaint alleges that "Square is a cohesive commerce ecosystem that helps Sellers (merchants who utilize Square to ***accept*** payment cards, hereafter 'Sellers') start, run, and grow their businesses, including by enabling Sellers to ***accept*** card payments …." Compl. ¶ 1 , *Block, Inc. v. Visa Inc.*, No. 1:23-cv-05377 (E.D.N.Y. July 14, 2023), ECF No. 1 (emphases added); SpA.22 (quoting same). Intuit's complaint likewise asserts that Intuit "provides merchant customers the capability to access an

---

[5] *See also* J.A.5424 (Saric Decl. ¶ 2); J.A.5427 (Roxberry Decl. ¶ 2); J.A.5430 (Bennett Decl. ¶ 2); J.A.5433 (Murphy Decl. ¶ 2); J.A.5437 (Baratz Decl. ¶ 2).

electronic payment system and therefore ***accept*** cards that can transact over the payment system …." Compl. ¶ 24(q), *Intuit Inc. v. Visa Inc.*, No. 1:21-cv-01175 (E.D.N.Y. Feb. 19, 2021), ECF No. 1 (emphasis added); SpA.22. Even Square's briefing below on this very issue acknowledged that Square's merchant customers "accept payment cards." Block, Inc.'s Opp'n to Defs.' Mot. to Enforce Settlement Agreement & Joinder in Lanning and Camp Grounds Pls.' Cross-Mot. for Partial Summ. J., D. Ct. Dkt. 9066, at 7. As the district court found, "Square and Intuit cannot now disclaim the plain meaning of a term they have used to induce [merchants] to utilize their services." SpA.22.

### 6. The class notice plan

The class notice appended to the Settlement Agreement further reinforces that the class members entitled to the proceeds of the settlement are the "merchants that accepted Visa and Mastercard." J.A.7728 App. F ¶ 55. The notice was addressed to ***all*** merchants that "accepted" Visa or Mastercard payment cards, irrespective of the intermediaries to which they may have paid fees. The published notice (similar to the mail notice) "feature[d] a prominent headline in bold text" that read: "**A settlement of as much as [$6.24] Billion and not less than [$5.54] Billion will provide payments to merchants that accepted Visa and Mastercard since 2004.**" *Id.* Given that the *Lanning*

plaintiffs describe themselves as "merchants" that "accept[]" payment cards, *e.g.*, J.A.29, 84, they cannot plausibly contend that they do not recognize themselves as the "merchants" referenced in the class notice.[6]

The *Lanning* plaintiffs' belated attacks on the notice process are a distraction and, in any event, unfounded in light of the exhaustive plan implemented by the Rule 23(b)(3) class counsel and approved by the court below. They argue that they "did not receive notice of the proposed settlement," Lanning Br. 46, but the notice plan did not rely solely upon direct communication. It also called for published notices in national consumer, business, and trade publications; digital banner advertisements distributed on websites including Google, Facebook, WSJ.com, and Bloomberg.com; and sponsored search listings on Google, Yahoo!, and Bing, among other methods. J.A.7717−28 App. F, ¶¶ 23–53. The court below found this plan to be reasonable, and, in affirming final settlement approval, this Court rejected the lone notice-related objection. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 59–60 (E.D.N.Y. 2019); *In re Payment Card.*, 2019 WL 6875472, at *4, *34–*35; *Fikes Wholesale*, 62 F.4th at 719–20 ("The district court acted (or

---

[6] To provide direct notice, the class administrator compiled "[o]ver 221 million merchant records … from Master[c]ard, Visa and the largest U.S. payment processors." J.A.7844 (Azari Decl. ¶ 11).

reacted) reasonably in a sprawling case with many interested parties, in which neither the district court nor class counsel can be expected to predict and preempt every issue that might arise."). Nothing from the *Lanning* plaintiffs undermines that conclusion now.

The *Lanning* plaintiffs also argue that the published notice was insufficiently "aimed" at merchants that used payment facilitators, supposedly because it did not clarify that their rights would be impacted even "though they did not directly do business with Visa or Mastercard and paid no interchange fees to Visa or Mastercard." Lanning Br. 51–52. But the same could be said of any class member, given that no class member ever paid interchange fees to Visa, Mastercard, or any issuing bank, and only a small subset of the millions of merchants in the class do business directly with Visa or Mastercard. *See* D. Ct. Dkts. 8174, 8175, 8857, 8931, 8950.

The *Lanning* plaintiffs also err in asserting that the decision below creates "an irreconcilable conflict among the settlement class members." Lanning Br. 36. As this Court explained in *Fikes Wholesale*, a dispute "over which claimants are within the class" does not create any intra-class conflict because "[w]hoever 'accepted' the payment cards is by definition in the class" and "gets compensation," whereas "an entity that did not accept the payment is by

definition excluded from the class ...." 62 F.4th at 717. Here, the evidence establishes that the settling parties intended to include merchants in the class, not payment facilitators or other intermediaries that provide payment-related services to merchants. Nor do the *Lanning* plaintiffs identify any conflict between merchants that were and were not serviced by payment facilitators. Both are in the class because both "accepted" payment cards.

*     *     *

On the basis of all this evidence, the district court correctly concluded that Square's and Intuit's merchant customers are the entities that "'accepted' payment cards within the meaning intended by the parties at the time they reached the Settlement Agreement." J.A.7546. The district court thus correctly granted defendants' motion to enforce the Settlement Agreement. *Id.*

## II. The Opposing Parties' Argument that Square and Intuit "Directly" Pay Interchange Is Both Irrelevant and Wrong

The *Lanning* plaintiffs acknowledge, as they must, that "either Square or the Square Sellers, ***but not both***, are members of the Rule 23(b)(3) Settlement Class." Lanning Br. 24 (emphasis added). The district court agreed: "The parties appear to agree that as between any particular Seller and Square or Intuit, only one entity may be in the Settlement Class for a given transaction ...." SpA.19. "This understanding effectuates the intent of the parties in

37

ensuring that, as between competing claimants, only one entity is entitled to make a claim of the settlement fund, which prevents duplicative recovery and further ensures that the Settlement Class is sufficiently ascertainable for purposes of Rule 23 of the Federal Rules of Civil Procedure." SpA.21.

The opposing parties argue that Square and Intuit, rather than their merchant customers, are the class members that "accepted" payment cards in the context of PayFac transactions. Their argument boils down to a simple syllogism: they contend that (a) under this Court's decision in *Fikes Wholesale*, the class member for any given transaction is whichever entity is the "direct payor" for purposes of the *Illinois Brick* doctrine; and (b) for PayFac transactions, it is the payment facilitator, not their merchant customer, that is the direct payor. Lanning Br. 21–25; Square/Intuit Br. 18–27. That is wrong on both counts. The opposing parties read too much into *Fikes Wholesale*, and regardless, Square and Intuit do not pay interchange fees directly.

## A. The Claim that Square and Intuit "Directly" Pay Interchange Fees Is Irrelevant

Neither this Court nor the district court has ever held that the Rule 23(b)(3) Settlement Class members are by definition "the most direct payor[s] of interchange," as the *Lanning* plaintiffs assert. Lanning Br. 34. To the contrary, in preliminarily approving the settlement, the district court cited

38

Defendants' defense under *Illinois Brick* (*i.e.*, that the acquiring banks are the only direct payors of interchange) as one of the risks of litigation that the class faced. *See In re Payment Card*, 330 F.R.D. at 37 & n.31. Ultimately, the settling parties' dispute over which entity in the flow of funds is the "direct payor" for *Illinois Brick* purposes did not have to be resolved because, under the Settlement Agreement, the merchant class members were "deemed to be direct payors of the challenged fees." *Fikes Wholesale*, 62 F.4th at 716. It makes no sense to say that the Settlement Agreement ***requires*** resolution of the parties' *Illinois Brick* direct-payor dispute, when the parties agreed to settle in part to ***avoid*** resolution of that dispute.

Nor does *Fikes Wholesale* support the opposing parties' position. There, this Court addressed the question of how the Settlement Agreement should be interpreted when two different ***merchants*** (neither of which is a payment facilitator under the TAC) assert claims as the entity that "accepted" the payment card based on the same transaction. As Defendants explained to this Court at the time, "the parties have long understood" that, as between two merchants, "only the ***merchant*** that is the more direct payor of the interchange fee can recover in the settlement. And it is that ***merchant***—and no other—that is encompassed in the class definition." Brief of Defs.-Appellees

39

(Oct. 15, 2020), *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 20-339-cv(L) (2d Cir.), Dkt. 209, at 24 (emphases added). This Court accepted that interpretation as a basis to resolve potential disputes between two groups of **merchants** that both might claim to have accepted payment cards for the same gasoline purchases—integrated oil companies and their franchised service stations. *See Fikes Wholesale*, 62 F.4th at 715–16. Only in that narrow context did this Court note that "the word 'accepted' [in the class definition] lends itself to ambiguity." *Id.* at 716. By contrast, here, when viewing the Settlement Agreement and TAC as a whole, there is no ambiguity that the class definition includes only merchants, not payment facilitators that assist those merchants in accepting Visa or Mastercard cards.

The *Lanning* plaintiffs bend *Fikes* past its breaking point by claiming that the class member is the most "direct payor" of interchange fees among all of the entities involved. Lanning Br. 14. This approach would define out of the Rule 23(b)(3) Settlement Class any merchant that accepted Visa or Mastercard payment cards through a payment facilitator or any other third-party intermediary. Redefining "accepted" in the class definition to mean "the more direct payor" among merchants and third-party intermediaries would fundamentally upend the settling parties' understanding of the scope of the claims

40

they were resolving. Nothing in the decisions of this Court or the district court below supports that result. To the contrary, as noted above, the parties agreed that, for the purposes of the settlement, the merchant class members that accepted payment cards—and that were represented by class counsel in the TAC—were "deemed to be direct payors of the challenged fees," thereby obviating the need for judicial resolution of the parties' *Illinois Brick* dispute. *Fikes Wholesale*, 62 F.4th at 716.

The *Lanning* plaintiffs (and Square and Intuit) thus take the discussion in *Fikes* out of context. *Fikes* involved a dispute as to claim ownership as between two merchants that each claimed to have "accepted" Visa and Mastercard payment cards—the linchpin of the class definition in the TAC and Class Settlement Agreement—not between a merchant and a payment facilitator (which, according to the TAC, has not even been harmed by the challenged conduct). This Court in *Fikes* did not provide an open invitation for any non-merchant in the payment processing chain to collaterally attack the Rule 23(b)(3) settlement and release merely by claiming "direct payor" status.

The *Jack Rabbit* appellants' brief adds nothing. They argue that the decision below dilutes their pro rata share of the settlement fund by increasing the number of class members to include Square's and Intuit's merchant

41

customers, which the *Jack Rabbit* appellants argue is improper because those merchants are indirect payors under *Illinois Brick*. Jack Rabbit Br. 8–10. But, as explained above, direct-payor status does not resolve which entity is the class member here: the *Lanning* plaintiffs and other merchants serviced by Square and Intuit are members of the Settlement Class because they are the entities that "accepted" payment cards, and that is the defining characteristic the settling parties intended. That the inclusion of such merchants in the class may reduce other merchant class members' recovery is irrelevant to determining the settling parties' intent. And the *Jack Rabbit* appellants have no viable argument about dilution to the extent the district court's decision about the class membership was correct.

The *Jack Rabbit* appellants also devote a substantial portion of their brief to arguing that "Jack Rabbit, and the other Retail Gas Station franchisees meet the elements necessary to be identified as an *Illinois Brick* Cost-plus [Direct Payor]." *Id.* at 34. But that question concerning gas station franchisees is not presented in this appeal.

## B. The Claim that Square and Intuit "Directly" Pay Interchange Fees Is Incorrect in Any Event

The opposing parties assert that Square and Intuit are the "direct purchasers" on the theory that they "directly" pay interchange fees. *See, e.g.,*

Lanning Br. 4 ("Square pays all the interchange fees associated with transactions facilitated for the Square Sellers directly to Visa, Mastercard, and their participating banks on all those transactions."); Square/Intuit Br. 1 ("[E]ach of *amici* (and any payment facilitator) directly pays interchange fees …."); *id.* at 2 ("[T]he PayFacs directly pay all interchange fees …."); Jack Rabbit Br. 28 ("The direct purchaser of the services is the Payment Facilitator."); SpA.15 (district court stating that, "Like Square, Intuit argues that it was the 'direct and only payor' of interchange fees for all of its PayFac transactions."). Although not necessary to resolve this appeal (and, indeed, the settling parties entered into the Class Settlement in part to *avoid* resolution of the *Illinois Brick* issue), that assertion is incorrect as a matter of fact and law.

### 1. Square and Intuit do not pay interchange fees directly

Acquiring banks are the sole entities that directly pay interchange. The interchange fee is the amount that the issuing bank retains when it transmits funds to the acquiring bank. Consistent with this fact, Defendants have always disputed the class plaintiffs' claim that "merchants are 'direct payors,'" although Defendants ultimately "compromised their indirect-purchaser defense in th[e] class action in order to reach a settlement." Brief of Defs.-Appellees (Oct. 15, 2020), *In re Payment Card Interchange Fee & Merch. Disc. Antitrust*

*Litig.*, 20-339-cv(L) (2d Cir.), Dkt. 209, at 32. Defendants have never deviated from their position that an acquiring bank alone is the only direct payor in a Visa or Mastercard payment-card transaction and that other entities are not direct payors. *See, e.g.*, Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. under *Illinois Brick Co. v. Illinois* (July 14, 2023), D. Ct. Dkt. 8931, at 1.

By contrast, Square's and Intuit's claim to "direct payor" status is in direct conflict with the position taken by merchants in this litigation. In its role as counsel for opt-out merchant The Home Depot, the same firm that now represents Square and Intuit argued that "the *merchant*," not payment facilitators or other intermediaries, "is the direct (and only) payor of interchange fees for Visa or Mastercard transactions." Direct Action Pls.' Mem. of Law in Opp. to Defs.' Mot. for Summ. J. under *Illinois Brick Co. v. Illinois* (Sept. 22, 2020), D. Ct. Dkt. 8192, at 12. While both merchants and payment facilitators are wrong, their positions are fundamentally irreconcilable.

The structure of transactions facilitated by Square and Intuit confirms that they do not directly pay interchange fees. In their role as payment facilitators, Intuit contracts with ███████████████████████████ ████████████████████████████ and Square contracts with ██████████████ ███████████████████████████████████████████

████████████████ for acquiring and processing of the payment card transactions of their merchant customers.  J.A.1626–75, 3694–727, 4026–39.

When a cardholder uses a Visa or Mastercard payment card to make a purchase from a merchant that uses Square or Intuit as a payment facilitator, Square's or Intuit's acquirer transmits information about the purchase through the Visa or Mastercard network to the issuer of the card to authorize the purchase.  Defs.' Counter-Statement of Undisputed Material Facts in Opp. to Cross-Mot. for Partial Summ. J., D. Ct. Dkt. 9084 ¶¶ 4–5.  The Visa or Mastercard network clears and "settles" the authorized purchase by transferring the transaction funds from the issuer to the acquirer, less applicable interchange fees and other fees.  *Id.* ¶¶ 6, 11–16.  ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

*Id.* ¶¶ 7–9, 17, 23–25, 27–29.  Square and Intuit then distribute to their merchant customers the net settlement funds for the merchants' transactions, less certain fees determined by the terms in Square's and Intuit's agreements with their merchant customers.  *Id.* 9084 ¶ 10.

For each transaction in which a merchant that uses Square or Intuit as a payment facilitator accepted a Visa or Mastercard payment card to complete a sale, Square's or Intuit's acquirer pays the issuer of the card the interchange applicable to the transaction. *Id.* ¶¶ 6, 11–19, 27, 30. Square and Intuit do not directly pay interchange fees to any issuing bank. *Id.* ¶¶ 6–7, 11–25, 27–32. As Square and Intuit each acknowledged and agreed in their respective contracts with their acquirer, ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

J.A.369, Sch. A (emphases added); *see* D. Ct. Dkt. 9084 ¶¶ 14–15. Square likewise acknowledged and agreed in its contract with its other acquirer, ███████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ to Square. D. Ct. Dkt. 9084 ¶ 14 (emphasis added).

████████████████████████████████████

██████████████████████████████ *Id.* ¶¶ 7, 23. ████████████████

███████████████████████████████████████████

46

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ *Id.* ¶¶ 7, 17, 23–32.  The Visa and Mastercard rules permit an acquirer to decide whether to pass on the cost—in whole or in part—of interchange fees to payment facilitators or other downstream entities.  *Id.* ¶¶ 12–13, 20–22, 25–32.  Accordingly, Square's and Intuit's agreements with their acquirers ██████████████████████████████████████ ██████████████████████████████████ *Id.* ¶¶ 27, 29.  The terms in ██████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████ *Id.* ¶¶ 24–29. And payment facilitators can and do switch acquirers to get better economic terms.  *Id.* ¶ 32.

### 2. Controlling precedent establishes that Square and Intuit are indirect payors of interchange fees

Under controlling precedent of the Supreme Court and this Court, Square and Intuit are not direct payors of the interchange fees for transactions in which they serve as payment-facilitator agents of merchants.[7]

---

[7] Contrary to the *Lanning* plaintiffs' assertion, the decision below is not "internally inconsistent."  Lanning Br. 35.  The district court correctly held that

*Illinois Brick* bars claims that require "trac[ing] the effect of the overcharge through each step in the distribution chain." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019) (citation omitted); *Fikes Wholesale*, 62 F.4th at 732 & n.2 (Leval, J., concurring) (*Illinois Brick* bars federal antitrust damages claims by "successive purchasers in a sequential chain"). In *Paycom Billing Services, Inc. v. Mastercard International, Inc.*, the plaintiff—which "serv[ed] as 'payment processor' or 'agent' for its customer website operators"—sued Mastercard claiming that its policies for permitting issuers' chargebacks and the network's fines violated Section 1 of the Sherman Act. 467 F.3d 283, 285, 287–88 (2d Cir. 2006). The plaintiff alleged that issuing banks and Mastercard assessed the chargebacks and fines, respectively, against the plaintiff's acquiring bank and that the acquiring bank "*virtually* always" decided to pass on those charges to the plaintiff. *Id.* at 291–92. This Court held that the plaintiff was an indirect payor and thus lacked antitrust

---

Square's and Intuit's merchant customers are class members because they "accepted" payment cards within the meaning the settling parties intended. The district court was the factfinder in reaching that conclusion to resolve the motion to enforce. And that conclusion is not inconsistent with the district court's separate determination (not relevant here) that factual disputes precluded summary judgment in Intuit's favor on the question of whether Intuit would have antitrust standing under *Illinois Brick*. As explained above, it is the settling parties' intent, and not the standing inquiry under federal antitrust law, that determines class membership here.

standing to seek damages under the Sherman Act because the challenged chargebacks and fines were not imposed directly on the plaintiff, but rather on the plaintiff's acquiring bank. *Id.* As explained by this Court, "even if one hundred percent of the chargebacks, fines, and penalties were passed-on" to the plaintiff by its acquiring bank, the plaintiff, "as an indirect payor of [those charges], would still lack antitrust standing." *Id.*

The facts here regarding the structure of the Visa and Mastercard payment systems are on all fours with the facts alleged in *Paycom* and compel the same conclusion. Payment facilitators like Intuit and Square are particularly similarly situated to the plaintiff in *Paycom*, which also "serv[ed] as 'payment processor' or 'agent'" for its customer merchants. *See id.* at 287. And like the plaintiffs' allegations in *Paycom*, the evidence here—namely, the unambiguous contracts between Square and Intuit and their acquirers and the financial records of the payment and receipt of fees applicable to Visa and Mastercard payment card transactions—demonstrate that interchange fees are assessed to and directly paid by acquirers, not Square or Intuit. Those same contracts establish that Square and Intuit agree to pay fees to their acquirers and agree with their acquirers regarding the amount of those fees. D. Ct. Dkt. 9084 ¶¶ 7, 23–25, 29, 32.

To the extent that the cost of interchange fees paid by acquirers are included in the fee that Square or Intuit pays to its acquirer, that pass-on dynamic is not mandated by Visa's or Mastercard's network rules. *Id.* ¶¶ 12–13, 25–32. ███████████████████████████████████

█████████████████████████████████████████

███████████████████████ *Id.* ¶¶ 24–29. Payment facilitators, like merchants and other entities downstream from acquirers, can switch their acquirers to receive more attractive pricing arrangements. *Id.* ¶ 32. Indeed, ███████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████ *Id.* ¶ 32. ████████

█████████████████████████████████████████

████████████████████ other downstream entities have negotiated different arrangements, such as blended rates or a mark-up above interchange. *Id.* ¶¶ 24–29.

These facts reinforce the "economic substance" established by Square's and Intuit's contracts: acquirers directly pay the challenged fees and may pass on the costs of such fees to Square and Intuit. *See Spinner Consulting LLC*

*v. Stone Point Cap. LLC*, 623 B.R. 671, 676 (D. Conn. 2020), *aff'd*, 843 F. App'x 411 (2d Cir. 2021). And "even if one hundred percent" of such fees were passed on by the acquirer, Square or Intuit "as an indirect payor of [those charges], would still lack antitrust standing." *Paycom*, 467 F.3d at 291–92. *Cf. Salveson* v. *JP Morgan Chase & Co.*, 663 F. App'x 71, 75 (2d Cir. 2016) (citing this Court's payment card precedents in explaining that the "interchange fee" is "paid by the acquirer"); *Kendall* v. *Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (holding that merchants lack standing under *Illinois Brick* because they are not "charged the interchange fee directly" and courts are not permitted "to determine what portion of an illegal overcharge was ... absorbed by the middlemen," and noting that middlemen in payment transactions include "acquiring ... banks" (cleaned up)); *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749–50 (9th Cir. 2012) (holding that ATM cardholders "are indirect purchasers" of ATM transactions because "they have never directly paid interchange fees" and instead "banks ... pay interchange fees").

Accordingly, while this Court need not resolve the *Illinois Brick* issue for purposes of deciding this appeal, the facts and law establish that Square and Intuit are indirect payors with respect to interchange fees and thus lack standing to assert federal antitrust claims for damages.

## CONCLUSION

The terms of the Settlement Agreement, the operative class complaint, and extensive other evidence of payment-card acceptance practices leaves no doubt that Square's and Intuit's merchant customers are members of the Rule 23(b)(3) Settlement Class, and that Square and Intuit as payment facilitators were never in the class represented in this litigation. This Court should affirm.

Dated: January 13, 2025   Respectfully submitted,

         /s/ Matthew A. Eisenstein
         _____

Kenneth A. Gallo     Matthew A. Eisenstein
PAUL, WEISS, RIFKIND,   Rosemary Szanyi
 WHARTON & GARRISON  R. Stanton Jones
 LLP       ARNOLD & PORTER KAYE SCHOLER LLP
2001 K Street NW    601 Massachusetts Ave. NW
Washington, DC 20006   Washington, DC 20001
(202) 223-7300     (202) 942-5000
kgallo@paulweiss.com   matthew.eisenstein@arnoldporter.com

Brette Tannenbaum    Michael S. Shuster
Nina Kovalenko     Demian A. Ordway
Gary Carney      Jayme Jonat
PAUL, WEISS, RIFKIND,   HOLWELL SHUSTER & GOLDBERG LLP
 WHARTON & GARRISON  425 Lexington Avenue
 LLP       New York, NY 10017
1285 Avenue of the Americas (646) 837-5151
New York, NY 10019   mshuster@hsgllp.com
(212) 373-3000     dordway@hsgllp.com
nkovalenko@paulweiss.com jjonat@hsgllp.com

*Counsel for Mastercard*   *Counsel for Visa Inc.*
*Incorporated*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order of January 13, 2025, that the foregoing brief contains 11,066 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century font.

Dated: January 13, 2025          /s/ Matthew A. Eisenstein
                                       Matthew A. Eisenstein

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing brief was served upon the following counsel on January 13, 2025, as follows:  The unsealed version of this brief was served via ACMS and the sealed version of this brief was served via email upon the consent of the appellants/recipients, to wit,

Wolf Haldenstein Adler Freeman & Herz LLP
Mark C. Rifkin
Thomas H. Burt
270 Madison Ave.
9th Floor
New York, NY 10016
(212) 545-4600
rifkin@whafh.com
burt@whafh.com
*Attorneys for Plaintiffs-Appellants*

Paul S. Rothstein
Florida Bar Number:  310123
Co-counsel for Appellant Jack Rabbit, LLC
Attorney Paul S. Rothstein, P.A.
626 NE 1st Street
Gainesville, FL 32601
(352) 376-7650
(353) 374-7133 (Fax)
Email:  psr@rothsteinforjustice.com
*Attorney for Objector-Appellant Jack Rabbit, LLC*

N. Albert Bacharach, Jr.
Florida Bar Number: 209783
Co-counsel for Appellant Jack Rabbit, LLC
N. Albert Bacharach, Jr., P.A.
4128 NW 13th Street
Gainesville, FL 32609-1807
(352) 378-9859
(352) 338-1858 (Fax)
Email: N.A.Bacharach@att.net
*Attorney for Objector-Appellant Jack Rabbit, LLC*


Dated: January 13, 2025              /s/ Matthew A. Eisenstein
                                     Matthew A. Eisenstein